UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA          )
                                  )
                                  )
vs.                               )
                                  )  No. 13-cr-10238-DPW
                                  )
DIAS KADYRBAYEV (1),              )
AZAMAT TAZHAYAKOV (2)             )
AND ROBEL KIDANE PHILLIPOS (3),   )
                                  )
                    Defendants.   )
```

BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

DAY ONE OF MOTION HEARING

John Joseph Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, MA 02210
Tuesday, May 13, 2014
9:00 a.m.

Brenda K. Hancock, RMR, CRR
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way
Boston, MA 02210
(617)439-3214

1   APPEARANCES:

2        U.S. ATTORNEY'S OFFICE
         By:  AUSA B. Stephanie Siegmann
3             AUSA John A. Capin
         1 Courthouse Way
4        Suite 9200
         Boston, MA 02210
5        On behalf of the United States of America.

6        LAW OFFICES OF ROBERT G. STAHL, LLC
         By: Robert G. Stahl, Esq.
7            Laura K. Gasiorowski, Esq.
             Joshua F. McMahon, Esq.
8        220 St. Paul St.
         Westfield, NJ 07090
9        On behalf of the Defendant Dias Kadyrbayev

10

         LAW OFFICE OF BUKH & ASSOCIATES PLLC
11       By:  Nicholas Wooldridge, Esq.
         1123 Avenue Z
12       Brooklyn, NY 11235
         On behalf of the Defendant Azamat Tazhayakov.

13

14       MYERS, SINGER & GALIRADO, LLP
         By:  Matthew Daniel Myers, Esq.
15       299 Broadway, Suite 200
         New York, NY 10007
16       On behalf of the Defendant Azamat Tazhayakov.

17       DEMISSIE & CHURCH
         By:  Derege B. Demissie, Esq.
18            Susan B. Church, Esq.
         929 Massachusetts Avenue
19       Suite 01
         Cambridge, MA 02139
20       On behalf of the Defendant Robel Kidane Phillipos.

21

22

23

24

25

1                          I   N   D   E   X

2   WITNESSES:          DIRECT      CROSS      REDIRECT     RECROSS

3   SPECIAL AGENT
    JOHN WALKER
4   By Ms. Siegmann       81
    By Mr. Stahl                      141
5

6

7
                         E   X   H   I   B   I   T   S
8
    No.                     Description          For ID.    In Evd.
9
10  1                          FD-26                           125

1                   P R O C E E D I N G S:

2           THE CLERK:  All rise.

3      (The Honorable Court entered the courtroom at 9:00 a.m.)

4           THE CLERK:  This Honorable Court is now in session.

5      You may be seated.

6           This is Criminal Action 13-10328, The United States

7      versus Dias Kadyrbayev, Azamat Tazhayakov and Robel Phillipos.

8           THE COURT:  You may be seated.

9           We have a number of motions to get through here in the

10     next several days, and the way in which I think I am going to

11     organize it is as follows:

12          First, I am going to deal with the charging document.

13     There are a series of Motions to Dismiss, and for Bills of

14     Particulars that deal with that.  I will deal with those on the

15     papers.  I am going to indicate briefly my resolution of them.

16          Then, there are a series of motions that I will say

17     are trial-related, a Motion to Sever, which is affected by the

18     Government's 11th-hour determination that they were not going

19     to oppose severance here, which means not trial, but trials, I

20     assume, although I at some point will want to have an

21     understanding from the Government how it came to pass that this

22     lack of opposition to the Motion to Sever was filed, as I say,

23     at the 11th hour, maybe a little later than the 11th hour.

24          The third set of issues are the Motions to Suppress.

25     I think they will take up most of our time in the next several

1    days.

2          There is one preliminary matter, and I guess,

3    Mr. Stahl, it is addressed to you.  In your filings there is a

4    suggestion that the defendant is insufficiently competent in

5    the English language and needs some sort of translator or

6    something.  I have looked through the materials.  He has never

7    had a translator before.  One was not even asked for here.  So,

8    I guess I want to understand what the story is on that.

9          MR. STAHL:  The argument is not as to his level of

10   English skills now, Judge, which are multiple times better than

11   they were back over a year ago when he was arrested.  Dr. Aneta

12   Pavlenko's submission goes to his understanding, his fluency,

13   his level of comprehension in English back at the time of this.

14         THE COURT:  So, in the period since he has been in

15   custody his English language skills have increased

16   dramatically?

17         MR. STAHL:  Dramatically, your Honor.

18         First of all, since the time he was first in, I

19   believe it was Sussex (sic) County Jail, which was the

20   immigration detention --

21         THE COURT:  Suffolk.

22         MR. STAHL:  Suffolk, sorry.  Suffolk.  He realized

23   that, "I'm going to be here for a while."

24         THE COURT:  Let me just pause.  I saw it, made

25   arrangements for a translator to be present, if it were asked

1    for, but it had not been asked for.  That being the case, I

2    take it that there is no need to keep the translator.

3           MR. STAHL:  Judge, what we had for both Mr. Kadyrbayev

4    and Mr. Tazhayakov, at the first official proceeding of any

5    substance was the deposition of the immunized witness, and we

6    had a translator standing by for technical terms, and they both

7    used them, and so did that witness.  There were some

8    difficulties about certain phrases, certain phraseology back

9    then.

10          I don't believe that it's necessary today at this late

11   stage, meaning a year and some months past, where

12   Mr. Kadyrbayev has been in jail, speaking with guards, with

13   other inmates, reading English language books, working very

14   diligently on his English skills, that he needs it for these

15   hearings.

16          THE COURT:  All right.  Well, then, we will simply

17   release the translator.

18          MR. STAHL:  Yes.  And I apologize if there was some

19   confusion, because I would have alerted the Court whether we

20   needed a translator or not.

21          THE COURT:  So, let me deal, first, with the charging

22   documents issues.  Of course, I have reviewed all of the

23   motions, which fall into two categories of relief, one to

24   dismiss, one Motion for Bill of Particulars.  As far as the

25   Bill of Particulars are concerned, I deny that.  The charging

1    document itself is clear enough for present purposes to alert

2    the defendants to the charges that are going to be pursued by

3    the Government.  The charging document is not bare bones; it is

4    rather fleshy.  In any event, it is sufficient to tell the

5    defendants what it is that they are facing.

6            Turning to the question of Motions to Dismiss, the

7    defendants have, I think, kind of allocated responsibility

8    among each other as to this.

9            The first is Mr. Kadyrbayev's challenge to the

10   Section 1519 charge, which is the basic fundamental charge

11   here.  I am going to deny that as well.  I do not personally at

12   this point find it to be vague or overbroad or Constitutionally

13   infirm in any fashion.  It is a new statute, to be sure, but it

14   is clear what it is that the statute itself provides and what

15   the charge is, and I simply do not see this as something to be

16   resolved on a Motion to Dismiss.

17           Now, I will add one further point.  About two days

18   after the Government's opposition was filed on April 25th, the

19   parties may be aware that the Supreme Court granted certiorari

20   in a 1519 case, and, of course, we will follow along in the

21   briefing.  The briefing will take place I think this summer.

22   The petitioner has 45 days from April 28th to file the merits

23   brief and then 30 days thereafter for the parties.

24           Having spent some time with the Sarbanes-Oxley Act and

25   some of the challenges it presents, I can fully understand why

1   the Supreme Court would grant cert to tidy it up a bit, but

2   nothing in the Petition itself or in the case law suggests to

3   me that 1519 is going to be held vague on its face, and it does

4   not seem to me, on the basis of the papers that I have now,

5   that the Government is going to be unable to prove a 1519

6   violation as to the defendants here.

7          I emphasize that this is all a matter subject to proof

8   at trial, but we are just dealing with the charging document.

9   As I indicated in a prior hearing, Motions to Dismiss are not

10  generally a useful way to get at the substance of the case,

11  except in the most extreme cases.  I will talk a little bit

12  about my attitude toward Motions to Dismiss generally and

13  Motions for Judgment on the basis of evidence before a jury

14  verdict.

15         I then come to the motion that has been filed, and I

16  probably, for Mr. Lovett's benefit, should be clear about this.

17  The Motion to Dismiss of Mr. Kadyrbayev is No. 117, and his

18  Bill of Particulars is also 117.  That is denied.

19         Then, turning to Mr. Tazhayakov's Motion to Dismiss

20  and his Motion for Bill of Particulars, those too will be

21  denied.  As I indicated, the Bill of Particulars is not

22  necessary here.  It is an initiative that is meant to provide

23  some specificity in the indictment.  I find that the indictment

24  is clear enough here not to require a Bill of Particulars.

25         And then, turning to the Motion to Dismiss itself that

1    is addressed to the aiding and abetting dimension to it, it is

2    both imaginative and retrospective in its desire to have

3    affirmed the dissents in Nye & Nessen, but the case law on

4    aiding and abetting is substantial.  The case can properly

5    proceed on that basis.

6           For the parties' purposes, I do want to direct your

7    attention, if you have not had a chance to review it, to

8    Justice Kagan's decision in Rosemond v. The United States,

9    which I think is a pretty useful overview of what "aiding and

10   abetting" means.  It is 134 S.Ct. 1240.

11          Not to emphasize a kind of pride of authorship, but

12   just so the parties are familiar with things that I have done

13   in this area, I find that 22 years ago I wrote about this issue

14   sitting by designation on the First Circuit in United States v.

15   O'Campo.  It is 973 F.2d 1015, which, in the context of

16   sentencing, I talked about what you can call "vicarious

17   liability."  I suppose it also can be called "associative

18   liability."  But, in any event, it discusses what I think may

19   be theories of prosecution here that the parties may want to

20   familiarize themselves with, at least as it appeared to me

21   then; and it does not, I think, appear to me differently now,

22   after reviewing it.  That deals not merely with conspiracy but

23   aiding and abetting and also Pinkerton charges.

24          So, in any event, No. 120, the Tazhayakov Motion to

25   Dismiss, is denied, and No. 121, the Bill of Particulars, is

1    denied.

2            Then, I turn to the Motion to Dismiss of

3    Mr. Phillipos, and this provides me with an occasion to talk

4    about my approach to Motions to Dismiss generally.

5            I view Motions to Dismiss in the criminal setting as

6    efforts, obviously, to pretermit the trial of the case, but

7    generally they arise at a time it is impossible to make a

8    determination about it.  You have to see the evidence before

9    you can really deal with this.

10           That is particularly true, I think, of Mr. Phillipos'

11   Motions to Dismiss.  They essentially ask me to function as the

12   fact-finder in this area.  I do not know the facts yet.  The

13   facts have not been developed.  In any event, it is not my

14   responsibility; it is a jury's responsibility to deal with

15   that.

16           The way in which I have approached, generally, Motions

17   to Dismiss and their sister kind of motions is this:  I am

18   intensely aware of the asymmetry of appellate rights between

19   the Government and a defendant.  The defendant has appellate

20   rights if there is an adverse decision after trial.  The

21   Government does not.  That is one of the reasons, I think, that

22   the Congress has provided appellate rights, interlocutory

23   appellate rights, to the Government on Motions to Dismiss; but,

24   as I have indicated, my view about Motions to Dismiss is that

25   the substance of them, as a generality, not in particulars,

1   really does not get fleshed out until there is a trial.

2        There is the potential for a judge to grant a judgment

3   on the basis of the evidence at the conclusion of the

4   Government's case, at the conclusion of all of the evidence in

5   the case.  I try never to do that.  The reason I try never to

6   do it is that the Government does not get an appeal right if I

7   do it; double jeopardy effectively prevents that.  In the

8   course of my period on the Bench, I do not think I have done it

9   fully in any case, and have only done it when it was simply

10  impossible intelligently to instruct a jury as to particular

11  counts, and that will be what guides me here.  It is not an

12  ultimate determination about the underlying issues until I look

13  at it, if I have to, after a jury verdict.

14        So, while the parties, for their own purposes, will

15  undoubtedly make such motions at the appropriate times and, in

16  fact, have to to preserve their rights, I suspect that I will

17  not deal with the substance of the underlying claims of the

18  Motion to Dismiss as a factual matter until after a jury

19  verdict, if the jury verdict is adverse to the defendants.

20        So, I think that deals with what I will call the

21  "charging document" issues, but in that connection I am denying

22  No. 118, which is Mr. Phillipos' Motion to Dismiss.

23        Now I come to the question of what I will call "trial

24  structure."  This has been, as I indicated, somewhat rearranged

25  by the Government's view that the case that it jointly charged

1    the defendants must separately be tried for severance reasons.

2    The reasons offered in the rather crisp response -- I think it

3    is three sentences -- is that there are colorable Bruton and

4    Crawford issues.  Yes.  I think that was evident from the very

5    outset, and so I am a little concerned and interested in why it

6    took the Government until, as I say, the 11th hour, because

7    their response was due on May 9th, and this filing, according

8    to the Court's clock, was made at Military Time 23:35 and 5

9    seconds, so it is the 11th hour plus.

10        So, why so long to address the obvious?  Is the

11   Government thinking about trying this case without implicating

12   Bruton and Crawford?

13        MR. CAPIN:  Well, your Honor, of course, were

14   cognizant at the charging stage of a potential Bruton rule.  We

15   also know that, as the Court knows, that under Richardson v.

16   Marsh it can be cured through redaction.  It seemed to us

17   possible that we could so cure it.  As the evidence developed,

18   it became clearer that the normal remedy isn't really

19   appropriate here, and we didn't want to risk the appellate

20   issue.

21        Moreover, we thought that there was some efficiency

22   because we --

23        THE COURT:  "Some efficiency"?

24        MR. CAPIN:  Efficiency to -- well, if the question is

25   why we didn't respond more timely --

1          THE COURT:  That is one of them.  Just a moment, so I

2    clarify.

3          Part of this is to now sequence the trials.  I will

4    look to the parties, of course, for their views about this, but

5    I have two people in custody, one person not in custody, one

6    person in custody who at least initially said he wanted a

7    prompt trial.  So, it would have been helpful to have more time

8    to reflect on that and for the parties to reflect on that.

9          Knowing as little as I do about this case, I was

10   interested in how the Government had thought they were ever

11   going to get around Bruton and Crawford problems here with what

12   seemed to me to be necessarily cross-inculpatory evidence in

13   the case.

14         So, I guess, yes, I would like to know why it took

15   until 11:35 and 5 seconds, not to put too fine a point on it.

16        MR. CAPIN:  Okay.  Your Honor, in response to an

17   earlier motion, I think it was in connection with the

18   Bill of Particulars, we did indicate that we would not be

19   objecting to the severance motion.

20         THE COURT:  I think you said it was under advisement.

21        MR. CAPIN:  The Court could be right.  I am fairly

22   certain that the document said very clearly "for reasons it

23   will state later," and it was one of those, you know, meeting

24   of deadline issues, and this is, of course, the possibility for

25   a Bruton issue had been discussed among the parties earlier.

1   We indicated that we would not be opposing severance.  So, we

2   thought we had put -- in fact, I had an exchange with Mr. Stahl

3   that very evening several weeks ago, when we filed that motion

4   on the Bruton issue.

5        So, we thought we had apprised the parties as timely

6   as -- well, timelier than necessary to respond to the Bruton

7   motion, and if the response to the motion itself was unduly

8   pithy, it's perhaps because, as the Court notes, the Bruton

9   issue sort of jumps out at you.

10        THE COURT:  Well, the issue goes back now to so what

11   is the order of trial?  Because what started as one trial is

12   now three, and I do not know what the Government's view is with

13   respect to it.  Obviously, I will be interested in it.  I

14   suspect the defendants' view is somebody else goes first, and

15   each one will take that position.

16        I guess I should go back to what I have made clear all

17   along.  We are starting on June 30th on this.

18        MR. CAPIN:  And the Government, of course, is ready.

19        THE COURT:  Well, it was acquiescent in a prior filing

20   for additional time here, but it is good to know the Government

21   is going to be ready.

22        So, do you have any views about order?

23        MR. CAPIN:  I think we have two views, your Honor.

24        First of all, the caption, which is alphabetic, is as

25   logical a choice as any.  It would be Kadyrbayev, Tazhayakov,

1    Phillipos.  Actually, Phillipos is charged later, but he is not

2    in custody, so there is no question he should not go first.

3    You may hear from Mr. Tazhayakov's attorney that he wants to go

4    first, and since he was the one asserting his speedy trial

5    right, that might be a logical way to proceed, if that's what

6    he wants to do.

7              THE COURT:  The other aspect of it is, I am raising

8    this because, obviously, I want to hear from the defendants,

9    but in reading the motion that sought to delay the deadlines, I

10   think, Mr. Wooldridge, you have got some pretty important

11   things happening to you and your family.

12             MR. WOOLDRIDGE:  Yeah, in September, Judge, my wife is

13   having a baby.  We do want to go first.  We do want to go

14   June 30th.  We do want to be the first ones to go up.

15             THE COURT:  Then that deals, then, with that issue.

16             Now, then, we deal with the question of back-to-back,

17   how to address these trials.  Because they have a way of then

18   creating a publicity of their own.  I will get to the question

19   of change of venue in a minute.

20             My present view is to arrange my schedule to permit

21   what I thought was one trial to become three trials this summer

22   through September 8th, that is, September 8th being the last

23   date here, but to get all of them done during the summer.  Now,

24   that may pose some jury-selection problems for either side.  We

25   do not know yet.

1        If the Government is unsuccessful in the Tazhayakov

2   trial, that may mean that they are having a new venire that has

3   been told that one defendant has been found not guilty.  By

4   contrast, if there is a guilty finding, that means that the

5   co-defendants may find a venire that knows a defendant has been

6   found guilty.

7        I raise it, but I am not sure it is so determinative

8   here.  I will talk about the Motion for Change of Venue in just

9   a moment, but I do not know if the Government has a position

10  with respect to that issue, that is, the timing and sequencing

11  of these cases.

12       MR. CAPIN:  I think generally it is both from the

13  perspective of -- in addition to the impanelment issue, the

14  jury issue, the difficulty finding jurors in the summer, we

15  have the same type of vacation-type conflicts with counsel and

16  with witnesses.  We haven't polled the witnesses, because,

17  frankly, discussion among the parties initiated by the defense

18  was that in the event there was a continuance, their

19  preference, at least other than Mr. Wooldridge's client, would

20  be to proceed in September.  We think that would be preferable.

21       THE COURT:  Well, what does that mean?

22       MR. CAPIN:  It means starting in September.

23       THE COURT:  Doing Tazhayakov, assuming that that is

24  the case that goes forward, on June 30th?

25       MR. CAPIN:  Yes, your Honor.

1          THE COURT:  The next trial, which presumably would be

2     Mr. Kadyrbayev, on September 8.

3          MR. CAPIN:  My understanding is that is

4     Mr. Kadyrbayev's pleasure.

5          THE COURT:  But there was also an expression from the

6     Government about, "Summer is when people have vacations.  We

7     would like to have one."

8          MR. CAPIN:  We would like to have one.  We know our

9     witnesses would like to have one, and jurors often like to have

10    them.

11         THE COURT:  Well, jurors try cases in the summer.

12    Judges are even here during the summer.

13         MR. CAPIN:  We think that a September trial, from

14    everybody's perspective, is preferable, and we would defer to

15    Mr. Kadyrbayev's desire to proceed in September.

16         THE COURT:  Well, there is one other point.  I am

17    tossing these out so the parties can -- I am sure they have

18    thought about it, but I am thinking about it as well, which is

19    bumping up against the current Tsarnaev trial date.  I do not

20    want in any fashion to cause issues to be exacerbated in terms

21    of pretrial publicity for that case as well.

22         MR. CAPIN:  So, that's a November trial.  It seems to

23    me if we went back-to-back in September, especially doing these

24    trials individually -- we don't think either one will be more

25    than two weeks.  So, we should be able to wrap it up in

1     September.

2                  THE COURT:  All right.

3                  So, Mr. Wooldridge, you have expressed your view now

4     that you are ready to go on June 30th.

5                  MR. WOOLDRIDGE:  June 30th, Judge, yes.

6                  THE COURT:  Is there any objection from either

7     Mr. Phillipos or Mr. Kadyrbayev about that?

8                  MR. STAHL:  No objection on behalf of Mr. Kadyrbayev.

9                  MR. DEMISSIE:  No objection from Mr. Phillipos.

10                 THE COURT:  So, let me, then, turn to Mr. Kadyrbayev,

11    because he will be the next in line on this.  You indicated

12    that you are prepared to go on September 8, I guess it is.

13                 MR. STAHL:  Yes, your Honor.  I have a scheduled

14    vacation right before and then one in the middle of October.

15                 THE COURT:  I saw that.  I was envious of all the

16    opportunities to travel.

17                 MR. STAHL:  You haven't met my wife.  She tells me

18    when to travel.

19                 But, yes.  So, September 8th is our preference.

20                 THE COURT:  All right.  So, I think we will go, then,

21    for September 8th on that.  And then we are talking about a

22    two-week period for the trial.  I will allocate three weeks.

23    So, the end of September for Mr. Phillipos, if that is

24    agreeable with Mr. Phillipos.

25                 MR. DEMISSIE:  Are we going to pick a specific date?

1          THE COURT:  I think I will.  So, let me just pull off

2     -- September 29th.

3          MR. DEMISSIE:  That would be good for us, your Honor.

4          THE COURT:  So, those are the three trial dates, then,

5     here.

6          The Motion to Change Venue is -- if I can just pause

7     for a moment, though, so that Mr. Lovett can get these down.

8          I am allowing Motion No. 148 of Mr. Kadyrbayev for

9     Severance, Motion No. 173 of Mr. Tazhayakov for Severance,

10    Motion Nos. 168 and 172 of Mr. Phillipos for Severance, and

11    establishing the trial dates as I have so far.

12         MR. STAHL:  Excuse me, your Honor.

13         THE COURT:  Yes.

14         MR. STAHL:  Also in our Motion to Dismiss was a motion

15    to strike surplusage.  I don't think you have ruled on that.

16         THE COURT:  Right.  Let me talk about that.  I think

17    that is useful in this context, that is, the context of trial

18    structuring and so on.

19         I do not see a reason to strike the surplusage at this

20    point.  What generally happens for me is, I will submit an

21    indictment to the jury if I think it is helpful to them.  I

22    will require redactions of the indictment, as necessary, if the

23    Government does not prove something.  If it appears that the

24    charging document, which, as I have indicated, is at this stage

25    fleshy, is a little too overweight, I will try to slim it down

1    a little bit.

2         But I do not think I need to get to the question of

3    surplusage at this point, and so I am denying it at this point,

4    subject to talking about what it is that goes to the jury to

5    shape their views about the case.

6         MR. STAHL:  If I could follow up with a question?

7         THE COURT:  Sure.

8         MR. STAHL:  Is this something in your practice that we

9    would file a motion *in limine* before the Government's opening

10   as to what they would be allowed to open on and how much they

11   would be able to go into the details of the bombing itself?

12        THE COURT:  I think it is two parts.  The first is for

13   motions *in limine* as to which I think I can only provide in

14   response to a motion *in limine* a tone poem.

15        MR. STAHL:  I'm sorry?

16        THE COURT:  A tone poem.  I am not going to be writing

17   their opening statement for them.  I will give them a sense of

18   where they could get themselves in a lot of trouble, if they

19   alluded to evidence or matters that simply are immaterial from

20   my perspective on it.  But I think we will be getting to know

21   each other more as things go along, and you will get to see the

22   dealings with Mr. Wooldridge and his client.  Motions *in limine*

23   will kind of shape some of that.

24        To the degree that something is in the charging

25   document does not necessarily mean that it gets presented to

1    the jury.  I said it was two parts.  The second part is what

2    document goes to the jury, if any.  I generally think it is

3    useful for the jury to understand what the Government has

4    undertaken to prove, but it frequently is the case that that

5    needs a redaction.  So, for instance, there will be a redaction

6    in this case to take out the caption for the other defendants

7    that are to be tried at any particular time.  There may be

8    overt acts that are not proved in the case that will be taken

9    out, and it may be that after a discussion I say the jury

10   understands this case enough, they do not need the charging

11   document to go in.  But that is the way I will deal with it.

12        The short of it is, again, this is a kind of premature

13   motion.  That is why I am denying the motion.  I think I

14   understand the underlying purposes behind it.

15        So, back to change of venue.

16        My present view about this is that there has not been

17   demonstrated as of yet a basis to change the venue in this

18   case.  Of course, it is a case that has generated a great

19   deal -- not this case itself -- but the general subject matter

20   has generated a great deal of press coverage.  I have reviewed

21   what the parties have submitted in that regard.  I do not find

22   it to be the kind of press coverage that on the whole can raise

23   some sort of presumption of the change of venue.  There has

24   been commentary on what the press has been able to find out

25   about various things and reporting about it.  Obviously, it is

1    a matter of continued interest and became particularly active

2    surrounding the anniversary.

3         But the submissions on the Motion to Change Venue seem

4    to me to be premature as well.  The proof of the pudding is the

5    selection of the jury and the evidence stated.  I will put it

6    into context for the parties, as I did with my standard way of

7    dealing with Motions to Dismiss, in dealing with their family

8    of suppression motions.

9         I think a good portion of my professional life has

10   been either observing or participating in one form or another

11   in high-profile cases.  As a newspaper reporter in Chicago and

12   Washington, particularly during the time period of Watergate

13   and those prosecutions, I had an opportunity to observe how

14   jury selection can be conducted and how in a Metropolitan area

15   jurors can be selected that provide a fair and impartial

16   evaluation of the case.

17        I think for lawyers involved, maybe even judges

18   involved and the press involved it is inconceivable that people

19   are not reading every story, but it is not inconceivable.

20   People have lives of their own.  They are not spending a great

21   deal of time reading all of this stuff or viewing it on TV.

22   More than that, the life experiences I have had suggest to me a

23   properly vetted jury will be fair and impartial, take seriously

24   their responsibilities, and can be chosen even in the community

25   in which some extraordinary event took place.

1          So, I do not find a presumption here.  I have a view

2     that the way in which this has to be dealt with is by jury

3     selection.  I have tested this against other kinds of

4     approaches.

5          Mr. Demissie suggested Portland or Providence.  I have

6     looked at the question of other venues in the

7     First Circuit, and that is affected by availability of a

8     facility as well as the likelihood that some other venue would

9     be less affected and it would not be inconvenient to all of the

10    parties here.  Within the First Circuit, the only other venue

11    that I think is potential is Springfield.  It is in this

12    District, but it is different media markets, of some distance,

13    probably more than both -- although I have not walked it off --

14    more than both Portland or Providence.

15         So, in that connection you should be aware that I have

16    dealt with the Clerk's Office here to arrange for panels to be

17    assembled in both Springfield and Boston for June 30th.  My

18    expectation is we will be going in Boston.  If something

19    arises, we will have available the potential for Springfield.

20    Springfield, I think, is also convenient to out-of-state

21    counsel here; just up the road, as I understand it.

22         I should also say that I have considered and explored

23    other Districts and other Circuits.  I do not think they are

24    necessary.  There are a number that would be quite inconvenient

25    for the parties.

1    But I mean to indicate that this is still a work in

2    progress.  We do not know yet whether we are going to get an

3    impartial jury.  If I were a betting person, which I am not, I

4    would bet that we can with the kinds of jury questionnaires and

5    tailored inquiry of the jurors that I would propose to

6    undertake.

7    So, let me tell you what is likely to happen, although

8    this is the subject of some further discussion.  The model that

9    I found, I think, particularly useful, and so far as I know,

10   successful, was the Bulger model, in which Judge Casper

11   structured matters so that, to apply it to this case, something

12   like 200 jurors came in in the morning on Monday.  They filled

13   out questionnaires after being instructed by Judge Casper, in

14   this case by me, about their responsibilities and the need for

15   candor in their questionnaires, but also an understanding of

16   what their larger responsibilities are.

17   Those questionnaires will be taken out, put on a disc.

18   The disc will be provided to the parties immediately.  We will

19   do the same thing in the afternoon, another 200 people,

20   perhaps.  Same thing Tuesday morning, same thing Tuesday

21   afternoon.  That could come to as many as 800 people.  I am not

22   sure about the numbers yet, but I have arranged for the Clerk's

23   Office to have available a panel that can do that much.

24   We are all going to be working hard that week, and so

25   you are going to be expected to review those discs, and

1   together we will deal with those that seem to be the subject of

2   a challenge for cause, at least on their face.

3            I am not yet sure what I will do by way of individual

4   voir dire of those who survive a challenge for cause.  I have

5   in the past done each remaining available juror.  That may take

6   Wednesday and Thursday to do it.  I am intensely aware, at

7   least in the first case, that we have got July 4th coming up.

8   I hate to tell you, but we are going to be working on July 4th

9   if we have not picked a jury at that point in the selection

10   process.  I should not say "you are."  We *all* are, because we

11   will get it done.  We are not going to be bringing jurors in on

12   July 4th, but we are going to be going through the process of

13   the exercise of peremptories.

14            I suspect that the peremptories are going to be

15   sufficient after the kind of cause analysis that I do.  The

16   current number of peremptories will be acceptable, but I will

17   think about whether or not additional peremptories are

18   appropriate in this case.

19            But that is it in the kind of broad outline.  A

20   similar process will be used in Springfield, if it is necessary

21   to choose to go to Springfield here.  I have it as a backup.  I

22   do not think it is going to be necessary, but we will see.

23            In any event, turning to the change of venue, I am

24   denying the Change of Venue Motions, Mr. Kadyrbayev, No. 133,

25   Mr. Tazhayakov -- these are joined kinds of issues in

1    No. 133 -- and Mr. Phillipos' on this kind of change of venue,

2    with the understanding that it is not over until it is over on

3    this.

4         The touchstone of this is to be sure that the

5    defendants are tried by a fair and impartial jury that is going

6    to decide this case solely on the basis of the evidence that is

7    presented to them and in light of the law that I will give to

8    them and not on some other basis, and I will try to be as

9    probing as possible.

10        The parties, I know, are familiar with Skilling, but

11   it bears rereading.  I think it is the modern statement of a

12   fair trial, free press and change of venue.  There were some

13   notorious cases that, as notorious cases sometimes do with

14   extraordinarily bad facts, create law that may be a little

15   difficult to deal with, at least in terms of bumper-sticker

16   snippets.  Skilling, it seems to me, provides the modern

17   Supreme Court view with respect to this, and Justice Ginsburg's

18   opinion, I think, is very, very helpful on this.

19        That said, I am sensitive to the dissent that

20   Justice Sotomayor had on this, and I mean to do whatever I can

21   to avoid the kinds of concerns that she I think properly raised

22   and reservations that she properly raised.  But this is an

23   undertaking we are all going to keep working on.

24        The bottom line of this, and maybe a reason for my

25   burdening you with some aspects of my own past experiences, is

1   I have been and I remain of the view that a properly vetted

2   jury takes its job very seriously and provides what the parties

3   are entitled to:  a fair and impartial trial.  That has been my

4   experience over 40 years of observation and involvement.  While

5   there are challenges in this case, I do not now see a reason

6   why this will not be yet another piece of evidence in support

7   of that proposition for me.

8            So, that, I think, deals with, as best we can at this

9   point, the question of the kind of trial structuring.

10           So, then that gets us to what I will broadly call the

11  Motion to Suppress issues.  Let me put this in the larger

12  context as well.

13           There are rules about criminal discovery that are

14  meant to be observed, and it is my responsibility to enforce

15  them.  A lingering concern that I have had over the years, and

16  it has been present in this case as well, is that events like

17  Motions to Suppress that are potentially evidentiary are used

18  for dual purposes, the Motion to Suppress itself, but also for

19  obtaining discovery that the parties are not properly entitled

20  to.

21           So, I outline for you a form of procedure that I have

22  used in previous cases to ensure that the appropriate purpose,

23  that is, to test a Motion to Suppress, does not become a

24  vehicle for an improper purpose, which is expansion of

25  discovery beyond what is appropriate.

1          I have before me a Motion to Quash some subpoenas that

2    suggests that there is a -- how best to describe this -- a

3    latitudinarian view of what is available by way of evidence and

4    the production of evidence in a Motion to Suppress, and we will

5    talk about that in just a moment.

6          I do not want to put too much emphasis on it, but the

7    Government has filed a Motion to Strike a letter brief that

8    sought, at least as a matter of correspondence, to obtain

9    reconsideration.

10          Certainly, my Session, and this District generally,

11   does not conduct proceedings by correspondence school, and so

12   letter briefs are just not appropriate, and I think counsel

13   became familiar with that after the back-and-forth.  But it did

14   raise the question of what was being asked for was some form of

15   reconsideration.

16          I am not going to strike the letter brief.  It is what

17   it is.  But to the degree it sought reconsideration, it is

18   denied.  I dealt with most of this discovery early on and ruled

19   with respect to it, and I know of no reason to depart from that

20   ruling.

21          Nevertheless, the parties have, I think quite

22   helpfully, started to proliferate the meaning of the

23   differences between burdens of production and burdens of proof,

24   and it seems to me a useful way of beginning the discussion

25   about the way in which I would like to conduct the Motion to

1    Suppress to deal with that.

2           Perhaps the most striking, kind of cutting through

3    this, as he did with the timing of trial, is Mr. Wooldridge's

4    reference to Rule 104(d).

5           There are two parts of this.  It seems to me that a

6    defendant has to put in play in some fashion the

7    appropriateness of the Motion to Suppress; that is, that there

8    is some reason to believe, broadly stated here, that the

9    statements that were offered by the defendant that are sought

10   to be excluded and in a related sort of way consents that were

11   given to searches and so on, were not voluntary.  That is a

12   memorandum inquiry, but is a broader factual inquiry as well.

13          One of the things that I have seen, and one of the

14   reasons why I scheduled this or stated this view about order of

15   proof, is that in the absence of affidavits, and even with

16   affidavits, it turns out that the presentation of the

17   defendants is nonexistent or does not include the underlying

18   testimony that is in an affidavit, and so it is a kind of bait

19   and switch for purposes of Motion to Suppress.  That, it seems

20   to me, is inappropriate, because it then turns out that the

21   Motion to Suppress was not a Motion to Suppress; it was a

22   discovery device that is not acceptable.

23          By the same token, this is not an opportunity for the

24   Government to goad the defendants into offering testimony.

25   While the testimony is immunized to the degree necessary, that

1    is to say, it cannot be used against them at trial, it is also

2    the case that if there are inconsistencies in trial testimony

3    and testimony that is given in a Motion to Suppress, then it is

4    available, and it is also available for consideration, if it

5    ever comes to that, in sentencing in terms of the candor of the

6    defendants.

7           So, it is a serious choice that a defendant has to

8    make concerning a Motion to Suppress.  Stepping back a little

9    bit on this, I have affidavits submitted by the defendants.  I

10   do not know if the Government takes the position, it seems to

11   me to be a hard position to take, that those affidavits do not

12   state a *prima facie* case for lack of voluntariness.

13          Do you take that position?  That is to say, if the

14   only evidence in this case were those affidavits, then it seems

15   to me that there is a question, factual question, about

16   voluntariness.

17                           (Pause)

18          THE COURT:  You will not have until 11:00.

19                          (Laughter)

20          MR. CAPIN:  Military time, your Honor?

21          I think it's a close call.  I think certainly with

22   regard to Mr. Phillipos, I think the Court could take

23   everything he says in his affidavit and deny the motion on its

24   face, because it comes nowhere near satisfying the burden of --

25   it comes nowhere near, viewed in the light of what the Court

1   could take judicial notice of, finding that there was either

2   involuntary waiver of Miranda or an involuntary confession for

3   the purposes of due process clause, or any consent form he

4   signed was done involuntarily.

5        A somewhat closer call with regard to the other

6   defendants, but I think that, while very colorful, what they

7   say in their affidavits is somewhat mushy.  I mean, there was a

8   lot going on when they were called out of their residence, a

9   lot that the Court could take judicial notice of and find that,

10   based on what we all know, it was a Terry stop.  And questions

11   of duration, of time and how they were spoken to, I think that

12   the prudent course, for the reasons you have articulated, is to

13   have the defense go first, articulate more specifically what it

14   is that they are saying was done on that day, let that be

15   fleshed out somewhat, with the understanding that they do have

16   the safety of Simmons and the Constitutional protections

17   against having that used at trial against them.

18        So, I think the answer is no.  I think our position is

19   they haven't really made a *prima facie* case.

20        THE COURT:  If forced to come to that conclusion now,

21   I think it probably is a close question, but I would be

22   inclined to say I will have a Motion to Suppress evidentiary

23   hearing on the basis of that.

24        That leads me to the second point, which is what

25   appears to be ambivalence, perhaps, on the part of the

1    defendants, the suggestion that, while their affidavits are

2    sufficient, they have not decided whether to testify.  The

3    problem there is that if they do not testify, then it is a bait

4    and switch.  They have submitted an affidavit that they are not

5    prepared to support by actual testimony, and that is the

6    potential abuse that I want to address.

7         Now, I say "abuse."  I do not mean to make this

8    personal but to understand that in order to enforce the rules

9    with respect to discovery and observe the Constitutional rights

10   of the defendants, and balance them together properly, I think

11   it is not appropriate for a defendant to file an affidavit and

12   then not be prepared to support it with live testimony; because

13   the grounds for having a hearing, which are that there is a

14   basis for finding involuntariness, however close the question,

15   disappears like the mists over San Clemente if they do not

16   testify.  And that is where the insight provided, again at the

17   last minute, to some degree, by Mr. Wooldridge seems to me to

18   be helpful.

19        What I propose to do, or would propose to do, is to

20   say that each of the defendants may support their Motion to

21   Dismiss with direct testimony and then ordering my proof,

22   because it is necessary to limit this to the issues involved.

23   If it is sufficient, raises the question sufficiently, again,

24   having in mind Mr. Capin's reservations about whether, in fact,

25   it does, but in my view that I am likely to think it does for

1    present purposes, and with the direct testimony of the

2    defendants, and then turn to the Government and say, "So, what

3    evidence do you have that it was voluntary," and proceed in

4    that fashion.

5         That, it seems to me, balances the respective rights

6    and obligations of the parties in this matter.

7         MR. STAHL:  Your Honor, may I be heard on that?

8         THE COURT:  Sure.  I am outlining it because I want

9    you to understand it, and I am going to take a break as well,

10    but I want to hear you before we take the break on that.

11         MR. STAHL:  Sure.

12         THE COURT:  I do not think it is the case that someone

13    just gets a Motion to Suppress hearing by saying, "I would like

14    one."  I do think that there are foundational requirements

15    here, but they are minimal, putting into play the issues.  That

16    is why the structure that I have outlined is the one that I am

17    disposed to pursue here.  But, as I said, I will obviously

18    listen to whatever you have to say, because this is a somewhat

19    more refined version of what we discussed earlier.

20         So, without holding you to a snap response to a

21    late-filed Wooldridge motion, I am interested in what you have

22    to say.

23         So, Mr. Stahl.

24         MR. STAHL:  Your Honor --

25         THE COURT:  I do not mean to cut you off.  If you want

1    to take the break at this point to think about --

2          MR. STAHL:  That would be helpful.

3          THE COURT:  -- this kind of outline.

4          Is there anything else that people want to take up

5    before that break?  Because now we are talking about how we are

6    going to structure the Motion to Suppress, if it goes forward;

7    that is, if there is reason to say that there is a factual

8    basis for this.

9          MR. WOOLDRIDGE:  Before we do have a restroom break,

10   your Honor, I would say one thing, and that we submitted an

11   affidavit in support of our Motion to Suppress.  The Government

12   comes back, and they make a bunch of factual allegations but

13   don't support their motion in opposition with any affidavit.

14   It would have been nice -- like if we have to do an affidavit,

15   then the Government should also have to do an affidavit.

16         THE COURT:  This, I think, is in the class of

17   oppositions or observations that I call the "Prodigal Son"

18   objections to procedures.  There is no question in my mind that

19   the Government could -- they should have, but they did not, but

20   this is fine points -- the Government could attach an affidavit

21   of the case agent with every one of the 302s and other reports

22   of investigation.  That would be sufficient.  They did not do

23   it, and, frankly, it was not altogether that clear that they

24   should.  But this addresses that irrespective, that is, this

25   process addresses that irrespective.  The Government could

1    stand up after the testimony of the defendants and say, "We

2    have nothing else to offer," and if they do, I will make the

3    determination on the basis of what has been provided with

4    respect to voluntariness by the defendants.

5          So, I understand the sense of resentment and

6    disappointment that they did not do what you did; they did

7    square their corners the way you did, at my suggestion, but

8    that is not going to trip this.

9          MR. WOOLDRIDGE:  I just think in all fairness, your

10   Honor, if we submit an affidavit, and if they don't submit an

11   affidavit, that's our proof and your Honor should rule that

12   way.  We shouldn't have to come forward with testimony.

13         THE COURT:  One thing that is clear from the

14   affidavits you submitted is that, in order to resolve them,

15   there is a credibility determination that has to be made to

16   establish the grounds for supporting suppression.  The

17   existence of the affidavit is enough for me to convene a

18   hearing, as I have, for purposes of taking testimony, which I

19   will, but it is not enough simply to submit the affidavit and

20   say that is enough to show -- at least these affidavits --

21   enough to show, or at least enough to satisfy me that you have

22   shown that statements, all of them, were involuntary.

23         MR. DEMISSIE:  If I may, your Honor?

24         THE COURT:  Yes, Mr. Demissie.

25         MR. DEMISSIE:  Just, I'm asking for clarification,

1   your Honor, and what you have outlined as the intended

2   procedure.  Is the Court not allowing the defendants to call

3   witnesses other than the defendants themselves?

4   THE COURT:  No, you do misunderstand, and it is useful

5   that you ask for clarification.  I am not forestalling

6   anything.  I am talking about a course of the presentation of

7   evidence, which is very much in the control of the Court.  I

8   order the proof in the case, particularly when it is non-jury.

9   I do it for purposes of efficiency, for purposes of clarity,

10  and for purposes of serving the underlying values that I have

11  outlined here.

12  You may well have other witnesses that you want to

13  offer here, and if at the conclusion of testimony by the

14  defendants, or a defendant, I think it is insufficient to go

15  forward on the question of voluntariness -- I do not now

16  believe that is the case in light of what I have read in the

17  affidavits -- then I will afford you that opportunity.

18  MR. DEMISSIE:  I think what I am asking is in the

19  order of witnesses that we call, is the order to require us to

20  call the defendants first before we call other witnesses?

21  THE COURT:  Yes.  The defendants will be called first

22  to establish that they have a grounds for a Motion to Suppress.

23  On the basis of what I now know, if they do not call them, then

24  those affidavits are meaningless.

25  MR. DEMISSIE:  I believe, your Honor, there are ways

1    that we can make of showing by calling other witnesses other

2    than the defendants, and the defendants should then be able to

3    be in a position to listen to the testimony of other witnesses,

4    evaluate what has been presented and then decide to testify or

5    not.

6         THE COURT:  Well, that is a refinement, and I think I

7    understand it.  If that is the way you want to proceed, you

8    can.  But I will tell you, after listening to those other

9    witnesses -- and let me be clear about this.  This does not

10   mean you call the Government's witnesses.  The Government is

11   going to call those witnesses.

12        MR. DEMISSIE:  All right.

13        THE COURT:  This does not mean that you have these 17

14   subpoenas that go well beyond anything that is available for

15   discovery and that seem to me to be nothing more than an

16   effort, another effort, at reconsideration of discovery.

17        So, I will see what the witnesses are.  We are going

18   to talk about those Motions to Quash in a bit.  But, while it

19   may be strategy or tactics for the parties, this is fundamental

20   to me of exercising my responsibility to hold the scales true

21   in balancing the several considerations that are involved in

22   this kind of matter, which I have outlined here.

23        So, back to the earlier question.  If you think that

24   you can show involuntariness by some other means than the

25   defendants themselves, in short, if you are not relying on

1    their affidavits, then I will consider it.  But it is not going

2    to be a case of, "Tell you what.  We think we can do this by

3    calling the Government's witnesses."  Because you do not get to

4    do that, unless there is a foundation for it.

5          Now, it may be that somebody was next to Mr. Phillipos

6    at a time in which there was some sort of coercion that took

7    place, just to use that as an example -- I do not know if that

8    is the case.  Sure, put that witness on, and I will consider

9    that.

10         MR. DEMISSIE:  Or the person who actually did the

11   interview.  We will take the break.

12         THE COURT:  No, no.  I think you understand my point.

13   You do not do it that way.

14         MR. DEMISSIE:  So long as there is the issue of

15   coercion that involves that individual.  I don't intend to call

16   witnesses just who are present, but if there is an

17   individual --

18         THE COURT:  As far as I am concerned, you do not get

19   to the point of a Motion to Suppress and the testimony

20   regarding the Motion to Suppress by saying, "I would like a

21   hearing, and I am going to call the other side."  You provided

22   a foundation for the hearing.  The foundation was

23   Mr. Phillipos' affidavit.  You are going to have to decide

24   whether or not that is the grounds.  If it is not the grounds,

25   if you are not prepared to support it by testimony like that,

1    then I will have to think about it.  But one does not have a

2    hearing by saying, "I would like a Motion to Suppress.  By the

3    way, bring them all in."  You have got to have a foundation.

4           MR. DEMISSIE:  I understand.

5           THE COURT:  The foundation you provided was that

6    affidavit.  Now, if there is somebody else who is going to say

7    Mr. Phillipos -- I am somewhat surprised that I didn't see

8    their affidavit -- but if there is somebody else there is a

9    good-faith basis for believing that will testify in a fashion

10   that is supportive of Mr. Phillipos's position, I will

11   obviously consider that.

12          But right now, my view is that the way in which this

13   is going to be ordered is it is going to be the testimony of

14   the defendants, that is, direct testimony, not

15   cross-examination.  It will not be cross-examination of those

16   defendants until after there is an offer from the Government,

17   to which you can cross-examine during that time period.

18          MR. WOOLDRIDGE:  Your Honor, I have something that I

19   think may allow the defendants to meet that level that you are

20   asking for, and that is the Government had their immunized

21   witness that we all had an opportunity to cross-examine.  I

22   didn't bring the transcript here today, but much of what she

23   said is what's contained in the defendant's affidavit, and I

24   don't know if maybe we should submit that to your Honor.

25          THE COURT:  You can.

1          MR. WOOLDRIDGE:  Okay.

2          THE COURT:  I have reviewed portions of it, as you

3    know.  I have actually provided, I believe, a dramatic reading

4    from it the last time we were here.  You may have gathered that

5    my evaluation of it did not establish in my own mind lack of

6    voluntariness.  But you can certainly submit that.

7          MR. WOOLDRIDGE:  Okay.

8          THE COURT:  And if that is what you want to rely on,

9    okay.

10         MS. SIEGMANN:  Your Honor, I just was wondering, so

11   you just indicated that the Government's not going to be able

12   to cross-examine the defendants.

13         THE COURT:  Not initially.  I have not been clear

14   about this proposition.  This is the ordering of proof.  I am

15   going to hear direct testimony, because that is going to be the

16   shape of the 104(d) issue that Mr. Wooldridge raised.  I am

17   going to hear the direct testimony of the defendants.  Then, if

18   that creates an issue, sufficient issue, and my view is that it

19   is likely to, if it follows more or less the outline of the

20   affidavits, then I will put the Government to its proof.

21         Your proof is to show that these were, in fact,

22   voluntary statements, and you will call whatever witnesses you

23   call to do that, and at the conclusion of that you will have

24   the opportunity to cross-examine the defendants, I believe, if

25   it remains an issue.

1          Now, it may be that after I hear the Government's

2     proof I am going to say, "This is not voluntary at all.  This

3     is the best the Government can do."  And that is the order of

4     proof, because the burden of proof in this context for most all

5     of these challenged statements is on the Government.

6          MS. SIEGMANN:  I understand that, your Honor, but the

7     defense will get an opportunity to cross-examine the

8     Government's witnesses when they testify.

9          THE COURT:  Right.

10         MS. SIEGMANN:  And the defendants, by their affidavits

11    and their testimony, will then be putting their credibility in

12    question, and the only way we can actually test that is by

13    cross-examination.

14         THE COURT:  You are in the same position as Mr.

15    Demissie, and that is saying, "Oh, well, we get to

16    cross-examine the defendants themselves if we put on our own

17    case," and that is just simply not true.  I will determine

18    whether or not you have made a *prima facie* -- probably more

19    than that -- showing that these are voluntary, and if you have,

20    then we will move to the next stage, which is the

21    cross-examination of the defendants themselves.  If you have

22    not, then the defendants have done all that is necessary to get

23    their Motion to Dismiss evidentiary hearing, and the Government

24    does not get its chance to do some sort of discovery.

25         Let us be candid about this in practical terms.  What

1    happens?  There are created prior statements, inevitably,

2    because we are all practical people, we understand what happens

3    in examination.  There are inconsistencies of some sort,

4    greater or lesser degrees of inconsistency.  The office of the

5    Motion to Suppress hearing is not to create inconsistencies or

6    additional opportunities for cross-examination.  It is to get

7    at the issue of whether or not here it is voluntary.

8           So, in order to balance all of those separate values,

9    I am going to order the proof in this fashion, or I intend to.

10   I am, obviously, going to hear more from you, and in the spirit

11   of Mr. Wooldridge's "Prodigal Son" observation, let me offer

12   this observation.  There is sauce for the goose and there is

13   sauce for the gander in this.  So, you are both going to

14   consider the practical aspects of how you put on your

15   respective cases for this, and this is the structure in which I

16   am going to follow, I think, but, again, subject to some

17   discussion.

18          So, why don't we take -- I think a half hour might be

19   sufficient.

20          MR. CAPIN:  Could I just mark one issue, your Honor?

21          THE COURT:  Sure.

22          MR. CAPIN:  As I understand it, the Court is denying

23   the Motion to Quash as -- denying the motion -- I'm sorry.  No.

24   Allowing the Motion to Quash the 17 subpoenas.

25          THE COURT:  Not yet.  I have to hear -- if somebody

1    explains to me why it is necessary to have these subpoenas --

2    and they are *subpoenas duces tecum*, which seem to have been

3    done not by a human being but, perhaps, by a word processor who

4    cannot spell "memorandum."

5           MR. CAPIN:  And if we are going to deal with it later,

6    I simply want to point out it is *dues tecum* as regards to 17 of

7    them.  As regards to one of them, it's also *ad testificandum*,

8    and that's Megan Dolan.

9           THE COURT:  We will talk about that.  None of them, I

10   think, are the Government's initial witnesses, but maybe they

11   are.

12          MR. CAPIN:  They're not, your Honor.

13          THE COURT:  All right.  So, we will take a half-hour

14   break.

15          THE CLERK:  All rise.

16      (The Honorable Court exited the courtroom at 10:20 a.m.)

17                         (Recess taken)

18          THE CLERK:  All rise.

19      (The Honorable Court entered the courtroom at 10:55 a.m.)

20          THE CLERK:  This Honorable Court is back in session.

21   You may be seated.

22          THE COURT:  Well, just one housekeeping matter, and

23   that is, the parties are expected to be here on time when we

24   take a break.  If you are not here, that is your fault.  I will

25   be in court when I say I will be in court.  So, being outside

1   for ten minutes past the time period is probably not a good

2   idea, if your purpose is to represent your clients.

3          So, where do we stand now?  Mr. Stahl?

4          MR. STAHL:  Thank you, your Honor.  I will put my

5   position on the record for you and hope to have you modify your

6   view of this.

7          Your Honor, I think that it's clear by the Court's

8   statements, and even the Government, although they're hedging,

9   I think the defendants have clearly met their burden of

10  persuasion.  I'll talk about Mr. Kadyrbayev, in particular.  We

11  submitted a very detailed affidavit under oath about the

12  circumstances of the seizure, the circumstances of the

13  statements, the lack of voluntariness, the circumstances about

14  understanding, the circumstances about holding an individual

15  for 12 hours, and then going back the next day and seizing them

16  again, using the Immigration's arrest, even though the FBI was

17  working hand in glove.

18          We have, under the case law, then, the District of

19  Massachusetts, Levasseur, citing the Fifth Circuit, Longmire,

20  as we submitted in our reply brief that your Honor allowed us

21  to file, met the burden of production.  The Government, then,

22  has the burden.  They have submitted nothing under oath, they

23  have nothing before you.  Mr. Capin stood up before and said,

24  "We all know what happened."  Quite frankly, the only thing we

25  know what happened that's under oath of any form is from the

1    defendants themselves that submitted affidavits.  The rest is

2    whatever people may think they know about the case.  But there

3    has been nothing before your Honor about the facts of the case,

4    except as presented by the defense.

5         So, I believe that the case law is clear that it's now

6    up to the Government to go forward and put its witnesses on to

7    show that this warrantless search, the warrantless seizure of

8    these individuals, that the statements were then voluntary and

9    their will was not overborne, and that they knowingly and

10   intelligently waived their rights.  These were un-counseled,

11   unwarranted seizures of these individuals, and then they

12   supposedly got consent searches.

13        So, we have put that all into play under oath by the

14   detailed affidavits.  We have now met our burden for the

15   hearing, and now we are talking about the order of the hearing.

16        THE COURT:  Let me ask you straightforward, are you

17   going to permit cross-examination of the affidavit?

18        MR. STAHL:  Excuse me?

19        THE COURT:  Are you going to permit cross-examination

20   of the affidavit?

21        MR. STAHL:  Your Honor, I think that the --

22        THE COURT:  Well, at the risk of being too peremptory,

23   but I will be peremptory.  Yes or no?

24        MR. STAHL:  Perhaps I don't understand the question.

25   Are you saying --

1          THE COURT:  You have offered an affidavit.  The

2     question is whether or not that affidavit is illusory in the

3     sense that it will not be tested because the defendant will not

4     be offered as a witness in the case, nor will he be permitted

5     to be cross-examined.  So, if it is an affidavit that is here

6     today gone tomorrow, it is evanescent, it is illusory, and I do

7     not find that it provides an adequate foundation.

8          So, you can answer the question yes or no.  Are you

9     going to permit examination?

10          MR. STAHL:  Well, if it becomes necessary.

11          THE COURT:  Let me just be clear.  That is an issue

12     about necessity.  There are a variety of ways of dealing with

13     this, I suppose.  I can say, upon the representation of a

14     defendant that he will submit to cross-examination, I will

15     permit the direct examination to be the affidavit itself, and

16     then we will move on.  That is one way of dealing with it.

17          But I must tell you that if the foundation is not

18     sustained, if it proves to be made of sand, then it is no

19     foundation at all.  That, at the outset, depends upon whether

20     or not the affiant is going to offer himself for

21     cross-examination, or the party is going to offer the witness

22     for cross-examination.

23          MR. STAHL:  I guess what I am saying, Judge, is we

24     have a sworn affidavit.  It's not illusory.  It's sworn to

25     under penalties of perjury.  It's notarized.  And my

1    understanding was that your order was -- that you were

2    proposing, you hadn't ruled yet, is the defendant would testify

3    on direct.  So, I would put Mr. Kadyrbayev on, and I would walk

4    him through basically the outlines of his affidavit.

5              THE COURT:  However you want to do it.

6              MR. STAHL:  However I want to do it, and somehow your

7    Honor would judge the credibility of Mr. Kadyrbayev's testimony

8    without the Government crossing just yet.

9              THE COURT:  No.  I would determine whether or not

10   there is a foundation for saying that we should have a Motion

11   to Suppress hearing.  The affidavit is meaningless unless it is

12   available for cross-examination.  It could lack sufficiency.  I

13   have gone beyond that.  I have not made a determination about

14   sufficiency, except as an instrumental sort of thing, but it is

15   sufficient to justify -- the facts provided are sufficient to

16   justify a hearing, but only if that can be subject to

17   cross-examination.

18             MR. STAHL:  The way I read the case law, and the way

19   that I have seen other suppression hearings -- and I'm just

20   doing that by general experience; I understand your Honor does

21   in your courtroom what you do -- is that we have made the *prima*

22   *facie* showing.  The Government now has the burden of persuasion

23   to put its agents on, not for a fishing expedition, and I will

24   explain the subpoenas in a moment, because it dovetails into

25   this, to put their agents on to talk about the voluntariness,

1    the timing.  So, "What was the timing?"  "When did you first

2    go?  When did you first seize these individuals," or whatever

3    term they would like to use.  "When did you first handcuff

4    them?"  "For how long were they cuffed?"  "For what period of

5    time was that?"  "What justified that seizure?"  "What

6    justified continuing?"  Establish that it was voluntary that

7    they volunteered to go to the State Police Barracks, establish

8    that it was voluntary for the next 12 hours, and then I get to

9    cross, and your Honor would then judge at the end of that, the

10   Government going through with the burden of persuasion, has

11   enough been heard that your Honor has decided that there it not

12   voluntary by the testimony and the cross of the Government's

13   witnesses, because it's their burden of persuasion.

14          And then, if not, your Honor would tell us at the end

15   of that presentation, "Well, Mr. Stahl, you have a choice now,

16   because I am not completely convinced, or I'm not convinced

17   enough, based upon what I have heard from the agents that you

18   have shown, demonstrated that it's involuntary.  You have a

19   choice now to put your client on."  And at that point then the

20   client would testify, and then your Honor would decide whether

21   the client is subject to cross.  That seems to make sense under

22   the case law.  And that we've come forward with enough to put

23   the issues that matter for this hearing into play, that your

24   Honor, reading that affidavit, can determine that there are

25   substantial issues of fact about the voluntariness and the

1    coercive atmosphere and whether there was a violation of

2    Miranda, and, therefore, it's the Government's obligation to

3    then go forward.

4          THE COURT:  I think we are to some degree ships

5    passing in the night on this.  I will hear you if you say you

6    can support your motion without the affidavit.  I do not think

7    you can on this record.

8          MR. STAHL:  I'm sorry.  I missed --

9          THE COURT:  I do not think you can on this record

10   support the motion without the affidavit.  So, then I look at

11   the affidavit, and I ask myself, is this an illusion, illusion

12   in this sense, that if it puts it into play the defendant does

13   not get to pick up the ball and leave the field after that.  He

14   has to be subject to examination.  Now, I have ordered the way

15   in which the examination can proceed.  The Government is not

16   happy with it either, but it seems to me the clean way to test

17   all of the relevant dimensions of this.

18         Now, let me add something further.  Oddly enough,

19   except for the discovery opportunities, scheduling a Motion to

20   Suppress and having a hearing on a Motion to Suppress and

21   establishing voluntariness before the jury is sworn, which is

22   what the Rules call for, or permit, is a benefit to the

23   Government.  I still have to make a determination, will have to

24   make a determination at trial, whether or not it is voluntary.

25   If I make the determination at trial it is not voluntary, I

1    will order a mistrial, and the Government will not get the

2    opportunity to retrial, because the Government will have taken

3    a position that did not permit before trial the resolution of

4    this case.  That is that question of voluntariness.  It is a

5    protection for the Government.  Now, they may view this as

6    macho and they will push their way through it, but I think this

7    U.S. Attorney's Office knows that if I find that it is not

8    voluntary, they are dead, and it is not going to be inflected

9    by some idea of I will let them save themselves.  No.

10        The whole process of criminal procedure is a kind of

11   Rube Goldberg machine that adjusts the balance of advantage

12   among the parties, and this mechanism of dealing with the

13   presentation of evidence with respect to voluntariness that I

14   have outlined is designed to deal with that.  But you do not

15   get to say that, "I have an affidavit that is sufficient, but I

16   am not going to represent to the Court that the defendant is

17   going to testify in cross-examination," because if you say

18   that, if you are not prepared to say, "I will permit the

19   defendant to be cross-examined at the appropriate time," then

20   the affidavit is meaningless.  It does not provide any basis

21   for the foundation that is necessary for a Motion to Suppress.

22        The parties will make their own, as I keep saying,

23   tactical decisions with respect to all of this, but in the

24   final analysis, if there is not a foundation for the Motion to

25   Suppress because I am presented with evidence that is written

1    in disappearing ink, that is, it cannot be challenged, then I

2    am not going to have a Motion to Suppress, and we will have

3    these issues resolved at trial.

4         Now, the Government may say, "Wait a minute.  We want

5    some protection on this," after reflection, but that is their

6    choice.

7         MR. STAHL:  I would like to follow up for

8    clarification.

9         THE COURT:  Sure.

10        MR. STAHL:  If I understand correctly, it is you would

11   be amenable, I think, if I understood correctly, for the

12   Government to go first with its burden of persuasion, as long

13   as I represent to the Court that at the end of their case,

14   their order of witnesses, that if your Honor finds that it is

15   insufficient for you to rule at that stage, that I would put my

16   client on, and then he would be subject to cross-examination.

17        THE COURT:  Yes, and bearing in mind that the

18   affidavit, which may be the basis for it, the refinement that I

19   might offer on this is I will receive the affidavit.  I will

20   treat that as the direct testimony of the defendant, rather

21   than going through the process of walking the defendant through

22   his affidavit.  The motion hearing will be limited to the

23   issues raised in that affidavit, that is, the cross-examination

24   that the Government could conduct ultimately on that, but also

25   the issues that can be raised in the examination of the

1   witnesses will be limited to what is fairly raised in an

2   affidavit.

3           MR. STAHL:  Would I be permitted to do some direct to

4   amplify things that are in there and to deal with some issues

5   that the Government has presented through some recent

6   discovery?

7           THE COURT:  Yes, you would.  But this is based upon

8   representation that the defendant will be subject to

9   cross-examination, if cross-examination becomes necessary.

10          Now, we are all doing this kind of hypothetically.  My

11  sense -- it is more than a sense, because I have read these

12  papers fairly carefully -- is that the Government is going to

13  raise issues sufficiently for me to say the question of

14  voluntariness is the Government has met a burden to show that

15  these were voluntary, and that we are going to expect the

16  defendant to testify.  I do not want them to be sitting there,

17  or you to be sitting there, I do not think you are, that maybe

18  the judge will decide not to have testimony.  I do not think

19  that is going to be the case.

20          MR. STAHL:  No.  I hear you.  I hear you.  With that,

21  could I have a few moments with co-counsel?

22          THE COURT:  Sure.  But let me just talk to each of the

23  parties, including the Government, which may or may not have

24  been fully sensitive to the idea that if they choose not to

25  have a Motion to Suppress even on this basis, that ultimately I

1    am going to be resolving this, and if I have to resolve it at

2    trial, they are exposed because jeopardy is attached, and they

3    have made the choice, the tactical choice, to let jeopardy

4    attach before there is a resolution of the question of

5    voluntariness.

6            MR. STAHL:  Your Honor, I would just like to reserve

7    the issue of the subpoenas.  I don't want to clutter the record

8    right now, but I would like to explain those at some period, I

9    think it will become apparent, and the purpose.

10           THE COURT:  What I propose to do, not that this is one

11   step forward, one step back, but what I propose to do is hear

12   all of the parties and then give you little bit of time to

13   think further about it.

14           MR. STAHL:  Thank you.

15           THE COURT:  Mr. Wooldridge.

16           MR. WOOLDRIDGE:  Sure, your Honor.  Your Honor, with

17   all due respect, I oppose your ruling.  I don't think that the

18   defendant has to be cross-examined on his affidavit.  I think

19   that if you did shift the burden on us for additional

20   production, I think that we should be able to call whatever

21   witnesses that we want.  I understand that you say that the

22   agent s are the Government's witnesses.

23           THE COURT:  No.  I say that there is no basis, unless

24   you have a good-faith basis for showing that there is

25   involuntariness, you do not get to call somebody.  As it stands

1    right now, I am not aware of a good-faith basis for you to say

2    that the Government agents are going to testify differently

3    from the 302s and the various discovery materials.

4         Now, let me pose a hypothetical that may clarify this.

5         MR. WOOLDRIDGE:  Of course, your Honor.

6         THE COURT:  You ask for a Motion to Suppress and for a

7    hearing on a Motion to Suppress because you contend, or your

8    client contends that he was beaten up.  That is not this case.

9    But that he was beaten up, okay?

10        MR. WOOLDRIDGE:  That is hypothetical, not in this

11   case.

12        THE COURT:  Right.  I would require the affidavit to

13   be submitted.  I would not permit you to call the agent unless

14   you had a good-faith basis for saying that the agent would

15   agree that he beat him up, even in the face of a 302 that says

16   otherwise.

17        Now, how would you do that?  Well, the agent may be at

18   a restaurant and say it to a friend:  "You know, if I had to

19   testify, I would have to say I beat him up."  That would be a

20   good-faith basis.  But you do not get to say, "Gee, I would

21   like to inquire of this guy, because maybe I can get him to

22   contradict himself."  That does not happen.

23        So, you have to have a good-faith basis for alleging

24   that these other witnesses would say something that is in

25   support of your Motion to Suppress.  Otherwise, we run into the

1   problem that I have identified before, of transgressing the

2   limitations on discovery that the Supreme Court, through the

3   promulgation of the *Federal Rules of Criminal Procedure*, has

4   outlined and the cases have developed.

5           MR. WOOLDRIDGE:  I understand, Judge.  I believe my

6   good-faith basis is the facts that me and my client allege in

7   the Motion to Suppress, and then the Government hasn't put

8   anything into play that --

9           THE COURT:  Is your client going to permit himself to

10  be cross-examined?

11          MR. WOOLDRIDGE:  I don't think we are doing that,

12  Judge, at this time.

13          THE COURT:  So, I understand your position.

14          MR. WOOLDRIDGE:  I'm just making my objection to your

15  ruling.  That's all.  Thank you.

16          THE COURT:  I think you have raised all of the issues

17  that you want to raise about this.  I am not trying to

18  foreclose you.  Your client does not want to testify, I

19  understand.

20          MR. WOOLDRIDGE:  No, Judge, not under that scenario.

21          THE COURT:  Right, understood.

22          Yes.

23          MS. CHURCH:  If I could be heard, your Honor.

24          Mr. Phillipos also objects to the procedure as

25  outlined by the Court, and one of the major reasons, as your

1    Honor is possibly aware, is that that is not the procedure that

2    is implemented by, from what I understand, any of the other

3    Federal District Court Judges in this Court.  I have never

4    heard of a Federal District Court Judge in this court going

5    through that procedure.

6          The reason that that's important is not that every

7    judge has to follow the same procedure, but it's an issue of

8    parity for these defendants.  That this is a very substantial

9    right.  It's a right described in Jackson v. Denno.  It has to

10   be both a fair hearing and a reliable determination of

11   voluntariness.

12         It's the burden of the Government to prove that these

13   statements are voluntary.  It's not the burden of the

14   defendant.  And to allow this procedure that the Court has put

15   in place to force our client to choose, really we are choosing

16   between a trial right and a very substantial Motion to Suppress

17   right, because as --

18         THE COURT:  Is your client going to expose himself to

19   cross-examination?

20         MS. CHURCH:  That's exactly the word, "expose

21   himself."  No, your Honor, he is not.

22         THE COURT:  So, let me just be clear about this.

23   Apart from the invocation of rights and purported knowledge of

24   the way in which judges in this court proceed, which I do not

25   necessarily share, the short of it is that he will put forth an

1    affidavit that he is not willing to or for your reasons does

2    not want to permit to be tested before trial.  That means that

3    there is no foundation.  It is absolutely illusory.  One does

4    not get a Motion to Suppress hearing on the basis of a

5    narrative that disappears, because it cannot be tested.

6         MS. CHURCH:  It's not illusory for an extremely

7    important reason, and that is that that affidavit is admissible

8    at trial for cross-examination purposes.  So, you will often

9    see affidavits submitted in Motions to Suppress that are six,

10   seven lines long, and they say, "I was arrested without

11   probable cause."

12        THE COURT:  Or you see affidavits in which they say,

13   "This is some of the facts but not all of the facts, and I

14   purport to elucidate those facts further," as is *your*

15   affidavit.  So, the point I guess --

16        MS. CHURCH:  Just as the police do and the FBI does in

17   their 302s.  At every trial they will testify, "This is not

18   everything," because the details of these cases, especially in

19   this highly charged environment, are complicated.  These agents

20   wrote their notes sometimes four or five days after the

21   incident occurred, and in this case the events occurred over a

22   year ago.  So, it's not illusive to put in there that this may

23   not be everything, because --

24        THE COURT:  Why is it not illusory to say, "I will put

25   in only my side, and they do not get to cross-examine?"  Why is

1   that not illusory?  Why is that not very much the same as the

2   traditional Fifth Amendment treatment of a witness who gets on

3   the stand, testifies on direct examination, and then refuses to

4   be crossed?  At that point it is stricken, the direct

5   examination is stricken.

6        MS. CHURCH:  Because the important part of this case,

7   your Honor, is that it's the Government's burden of proof, and

8   traditionally the party with the burden of proof has to go

9   first, and that means that the Government has to put their

10  witnesses on.  If, after hearing --

11       THE COURT:  If I may, just address this question.  Is

12  there any foundational requirement?  Do you just simply not

13  even have to file an affidavit, you just stand up and say,

14  "There are statements in this case, we want a hearing?"

15       MS. CHURCH:  In this case, your Honor, you have

16  already indicated that the affidavits made out --

17       THE COURT:  We are testing the analysis that you

18  provided.  So, is it your position, under the kind of analysis

19  that you provided, that all you have to do is say, "We want a

20  hearing; there is a question of voluntariness because there is

21  a statement, and we have to decide whether or not the witness

22  was voluntary"?

23       MS. CHURCH:  Traditionally, your Honor, the affidavit

24  is sufficient.  And, more importantly, in this case we expect

25  the agents to testify truthfully, and we expect the agents to

1   get up and testify consistently with what our client has

2   indicated occurred during the numerous and repeated

3   interrogations, one of which was 4:00 in the morning.

4           THE COURT:  If I may.

5           MS. CHURCH:  Sorry.

6           THE COURT:  Apart from the sterile incantation of the

7   *Baltimore Catechism* regarding the availability of a hearing no

8   matter what in a Motion to Suppress, I would like you to answer

9   my questions.

10          So, I guess the first question that I have is, do you

11  get a hearing, irrespective of whether you have an affidavit or

12  not, by merely asking for it and saying, "There are a series of

13  statements in this case -- "

14          MS. CHURCH:  Yes, your Honor.

15          THE COURT:  " -- now it is the Government's

16  responsibility to deal with that"?

17          MS. CHURCH:  No, your Honor, and that's why we did

18  file the affidavit, but we know that affidavit is subject to

19  cross-examination of our client at trial, so we have to make

20  sure --

21          THE COURT:  Only if your client testifies at trial.

22          MS. CHURCH:  Correct.

23          THE COURT:  And so, what happens is, you file an

24  affidavit, and then you effectively withdraw it as a tactical

25  choice.

1          MS. CHURCH:  We can't, though.

2          THE COURT:  Sure you can.  You do not put the

3    defendant on.

4          So, what you have done is you have obtained a basis,

5    as you say -- you have to have an affidavit to have a Motion to

6    Suppress hearing.  You filed an affidavit, you got the Motion

7    to Suppress hearing, and never intended to permit the defendant

8    to be examined, even within the confines of immunity that is

9    provided in a Motion to Suppress.  That is what I mean about an

10   illusory affidavit.  It is an affidavit that is here today,

11   gone tomorrow, a bait and switch is I think not an unfair way

12   of saying that.

13         MS. CHURCH:  But it would be different, your Honor, if

14   it were not a case where the Government had the burden.  So,

15   the Government clearly has the burden.  They clearly have to go

16   forward to prove the voluntariness of these statements.  The

17   defendant needs to just raise enough of an issue to obtain a

18   trial.  That is the standard procedure that is followed.

19         THE COURT:  That is a burden, and that is called the

20   "burden of production," and if the burden of production is

21   illusory, then it has not been meet, and it is illusory if it

22   is here today and gone tomorrow.

23         So, that is the conundrum.  I understand your position

24   that you can file an affidavit and you do not have to back it

25   up, but that is not my position with respect to that.  And that

1      is what is fundamental for purposes of having a Motion to

2      Suppress hearing.

3               MS. CHURCH:  And, your Honor, again, we are starting

4      to go around a little bit in a circle here, but --

5               THE COURT:  At least one of us is.

6               MS. CHURCH:  -- we are not discussing not backing up

7      the affidavit.  We are discussing expecting the agents who

8      conducted these interrogations to get on the stand and testify

9      truthfully as to what occurred during the course of these

10     interrogations.

11              THE COURT:  Now, what is your good-faith basis for

12     saying that you will, through the testimony of those agents, be

13     able to establish lack of voluntariness?  Point me to the 302s

14     that do that, point me to some statements that do that.  That

15     is the discussion I had with Mr. Wooldridge on the hypothetical

16     of the agent who somewhere says, "I know what I said in my 302,

17     but that is not what happened."

18              MS. CHURCH:  Again, those 302s are prepared -- as

19     every agent will testify in every case, they are prepared --

20              THE COURT:  I am asking you to show me where I can

21     find in those 302s that this was not voluntary.

22              MS. CHURCH:  I think our client went through a very

23     long outline of what happened, but this was an interrogation of

24     our client --

25              THE COURT:  I think it would be helpful to avoid going

1     around in circles.

2           MS. CHURCH:  No.

3           THE COURT:  Just a moment.  To answer the question.

4     Where in the 302s am I going to find this?

5           MS. CHURCH:  In the 302s you will hear the agents

6     admit that they interrogated our client over the course of many

7     different days, that they came up on one occasion at 4:00 in

8     morning, asked him to come outside of his house in the middle

9     of the night, that they repeatedly came after him over and over

10    again, and then on the last day in the last statement conducted

11    an extensive, I believe four- or five-hour interview.

12          That is just what the 302s say.  That is not even what

13    we expect to obtain out of the cross-examination.

14          THE COURT:  What is the basis for your expectation

15    that there is going to be something different from that?

16          MS. CHURCH:  Your Honor, in every case I have ever

17    tried there has been something different.  There has been a

18    supplementation by agents.  There has been, "Well, I didn't

19    really mean it that way."  Otherwise, then why do we have a

20    trial?  Why don't we just put the police reports in and let the

21    jury decide based on the police reports.  That is the essence

22    of courtroom advocacy and cross-examination.

23          THE COURT:  It certainly is, and now we are talking

24    about how we use the process of Motions to Suppress.  Of course

25    that is part of the trial.  It is putting someone on and

1    letting them be cross-examined.  But if nobody comes on because

2    they withdraw their affidavit, then there is not a foundation

3    for it.  That is where I am on this.

4         Saying that, "We think we can ask some questions and

5    maybe we will be successful," is not enough.  That is not a

6    good-faith basis.  Looking at someone and saying, "I know what

7    he said, but he is going to say the opposite because sometimes

8    in trials people say the opposite," is not enough to meet your

9    burden.

10        MS. CHURCH:  And I would suggest, your Honor, that

11   this case is a little different from kind of a regular case

12   where the defendant writes an affidavit that is absolutely

13   contradictory with everything that is in the 302s, and it's a

14   question of who is telling the truth.  The defendant's

15   affidavit is not outside the realm of possibility based on what

16   is in the 302s.  In fact, it's largely consistent.  So, again

17   it's not illusory in the sense that it's out from left field.

18   There is a lot of what he says in his affidavit that is

19   consistent with the 302.

20        THE COURT:  Right.  And that is why I suppose

21   Mr. Capin argued, not without force, that that affidavit may

22   not be sufficient itself.

23        But taking a broad view, I am prepared to permit this

24   case to go forward on a Motion to Suppress, if we have an

25   affidavit that the defendant will stand behind; and the way in

1   which I have defined "stand behind" is permit himself to be

2   subject to cross-examination in the context of the Motion to

3   Suppress with the immunity that is provided for a defendant.

4   It is not complete immunity, you are absolutely right.  He can

5   be subject to cross-examination if he testifies at trial.

6           But without involving myself in trial choices,

7   strategic choices at trial, I think it is not likely that

8   someone who will not testify under the immunity provided by a

9   Motion to Suppress will testify at trial.  Maybe it could

10  change, maybe not.  But we are talking about what you get on a

11  Motion to Suppress, that is what we are talking about right

12  now, and what you need to do to get a Motion to Suppress, and I

13  have suggested, as I have indicated, that you get it if you can

14  supply an affidavit that is supportable and is going to remain

15  supportable for purposes of examination.  Otherwise, I will

16  look at this without consideration of the affidavit to decide

17  whether or not there is sufficient evidence in the record to

18  raise a question that has to be resolved in a

19  Motion to Suppress before trial.

20          I am not sure that counsel has completed.

21          MR. STAHL:  I'm sorry.

22          THE COURT:  Is there anything further that you wanted

23  to raise?

24          MS. CHURCH:  No.  Note my objection, your Honor.

25          THE COURT:  All right.

1            MR. STAHL:  Your Honor, I just have two quick points,

2       and then a point of clarification for your Honor again.

3            THE COURT:  Sure.

4            MR. STAHL:  I want to go back for a second.  It's the

5       Government's burden to prove that there was an exception to the

6       warrant requirement and that there were exigent circumstances.

7       We are focusing so far on the discussion of the defendant's

8       knowledge as to voluntariness and the circumstances, but the

9       defendant doesn't have knowledge to what Ms. Siegmann put in

10      her brief.

11           We now know, according to unsworn statements with

12      nothing but good faith of counsel going forward, that there was

13      some sort of indications that Jahar might have been in the

14      apartment, that Jahar was close to the apartment, that a phone

15      was pinging, that a hostage rescue team out of Quantico

16      presumably came up, a Hostage Rescue Team was authorized by the

17      Director of the FBI himself.  We have all these things, and

18      it's the Government that has the knowledge, we don't, of how

19      that came about, and what was the exigency.

20           Why wasn't a search warrant obtained?  They started

21      gathering this information, we don't know for sure, but

22      according to the papers, again unsworn, sometime earlier that

23      morning, 6:00 in the morning, or the night before, and then

24      they had surveillance.

25           THE COURT:  If I may interrupt you, you have

1    identified a discrete category of material that may be the

2    subject of a Motion to Suppress.  That is to say, it does not

3    depend upon the testimony of the defendant to explore it.  That

4    is, I guess, the kind of -- it is a little much to call this a

5    Terry stop, but the Terry stop quality of the initial encounter

6    at Carriage Road.  That may be carved out separately, and I

7    mean to do that once we get to the point of what is left if we

8    do not have these affidavits.

9          MR. STAHL:  So, that is one part.  And then, if we

10   look through the 302s, which is what we have, and we now have

11   from last evening provided to us some e-mails now between

12   agents working on this portion of the case and interrogating

13   these individuals and doing the searches.  We now have some of

14   their e-mails provided to us about timing and about different

15   issues.

16          So, we now have a little bit more, but we still don't

17   have anything under oath from the Government as to the

18   voluntariness of the statements either.  So, we go back to we

19   have what is the exigency and then what are the circumstances

20   of their interrogation?  We have some times only on the Miranda

21   forms.  Then we have some general comments in 302s.  They spend

22   very short shrift, just a couple of lines, about how, a couple

23   of lines about how the people were Mirandized, supposedly, and

24   then we go into pages and pages of other things, and then we go

25   into, "We nicely drive them home afterwards, and then we see

1   some more things."  I mean, that's all we have.  So, we don't

2   have any information or testimony from the 302s as to the exact

3   circumstances that the Government even claims went into those

4   circumstances.

5          So, that leads me to -- my question, then, is if we

6   are doing this order where I will represent, and your Honor has

7   graciously given me more time to then think about that, is if

8   the Government goes first, do we get to cross-examine those

9   witnesses as we go along, as we would normally do, limited to

10  the relevant issues -- this is not a fishing expedition for

11  trial.  This is going strictly to those discrete areas that we

12  have outlined in our brief.  Or was your Honor saying before

13  that the Government would do the direct, you would hear that,

14  we would not cross and then the defendant --

15          THE COURT:  No, no.

16          MR. STAHL:  Okay.  If I misunderstood, that's fine.

17          THE COURT:  If I was not clear, I thought I was, but

18  of course you get to cross-examine limited to the issues that

19  are in play in this case.

20          MR. STAHL:  That are relevant, yes.  Okay.  All right.

21  That cleared it up.  I completely misunderstood that.

22          THE COURT:  Does the Government have anything to

23  offer?

24          MS. SIEGMANN:  Your Honor, just from what we have

25  heard today, it sounds like Mr. Tazhayakov and Mr. Phillipos

 1    are now withdrawing their affidavits.

 2         THE COURT:  Well, they are not standing behind them.

 3    I suspect they would not say that they are withdrawing, but I

 4    view that as effectively withdrawing their affidavit, because

 5    they will not permit that affidavit to be the subject of

 6    cross-examination.

 7         MS. SIEGMANN:  And, yes, last night in advance of the

 8    hearing we produced Jencks materials for witnesses that we

 9    thought might be testifying today and we weren't sure if they

10    were being called as Government witnesses or defense witnesses

11    so that we produced those in advance of the case.  And we do

12    stand by every statement of fact in our brief, and we will be

13    able to call witnesses and prove those to the Court.

14         THE COURT:  What does that mean?  Now you want to have

15    a hearing on the Motion to Suppress?

16         MS. SIEGMANN:  No, we would only actually want a

17    hearing if -- right now it sounds like the only person -- I

18    didn't hear definitively from Mr. Stahl whether they are going

19    to stand by the affidavit and have their client subject to

20    cross-examination.  But if that's the case, then the hearing

21    would only be as to Mr. Kadyrbayev and not as to the two --

22         THE COURT:  There are other dimensions of this, which

23    is the foundation for a Terry stop, which is established

24    through the 302s.  That is, agents say that they had all of

25    this information about the locus being a place that they were

1    concerned might be where Mr. Tsarnaev was then located.  That

2    is not something that their affidavits can deal with.  So, the

3    question then becomes do we have a hearing on that, or is the

4    Government satisfied to simply rest on the state of the

5    submissions, which I will permit to be updated with affidavits

6    saying that they are truthful?

7         MS. SIEGMANN:  With regards to the <u>Terry</u> stop, as the

8    Government indicated in its papers, we are not relying upon the

9    exigent -- anything that was said during the exigent search by

10   the defendants.  The issue with the <u>Terry</u> stop was just to

11   prove that the defendants were not unlawfully arrested at the

12   time that they were taken.

13        THE COURT:  So, I understand the Government to be of

14   the view that, "We are not using any of these statements.  As a

15   consequence, we do not need this hearing."

16        MS. SIEGMANN:  And they were subsequently Mirandized

17   at the Barracks before they confessed to the crimes charged.

18        THE COURT:  And you understand that all of this will

19   have to be resolved at trial, that is, independently, the

20   question of voluntariness, at trial after jeopardy has

21   attached?

22        MS. SIEGMANN:  Yes, your Honor, we understand that.

23        THE COURT:  All right.

24        So, do you want to take additional time, Mr. Stahl?

25        MR. STAHL:  Yes.

1          THE COURT:  As I understand it, unless I hear

2     something further from Mr. Wooldridge, or Mr. Demissie, or

3     Ms. Church, that the defendants will not permit examination on

4     the affidavit?

5          MR. WOOLDRIDGE:  Just one issue I had, your Honor.

6     Just for clarification, did I hear the Government correctly

7     that they are going to submit affidavits in support of the

8     factual allegations?

9          THE COURT:  No, you did not hear them say that.  You

10    heard me say that I would afford the opportunity to do so.

11         MR. WOOLDRIDGE:  And I did hear them correct that they

12    stand by the facts alleged in their opposition papers?

13         MS. SIEGMANN:  Yes, your Honor.  As I indicated, that

14    we would call witnesses, if we were going to have a hearing, to

15    support every fact in that brief.

16         THE COURT:  I'm sorry, Mr. Demissie.  I think this is

17    a second round of replies.

18         MR. DEMISSIE:  Yes, your Honor.  I just want to

19    clarify we stand by the affidavit we submitted.  We simply

20    object to the requirement that we have to make the decision to

21    put on our client prior to the Government meeting its burden of

22    proof, and we just ask the Court to note that objection, and we

23    will obviously address the issue at trial, as your Honor

24    suggested.

25         THE COURT:  I understand that that is the case for

1   both, and I just want to be sure that in the case of both

2   Mr. Tazhayakov and Mr. Phillipos you do not suggest that you

3   have laid a foundation for a Motion to Suppress other than

4   through the affidavit, that there is anywhere in the evidence

5   in this case that would support your Motion to Suppress, the

6   foundation for your Motion to Suppress, of involuntariness.

7          MR. DEMISSIE:  Your Honor, I don't want to belabor the

8   issue; I think my co-counsel addressed it.

9          But we believe that the affidavit raised sufficient

10  facts that made out a *prima facie* case, and the procedure the

11  Court should follow, and I understand your Honor's position, is

12  then to require the Government to meet its burden of proof,

13  allow the defendant at *that* point, once the Government rests,

14  to decide whether or not to submit additional evidence by way

15  of testimony or additional witnesses.

16         We believe we have met a *prima facie* case.  We are not

17  withdrawing the affidavit, we are standing by it, but if the

18  Court decides that the only way we can proceed is by indicating

19  at this point whether or not our client would take the stand,

20  we are not willing to make that commitment.

21         THE COURT:  I understand your response.

22         Mr. Wooldridge, anything further?

23         MR. WOOLDRIDGE:  The only thing, your Honor, I was

24  thinking, and I don't have the immunized witness's deposition

25  here with me, I would like to be able to review that and submit

1    some of that testimony to your Honor.

2            THE COURT:  Well, what I think, then --

3            MR. WOOLDRIDGE:  See if that would be enough for your

4    Honor to say I have met my burden of production.

5            THE COURT:  Because I have carved out this whole week

6    to have these hearings.

7            MR. WOOLDRIDGE:  I understand, Judge.

8            THE COURT:  I am kind of surprised that the defendants

9    have taken the position that they take concerning this, but

10   that is their choice, or, as I say, tactic.  But I will review

11   anything further that you offer in support like that --

12           MR. WOOLDRIDGE:  Thank you, your Honor.

13           THE COURT:  -- to support having some sort of

14   evidentiary hearing on a Motion to Suppress.

15           MR. WOOLDRIDGE:  Okay.

16           THE COURT:  But I really think I want it by the end of

17   the day here.  I mean, it is one deposition, you took it so,

18   you can show me what supports it.

19           MR. WOOLDRIDGE:  Thank you, your Honor.

20           THE COURT:  All right.  So, we will take another

21   break.  How long do you think you need here?

22           MR. STAHL:  Just, if I could have till 12:00, your

23   Honor?

24           THE COURT:  Sure.

25           MR. STAHL:  Your Honor, just so the record is

1    complete, I don't know your courtroom procedure.  I join in the

2    other defense counsels' motions.

3             THE COURT:  You are standing alone on this.  There is

4    no joinder on this.

5             MR. STAHL:  All right.  So, then I join in -- you are

6    saying there is no automatic joinder, so I am saying I join in

7    Mr. Demissie's --

8             THE COURT:  But to the degree that it applies, and it

9    does not, you are making an individual determination regarding

10   this defendant and what position you take.  You do not get to

11   join in that objection, unless you individually raise it.

12            MR. STAHL:  Well, your Honor, I am individually

13   raising that I also object that the defendant has to make a

14   commitment now to your Honor to testify and be subject to cross

15   at the end of the Government's presentation without seeing

16   whether it's necessary or not and committing to that in

17   advance.  I understand that if I say we are going to do that

18   and go forward, that's what we're going to do.  I think I still

19   have a right to object for the appellate record that your Honor

20   is telling me I must do it that way, and there's a shifting of

21   the burden.

22            THE COURT:  That is noted.  It is not quite what was

23   said as the foundation.  What was said is that there is an

24   inadequate foundation for this Motion to Suppress, having a

25   hearing on this Motion to Suppress, unless the affidavit is

1    considered.  The affidavit can only be considered if there is a

2    commitment to permit it to be examined.  If there is not a

3    commitment to permit it to be examined, cross-examined, then it

4    is illusory, as far as I am concerned.

5         MR. STAHL:  I understand your Honor's ruling, and I

6    would simply note for the record that I don't believe it's

7    illusory.  I think your Honor can give it less weight, but it

8    still is admissible, and it's still a fact to be considered,

9    but it goes to the weight --

10         THE COURT:  Whenever there is a factual dispute,

11    virtually whenever -- there are modest circumstances in which

12    this changes -- I want to hear the witnesses.  I am being asked

13    to make a determination with respect to voluntariness.  I want

14    to be sure that I am hearing all of the witnesses, and I want

15    to be sure that there is a foundation for someone to ask for it

16    that is not designed to advance a discovery initiative that is

17    not authorized by the Federal Rules.

18         MR. STAHL:  I understand, your Honor.

19         THE COURT:  If you want to take over the lunch period,

20    that is fine.  I am not trying to force this issue any more

21    than that.

22         MR. STAHL:  No.  That's very generous, your Honor.  I

23    would take you up on that.  I didn't want to push my luck, but

24    that would be good.

25         THE COURT:  Well, it is no longer a matter of luck; it

1    is a matter of whether or not you have got something

2    persuasive.  If it is 12:30, do you want that?  I am not

3    pressing beyond the fact that if we are going to have a hearing

4    I would like to have the hearing.

5         MR. STAHL:  Yes, your Honor.  If this is going to be

6    our lunch break, I would just ask for the full hour.

7         THE COURT:  So, we will be back here at 12:45.

8         MR. STAHL:  Thank you, your Honor.

9         THE COURT:  And those who wish to participate will be

10   here at 12:45.  If they are not, then the matter is going

11   forward in their absence.

12        THE CLERK:  All rise.

13     (The Honorable Court exited the courtroom at 11:40 p.m.)

14                    (Lunch recess taken)

15        THE CLERK:  All rise.

16    (The Honorable Court entered the courtroom at 12:50 p.m.)

17        THE CLERK:  This Honorable Court is back in session.

18   You may be seated.

19        THE COURT:  So, Mr. Stahl, where are we?

20        MR. STAHL:  Yes, your Honor.  We are prepared to

21   proceed.

22        THE COURT:  So, let's talk about the -- although, I

23   guess we do not have to reach it today, the question of the

24   subpoenas.

25        MR. STAHL:  No, your Honor.  I subpoenaed the agents

1    and what I thought were relevant documents to what they would

2    be testifying about, and I presumed that when we first

3    discussed this I think back in January that I would be putting

4    the agents on.  So, I wanted to make sure that, number one,

5    they were here and available, and, number two, that they had

6    the documents.  The Government has started to provide us some

7    documents.  I am sure as things come up we will have other

8    things.  So, I don't think it's an issue right now.

9          THE COURT:  All right.  So, how do you want to proceed

10   with respect to Mr. Kadyrbayev's affidavit?  I indicated a

11   willingness to receive the affidavit as direct testimony.  You

12   indicated you might want to expand on some of the issues.

13         MR. STAHL:  Yes.  I would like to proceed where the

14   Government puts on their agents.  They have talked about who is

15   going first.  It will be Agent Walker.  At cross, we will hold

16   Mr. Kadyrbayev to the end.  I will do some direct in addition

17   to the affidavit, just to highlight some things and to bring

18   some things out, and then, pursuant to your Honor's ruling at

19   the time, whether he needs to be crossed, and then that's it.

20         THE COURT:  So, let me, then, turn to the procedures.

21   I understand that there may be some further submission on

22   behalf of Mr. Tazhayakov.

23         MR. WOOLDRIDGE:  Of course, your Honor.

24         THE COURT:  I am not sure the people who practice

25   principally in the Second Circuit would understand this

1    reference, but the way in which I am going to treat the

2    question of voluntariness is in the cases of those who are not

3    submitting something further, or whatever they submit is

4    insufficient, is what we call a Petrozziello determination.  At

5    the conclusion of all of the evidence in the case -- it arises

6    out of a case called United States v. Petrozziello, but that is

7    the treatment of co-conspirator hearsay -- a judge in the First

8    Circuit is required to make a finding, if asked, to make a

9    finding as to the admissibility of co-conspirator hearsay.

10   Generally it is made at the conclusion of all of the evidence,

11   but sometimes the Government wants to get that clarified

12   before.

13          In any event, here the Government has not indicated a

14   desire to have this clarified before the conclusion of all of

15   the evidence in the case, and that is when I will make the

16   determination with respect to voluntariness.  I emphasize what

17   I have said before.  If I find that those statements are not

18   voluntary, I will order a mistrial, I will consider it to be on

19   the Government's back, and, as a consequence, there will be no

20   retrial, or at least as far as I am concerned there is no

21   retrial on it.  So, everybody understands the rules of the game

22   with respect to this.  All right?

23          MR. WOOLDRIDGE:  Yes, Judge.

24          THE COURT:  Mr. Demissie, similarly?

25          MR. DEMISSIE:  Yes.

1    MR. STAHL:  I always think you are pointing at me.

2    THE COURT:  No.  There is a guilty mind at work.

3                    (Laughter)

4    MR. DEMISSIE:  So, I just take it what you just said

5    applies to my client?

6    THE COURT:  Yes, it does as well.  There are a couple

7    of *ex parte* submissions that some of the parties have made.  I

8    do not think I need to deal with them immediately now.

9    MR. DEMISSIE:  No, your Honor.

10   THE COURT:  I assume that both counsel for

11   Mr. Tazhayakov will be remaining and also Mr. Phillipos and his

12   counsel will be remaining during these examinations.  The

13   examination will be conducted only by Mr. Stahl.  All right?

14   MR. DEMISSIE:  Yes.

15   MS. SIEGMANN:  That was going to be my question.

16   MR. WOOLDRIDGE:  Yes, your Honor.

17   MS. SIEGMANN:  Your Honor, just some clarification on

18   one issue.  The exigent search and then the Terry stop.  The

19   circumstances were very similar for both Kadyrbayev and

20   Tazhayakov, and the question the Government would pose is, if

21   you are making a determination concerning Kadyrbayev that the

22   Government would, at least up to the point of the Miranda,

23   request a decision be made as to both, up to that point.

24   THE COURT:  Only if they both participate.

25   MS. SIEGMANN:  And if the Government asks for that to

1  be done, just for that portion of it, we wouldn't be calling

2  witnesses on the Miranda issue with regards to Tazhayakov, just

3  at the initial justification for the Terry stop, and that would

4  only allow Mr. Tazhayakov to cross-examination on that issue.

5  Would that be what the judge would allow?

6          THE COURT:  Yes, and so would I.  Both the judge

7  and I.

8                      (Laughter)

9          MS. SIEGMANN:  No.  What you would allow, your Honor.

10         THE COURT:  Right.

11         MS. SIEGMANN:  One second.

12         So, I think that it makes sense to do it that way,

13  because since we are presenting the same testimony that we

14  would, because the witness, Special Agent John Walker, will be

15  testifying as to the circumstances as to both defendants at the

16  scene on that day in question, but we wouldn't be asking the

17  Court for an advanced ruling on the Miranda waiver.

18         THE COURT:  Does that work for you, Mr. Wooldridge?

19         MR. WOOLDRIDGE:  That's fine, your Honor.

20         THE COURT:  All right.  So, that is how we will

21  proceed, then.

22         MR. CAPIN:  One further clarification.  Will the Court

23  be ruling, then, with regard to Kadyrbayev, who is fulsomely

24  participating, on the question of voluntariness of his

25  confession at this juncture?

1            THE COURT:  Yes.

2            MR. CAPIN:  Thank you.

3            THE COURT:  Now, he has a right to raise it again at

4    trial.

5            MR. CAPIN:  Understood.

6            THE COURT:  And I will think about it at trial, and it

7    may be that the testimony at trial is different than it is

8    here.  But he has asked for a Motion to Suppress.  He has met

9    the foundational requirements, unlike, in my view, the other

10   two defendants.  So, he is entitled to the Motion to Suppress

11   determination.  He is also entitled to the determination at

12   trial, as are all three defendants at that point.

13           So, what I understand is I have before me the

14   affidavit of Mr. Kadyrbayev, and the Government can call its

15   first witness.

16           MS. SIEGMANN:  The Government calls Special Agent John

17   Walker to the witness stand.

18           SPECIAL AGENT JOHN WALKER, DULY SWORN BY THE CLERK

19           THE CLERK:  Please state your full name, spelling your

20   last.

21           THE WITNESS:  My name is John Walker, W-A-L-K-E-R.

22           MR. STAHL:  Excuse me, your Honor.  I just want to

23   make sure.  I did talk to the Government before we started

24   about sequestration of witnesses.  I want to make sure no other

25   FBI agents are in the room that will be testifying.

1          MR. CAPIN:  Agent Quinn.

2          THE COURT:  I will look to the parties to police this,

3     but it is any person -- that there has been a request for

4     sequestration, I guess, and any person whose reasonable belief

5     is they are going to be a witness in the case should be out of

6     the courtroom, except, of course, obviously, the defendant.

7                          DIRECT EXAMINATION

8     BY MS. SIEGMANN:

9     Q.   Sir, could you tell us how you're employed.

10    A.   I'm a Special Agent of the Federal Bureau of

11    Investigation.

12    Q.   How long have you been employed by the Federal Bureau of

13    Investigation?

14    A.   In August I will have been employed in that capacity for

15    23 years.

16    Q.   What is your current assignment?

17    A.   I am assigned to a Criminal Investigative Squad of the

18    Boston Division of the FBI, but for the past 13 months I've

19    been effectively seconded to the Boston Marathon Bombings Task

20    Force.

21    Q.   Sir, can you tell us what the JTTF is?

22    A.   The JTTF, the Joint Terrorism Task Force, one of which is

23    resident here in Boston, is one of 56 or more Terrorism Task

24    Forces that the FBI established with multi-agency participation

25    in order to investigate most all, or perhaps all, of the

1   terrorism complaints, cases that arise in the course of our

2   work.

3   Q.   You indicated a moment ago that you have close to 23

4   years' experience as an FBI Agent.  Could you briefly describe

5   what positions you've held over that 23 years as an FBI Agent.

6   A.   For my first six years I was assigned to a small office in

7   Oregon where I primarily investigated violations of -- violent

8   crimes violations and domestic terrorism violations.

9          Thereafter, for 2 1/2 years I investigated public

10  corruption matters arising from the 1996 Presidential Election

11  cycle.  I was promoted to a position in the Criminal

12  Investigator Division, the Violent Crimes and Major Offenders

13  Section at FBI headquarters.  A couple of years later I was

14  promoted to a field supervisory position here in Boston, where

15  I supervised a squad of the Boston Joint Terrorism Task Force.

16         About three years later I started effectively six

17  years of overseas assignments for the FBI, the last portion of

18  which I was resident in Western Europe, and returned to Boston

19  about three years ago and, as I mentioned, have been employed

20  for a little more than a year with regard to the Marathon

21  investigation generally.

22  Q.   Have you ever served in any capacity as an emergency

23  management or in crisis management for the FBI?

24  A.   I have.  When I was on the JTTF, I had responsibility.  My

25  portfolio, that of my squad, was both domestic terrorism and

1   counterterrorism preparedness.  In that role I was the

2   Division's Crisis Management Coordinator.  I supervised various

3   of the critical incident response elements in the Division,

4   Special Agent Bomb Technicians, Hazardous Materials Response

5   Team, Evidence Response Team and so forth.

6          I also in that role supervised our counterterrorism

7   preparedness for large-scale events that might be susceptible

8   to acts of terrorism, including the Boston Marathons that

9   occurred during my supervision, the 2004 Democratic National

10  Convention.  I supervised the FBI's about a two-year effort

11  building up to that.  So, that would answer it.

12  Q.   So, before the Boston Marathon bombing had you worked on

13  any other cases that involved attacks that resulted in

14  fatalities?

15  A.   Yes.

16  Q.   And could you just briefly describe those instances.

17  A.   From the explosion of the Murrah Building in Oklahoma

18  City, to notably the first and second World Trade Center

19  bombings, every agent in the FBI, including myself, was working

20  leads in that regard.  When 9/11 occurred I was in Washington.

21  I spent the first days in our Strategic Information and

22  Operations Center, because I had a responsibility criminally

23  for the Crime Aboard Aircraft Program for the FBI.  When I came

24  to Boston I began a national security profile in terrorism.

25          Most of my work overseas for just shy of six years,

1    the vast bulk of it was also in the national security arena,

2    although not all counterterrorism, but the majority of it was.

3    Q.   And, sir, over your 23 years of experience, how many

4    interviews would you estimate you have conducted?

5    A.   Well over a thousand.

6    Q.   Now, directing your attention to the week of the Marathon

7    bombing, I would like to go through and discuss what knowledge

8    and what information the FBI knew at the time that they

9    encountered the defendants.

10        So, going back at 2:49 p.m. on April 15th, 2013, what

11   happened?

12   A.   Two explosive devices detonated in close succession on

13   Boylston Street in Boston, killing three people and seriously

14   injuring, maiming approximately 260.

15   Q.   How soon after the bombings did the investigation begin?

16   A.   Immediately.

17   Q.   Were command posts set up?

18   A.   A command post was established for a little less than a

19   day.  A unified command was set up, and an initial command post

20   was set up at the Weston Hotel in Boston.  At the same time,

21   the FBI set up its Joint Operations Center in Boston within

22   moments of the explosions, and various other command posts were

23   established throughout the week as developments warranted.

24   Q.   What were the first investigative steps taken that day?

25   A.   After establishment of the unified command and, naturally,

1    after life-saving efforts and without interfering with

2    life-saving efforts, a perimeter was established in the

3    Back Bay of Boston so that evidence could be secured.  Evidence

4    Response Teams, Special Agent Bomb Technicians, all manner of

5    investigators at I think all three levels of Government.  All

6    three levels of Government began working in earnest in the Back

7    Bay.  We conducted immediately a logical investigation in a

8    case of this kind.  We sent out investigators from the FBI but

9    also many -- all of our JTTF partners to each of the hospitals

10   where victims were reported as having been transported.  We

11   began interviews of those victims, collecting physical evidence

12   from those victims, to include their clothing, any remnants,

13   potential remnants of explosive devices from their persons.

14        We brought in and began to establish a unified

15   evidence response effort and team involving different agencies.

16   We obtained various telephone data.  On and on and on

17   throughout the week, yes.

18   Q.   So, it's fair to say there was a lot of work done to

19   collect as much evidence as possible?

20   A.   Yes.

21   Q.   Who took the lead in the investigation, what agency?

22   A.   Ultimately, the FBI assumed, with the acquiescence or the

23   concurrence of that unified command, to assume a lead role for

24   the investigation.

25   Q.   But at all times this was a JTTF investigation, correct?

1    A.    Yes.

2    Q.    Law enforcement agencies were sharing information?

3    A.    Yes.

4    Q.    And after assisting the wounded, the next immediate

5    concern was to prevent further loss of life; is that your

6    understanding?

7    A.    Precisely correct, yes.

8    Q.    Is it fair to say that the FBI was concerned about other

9    attack plans?

10   A.    Yes.

11   Q.    Can you explain to the Court what the concerns were at

12   that time?

13   A.    Immediately we had apprehension that a coordinated attack

14   of this nature in and of itself was a sophisticated crime,

15   sophisticated act of terrorism, if only because in a highly

16   populated but also a highly secure area of a city like this, in

17   a special event that had gone on for, obviously, decades, that

18   persons were able to infiltrate the security setup in the area,

19   they were able to explode, detonate devices with large-scale

20   casualties.  They were able to effectively flee the scene.

21         We did not, for instance, see -- as is often or can be

22   the case with regard to suicide bombings, we did not, for

23   instance, see decapitated heads on the scene.  There were clues

24   that led us to believe that the bomber had escaped the area.

25   And as the information was developed early on Monday, and

1   certainly was bolstered by the evidence collection on Tuesday

2   at the scene, we developed a much closer sense of the types of

3   devices and the level of sophistication, and, therefore, that

4   it was likely not one person but likely two or more people or

5   some broader conspiracy.

6   Q.   You mentioned a moment ago that there was some preliminary

7   analysis by Bomb Technicians about the bombs, the improvised

8   explosive devices.  Could you tell us what the preliminary

9   analysis -- briefly, what did the preliminary analysis reveal

10  as to how this bomb was constructed?

11  A.   I will, with the caveat that the FBI has not but will soon

12  issue its final exhaustive analysis and report of the devices

13  themselves and how they were constructed and detonated.

14        But with regard to our working knowledge at the time,

15  we had an understanding, based on evidence that we gathered at

16  least by Tuesday, Tuesday morning, that there were two devices

17  likely contained -- or the conveyance devices were likely

18  backpacks; that the devices themselves were likely constructed

19  of pressure cookers designed to delay the expansion of the

20  gases sufficiently that the pressure would build up so much

21  that it would multiply by an order of magnitude the impact of

22  the explosions.

23        We gathered different components of those devices, to

24  include shrapnel, generically, designed to kill and maim; and

25  so, we had a fairly good understanding, including we had a

1    working hypothesis with regard to how the devices were

2    detonated.

3    Q.    And they were detonated remotely?

4    A.    They were.

5    Q.    So, how much of the FBI's resources were dedicated to this

6    investigation during the week of April 15th, 2013?

7    A.    There was no greater obligation of the FBI broadly

8    throughout the World that week, throughout the entirety of the

9    week.  It was all hands on deck for the Boston Division.  We

10   were supplemented very early on and successively by specialized

11   teams of Bomb Techs and people with different skill sets and

12   evidence response, crisis management, from various divisions, a

13   huge augmentation from the headquarters, and the Quantico

14   Critical Incident Response Group Teams.  But also from --

15   increasingly as the week went on and was ramping up on

16   Thursday, we began simply to receive more investigators, line

17   investigators, from New York and New Haven and Albany and

18   places to assist us and to keep us pressing forward.

19   Q.    At approximately 5:00 p.m. on Thursday, April 18, 2013,

20   what happened?

21   A.    At approximately about 5:15 that day, on Thursday, the

22   18th, the Special Agent in Charge of then -- the SAC of the

23   Boston Division released photographs and sought the assistance

24   of the public in identifying two men whom we believed were

25   responsible for the bombings.

1    Q.   And by 6:50 a.m. Friday morning, April 19th, had the

2    suspected bombers in those photographs been identified?

3    A.   By 6:50 a.m. the FBI was certainly aware of the identity

4    of one of those persons, then deceased, and the FBI publicized

5    the name of the second person in the photograph, colloquially

6    referred to as "White Hat" or "Bomber Number Two."  But, yes,

7    we had.

8    Q.   And how was it that the FBI was able to identify the

9    individuals in those photographs?

10   A.   We identified the first individual based on a positive

11   comparison of his known fingerprints.  A fingerprint from the

12   decedent was transmitted to our facility in West Virginia, the

13   repository for fingerprints, and within moments we had a

14   positive identification on that person.

15   Q.   Well, how was that person -- the decedent you are

16   referring to was Tamerlan Tsarnaev, correct?

17   A.   It is.

18   Q.   How was that person killed?

19   A.   Perhaps another caveat.  I would not want to weigh in on a

20   -- there may be some pending determination of that, but he came

21   into --

22        MR. STAHL:  I am going to object.  I don't know what

23   the relevance is of how Tamerlan was killed.

24        THE COURT:  I sustain the objection.

25        MR. STAHL:  The fact is he is deceased, and we can

1   move on.

2           THE COURT:  I do not see it is relevant.  If you are

3   trying to bring out there was a fire fight, you can do that.

4           MS. SIEGMANN:  Yes, your Honor.  Then, I'll ask.

5   BY MS. SIEGMANN:

6   Q.   Earlier that morning, on April 19th, had there been a fire

7   fight in Watertown?

8   A.   Yes.

9   Q.   And who was believed to be involved in that fire fight?

10  A.   We believe that Tamerlan Tsarnaev and his younger brother,

11  Dzhokhar Tsarnaev, engaged in a violent confrontation with law

12  enforcement, wherein they were shooting in the direction of

13  police officers and lobbing improvised explosive devices at

14  those police officers.

15  Q.   And during that fire fight, Tamerlan Tsarnaev, at the

16  conclusion of that fight, was actually deceased, correct?

17  A.   Yes.

18  Q.   And was law enforcement able to capture the younger

19  brother, Dzhokhar Tsarnaev, during that fire fight?

20  A.   No.

21  Q.   So, by 6:50 a.m., after this fire fight on April 19th, did

22  the FBI believe that the Tsarnaevs had committed any other

23  violent crime?

24  A.   Yes.

25  Q.   What was that, Special Agent?

A.   We believed at the time that they were responsible for the murder of a police officer in Cambridge at about 10:31 on the evening of Thursday, April 18.  We believe they committed a carjacking, a violent crime, when they carjacked a getaway car, if you will.  We believed at that time that they may have been involved and were involved in a robbery at the time in a convenience store, but we then thereafter believed they were involved in this violent confrontation in Watertown.

Q.   How big of a threat did the FBI believe Dzhokhar Tsarnaev was on April 19th, 2013?

A.   An enormous threat to the general public and to law enforcement seeking his apprehension, sufficiently so that our Government leaders considered it prudent to effectively shut down a major metropolitan area for 12 hours or more.

Q.   As a result, were there any special instructions issued to law enforcement what to do if he was spotted?

A.   There were special instructions given to law enforcement, including myself and my FBI colleagues, even with regard to how to conduct leads during that day, that we would, because of the perceived level of threat, even with -- we talked to many, many, hundreds of people during that week, and we began that morning to go out and talk to every conceivable person that we even thought knew Dzhokhar Tsarnaev.  But we were instructed to do things in a manner that we don't normally do, for instance, telephoning ahead before knocking on a door, if you will,

1    because we did not know at the time -- we had within hours

2    before identified persons we believed responsible for this

3    bombing and other violent crimes.

4            And so, I don't know that I recall specific

5    instruction with regard to what to do if we come upon the

6    fugitive, if you will, but I don't think we needed to be told

7    that.  I would have exercised extraordinary caution.

8    Q.   Well, after there was public -- the media was reporting

9    who the individuals in the photographs were, Tamerlan and

10   Dzhokhar Tsarnaev, did the FBI believe that now that's the only

11   people that were involved in this bombing?

12   A.   No, to the contrary.  We believed that there were very

13   likely more people involved, that there were possible cells.

14   Our enormous and abiding focus was to ensure that we did not

15   see a third bomb go off, if you will.

16   Q.   So, how many resources were dedicated on April 19th, 2013

17   into finding Dzhokhar Tsarnaev?

18   A.   I have come to learn over the course of the last 13 months

19   that there were thousands here in Massachusetts, and the leads

20   likely spun around the World at that time, literally.  The

21   Legal Attaché Officers of the FBI in different places I know

22   were engaged immediately.  Again, I know of no -- nothing of

23   greater moment during that year and in recent term of the FBI.

24   It was of enormous significance of national consequence.

25   Q.   Now, by the time the Tsarnaevs were publicly identified,

1   were any manhunts already underway?

2   A.   Yes.

3   Q.   And where was that?

4   A.   There was a massive manhunt that was underway in

5   Watertown, where a huge swath of a residential neighborhood was

6   effectively cordoned off, and tactical teams were going house

7   to house to effect his arrest.

8   Q.   So, is it fair to say that on April 19th, 2013, finding

9   Dzhokhar Tsarnaev and determining whether there were any other

10  bombs, bombers, or conspirators, or other attack plans was an

11  urgent public safety concern?

12  A.   Without question.

13  Q.   Special Agent, where were you on April 19th, 2013?

14  A.   In the morning I was in Boston, and at or about 9:00 I was

15  dispatched to New Bedford.  Actually, North Dartmouth,

16  Massachusetts, for a related investigation.

17  Q.   So, you said you actually were sent to North Dartmouth?

18  A.   Yes.

19  Q.   Where, specifically?

20  A.   I went to the Barracks of the Massachusetts State Police

21  in North Dartmouth, Massachusetts.

22  Q.   And what was the purpose that you were sent there?

23  A.   I was to speak with a complainant who had said that he had

24  gone to school at one point with the fugitive, Dzhokhar

25  Tsarnaev, and it was one of hundreds of leads to, as I

1   described earlier, go out and develop lead information that

2   could lead us to effecting the arrest.

3   Q.   What did you determine that morning as to where

4   Dzhokhar Tsarnaev went to school?

5   A.   When I got down into the South Coast, if you will, I

6   learned that, in fact, he was matriculated at the University of

7   Massachusetts at Dartmouth, and as the morning went on it

8   became clear that, in fact, he wasn't simply a former student

9   or a sometimes student, but that he was a student there, and

10  that the campus itself might be a locus for a search.

11  Q.   So, did you actually eventually go to UMass Dartmouth that

12  day?

13  A.   I did.

14  Q.   And when you arrived at UMass Dartmouth, what was going on

15  there?

16  A.   The campus was nearing completion of a total campus

17  evacuation.  The University had decided, for student and public

18  safety, to shut down the University.

19  Q.   In addition to being a student at the University, at UMass

20  Dartmouth, were you provided any other information from the

21  University about Tsarnaev on that day, April 19th?

22  A.   I was.

23  Q.   Can you describe what you learned from UMass Dartmouth

24  from the administrators or the Police Department there?

25  A.   Sure.  I learned that Tsarnaev was a resident on campus in

1    a dormitory called "Pine Dale," and that, in fact, he was last

2    thought to have gained access to that particular dormitory as

3    late as 4:02 p.m. on Thursday, April 18th.

4           I learned later, but not too much later, we received a

5    report on campus from the campus technology infrastructure that

6    at 6:19 a.m. on the morning of Friday, April 19, that Tsarnaev

7    had logged onto the system on campus.  While I was determining

8    whether that logon was remote or was -- would suggest that he

9    was physically present on campus, I received a second report

10   from campus authorities that he logged on and was thought to be

11   physically present on campus at 6:21 a.m. that Friday.

12   Q.   On the morning of April 19th, had the FBI received any

13   information about telephones subscribed to Tsarnaev?

14   A.   We had.  We knew that Tsarnaev, Dzhokhar Tsarnaev,

15   subscribed to four telephones with AT&T, and that the address

16   that he provided and the address to which his telephone bills

17   were sent was 69 Carriage Drive, New Bedford, Massachusetts.

18          One of those telephones was significant to us

19   immediately, because the telephone showed enormous and

20   continuing and temporally significant connectivity with the

21   late Tamerlan Tsarnaev, including around the time of the

22   bombings.

23          Almost as importantly for my work there that day, a

24   second of the telephones again subscribed by Tsarnaev happened

25   to show connectivity with Dzhokhar Tsarnaev a few hours before

1    the bombings on that Monday, April 15th.  The other two phones

2    showed little, if any, recent connectivity to either of the

3    Tsarnaev brothers.

4    Q.   Special Agent, was there a belief at the FBI at that time

5    that telephones, mobile phones, were used during the execution

6    of the bombing attack?

7    A.   Yes.

8    Q.   So, based upon that information, this telephone

9    information that you had received, subscriber information, what

10   did the FBI do next?

11   A.   Well, we were naturally all week long very concerned with

12   regard to phones, because, as I have mentioned, we suspected

13   that phones were used in the general commission of the act of

14   terrorism on the Monday.  We were also interested in

15   potentially exploiting intelligence from the phones to locate

16   the fugitive Tsarnaev.

17         I was told, and it caused me to that morning leave the

18   Barracks in North Dartmouth and proceed with all haste and with

19   blue lights flashing over to the campus, because I received a

20   call from the FBI Command Post in Boston that about 20 minutes

21   earlier -- and the time I received it I thought about 10:40

22   a.m. -- but about 20 minutes earlier that the second phone in

23   question that I just mentioned had transmitted a message, and

24   the report that I received was it transmitted a message to

25   Russia, and that message had bounced off a tower located about

1    a mile from the campus at UMass Dartmouth.

2            So, I believed at the time that there was a stronger

3    possibility that Tsarnaev may have actually eluded capture in

4    Watertown and might be transmitting communications from down in

5    the New Bedford/North Dartmouth area.

6    Q.   Now, talking about this phone, were the last four digits

7    9049?

8    A.   Yes.

9    Q.   And did you subsequently learn that that phone was used by

10   one of the defendants?

11   A.   I did.

12   Q.   And which defendant was that?

13   A.   Mr. Tazhayakov.

14   Q.   And a moment ago you said approximately shortly after

15   10:00 a.m. that one of the phones had sent a text message or

16   had some activity with Russia?

17   A.   Yes.

18   Q.   How far was that tower that it bounced off from the

19   defendants' apartment?

20   A.   From the defendants' apartment it was -- and I know this

21   because I mapped it out after the fact -- but it's

22   approximately 900 meters.

23   Q.   Now, what, if any, belief -- sorry.  Strike that.

24           During the afternoon of April 19th, 2013, was the FBI

25   able to determine the location of any of Tsarnaev's phones,

1    Dzhokhar Tsarnaev's phones?

2    A.    Yes.

3    Q.    And can you tell us what was learned that afternoon about

4    where that phone was located?

5    A.    We learned that the phone ending or having the suffix 9049

6    was physically present within, because we could not see it on

7    the outside, but within 69 Carriage Drive in New Bedford.  It's

8    a two-story, four-apartment building amidst a larger complex of

9    similarly constructed buildings.

10   Q.    So, based on that information, the FBI believed that one

11   of Tsarnaev's phones was located in 69 Carriage Drive; is that

12   what you said?

13   A.    Yes.

14   Q.    And did the FBI research that apartment, that address?

15   A.    The FBI separately, including down in the South Coast, and

16   I was witness to some of this, separately began developing

17   intelligence with regard to the persons that we believed to be

18   resident within an apartment at 69 Carriage, specifically

19   within 69A Carriage, a first-floor apartment.

20   Q.    And who did the FBI determine were the residents of the

21   69A Carriage Drive apartment?

22   A.    We knew at the time, including from Mr. Phillipos, that

23   Mr. Kadyrbayev, a Dias Kadyrbayev and someone named Azamat, was

24   a resident there, that they were Kazakhstan nationals, and that

25   was our working knowledge at the time.

1   Q.   And during the course of that afternoon, what, if

2   anything, did you learn about the defendants and their

3   relationship to Dzhokhar Tsarnaev?

4   A.   We learned from their friends that they were very close

5   friends or associates of Dzhokhar Tsarnaev.  We learned from

6   their friends that 69A Carriage was a frequent -- that Dzhokhar

7   Tsarnaev frequently visited that apartment, and that people

8   would see them coming back and forth between the school to that

9   apartment.

10   Q.   What did the Joint Terrorism Task Force learn that day

11   about the immigration status of Dias Kadyrbayev?

12   A.   We knew in the mid-afternoon of Friday, April 19th that

13   Mr. Kadyrbayev had suffered revocation of his Student Visa.

14   His F1 Visa had been revoked, and, therefore, we knew that he

15   was unlawfully present within the United States.  He was an

16   overstay following Visa revocation.

17   Q.   Were any Internet searches done on April 19th by anyone on

18   the JTTF?

19   A.   Many, many, many, including with regard to Mr. Kadyrbayev.

20   In particular, we received at about 9:00 in the morning, we

21   received intelligence from our U.S. Department of State that

22   had been doing some logical Internet search, and they

23   identified him.  They provided us information suggesting that

24   he was a close associate of Dzhokhar Tsarnaev.  They indicated

25   further that they found suspicious the fact that a photograph

1    had been somewhere on the Internet showing Dzhokhar Tsarnaev

2    and Dias Kadyrbayev, but that photograph had been removed hours

3    later.

4            So, with that information, an immediate lead was set,

5    bearing officer-safety caution statements, and to locate and

6    interview Kadyrbayev, because he may be at the two addresses

7    given.  One happened to be coincidently in Watertown, but the

8    second one was in Carriage Drive in New Bedford.

9    Q.   So, did the FBI have any other information connecting

10   Dzhokhar Tsarnaev to 69 Carriage Drive?

11   A.   We did.

12   Q.   Can you please describe that to the Court.

13   A.   We received information from the Massachusetts State

14   Police and its Fusion Center that on April 17 and April 18

15   three Skype calls were made between Dzhokhar Tsarnaev and

16   Tamerlan Tsarnaev, and that each of the three Skype

17   communications was made from an Internet protocol address, an

18   IP address, resolving to Dias Kadyrbayev at 69A Carriage Drive

19   in New Bedford, Massachusetts.

20   Q.   And based upon that information, did you or the FBI have a

21   belief as to where Mr. Tsarnaev was on April 18th?

22   A.   Yes.  As of the afternoon of April 18, the FBI, the JTTF,

23   Special Agent Walker, thought there to be a high probability

24   that the fugitive was located within the apartment bearing the

25   address 69A Carriage Drive in New Bedford.

1   Q.   Did Tsarnaev also receive mail at 69A Carriage Drive?

2   A.   He received his AT&T bill there.

3   Q.   So, based upon all this information, what did the FBI do?

4   A.   The FBI, as the information developed from the early part

5   of the afternoon, decided it prudent to establish some type of

6   a perimeter around the apartment, lest the fugitive, as we

7   increasingly suspected was in the apartment, lest he flee, and

8   we did that -- as the information hardened over the course of

9   the afternoon, we hardened up the perimeter around the

10  apartment.

11          That perimeter was almost exclusively the

12  Massachusetts State Police, but we were working -- I was

13  working in the unified command there at the -- we set up a

14  unified command post at the library of UMass Dartmouth, and I

15  was communicating and spent most of my day together, for

16  instance, with the State Police Major, having geographic

17  responsibility for that area, with the State Police Major

18  having tactical responsibility for their tactical assets, and

19  so we agreed that it would be prudent to set up the perimeter,

20  and we did.

21  Q.   And later that day was there a decision made as to whether

22  to execute a search of that apartment?

23  A.   Yes.

24  Q.   And what was the reason that there was a search executed,

25  a decision to search that apartment made?

1    A.    Because we thought it highly probable that the fugitive,

2    who had demonstrated enormous proclivity toward violent

3    confrontation, was physically present in the apartment, that we

4    believed, because of surveillance early in the afternoon, that

5    he was probably still in the apartment, including with regard

6    to the electronic emissions of the telephone that he subscribed

7    to, and we were concerned as an agency, as a Task Force, as

8    individuals there, that the more time that he had within a

9    close space unbeknownst to -- hiding out there, that there was

10   an increased threat of violence to the neighbors, to law

11   enforcement.

12   Q.    When you say "neighbors," was this a small apartment

13   building that only had just one apartment, or were there

14   numerous apartments within this complex?

15   A.    The complex itself was large.  The building itself is a

16   four-unit, as I mentioned, two on the bottom level and two up

17   top, but otherwise across the street are single-family homes.

18   It's sort of a busy, close-in neighborhood there.

19   Q.    So, it's a heavily populated residential area?

20   A.    Yes, yes, yes.

21   Q.    So, is it fair to say that there was a decision made to do

22   an exigent warrantless search that day of the apartment?

23   A.    Yes.

24   Q.    Who made that decision at the FBI?

25   A.    The Director of the FBI.

1    Q.   And that decision was made so you could find a person who

2    was believed to be armed and dangerous and had attacked the

3    Boston Marathon, bombing and committed violence throughout the

4    State; is that right?

5    A.   That is my clear and direct inference.  I obviously -- I

6    knew what the facts were, and those were the facts as of the

7    time that decision was made.  So, yes, that's my clear

8    inference.

9    Q.   When the FBI Director made the decision to search the

10   Carriage Drive apartment, where were you?

11   A.   I was, again, at the library of UMass Dartmouth.

12   Q.   Had you had any contact with the FBI's Hostage Rescue Team

13   at that point?

14   A.   I had.

15   Q.   And what is the FBI's Hostage Rescue Team?

16   A.   The Hostage Rescue Team, or HRT, is a large, full-time,

17   highly professional tactical force that the FBI deploys when

18   confronting its most significant criminal or terrorist threats.

19   I say this at the risk of seeming to flatter the Agency.  It is

20   undoubtedly the World's finest Civilian Tactical Force.  It

21   includes members of the World's finest military tactical

22   forces, and it has been employed in very, very high-level

23   investigations over its 30-year history.

24   Q.   Did they have any involvement in the search?

25   A.   They executed -- yes.  They were deployed to execute the

1    search of the apartment for Tsarnaev, yes.

2    Q.   So, they went into the apartment to find Dzhokhar

3    Tsarnaev?

4    A.   Ultimately, yes.

5    Q.   What role did you play in this search?

6    A.   I didn't play any role in the search itself.

7    Q.   Were you in the vicinity of the apartment when the search

8    was conducted?

9    A.   I was.

10   Q.   And what role were you playing by being in the area?

11   A.   I was there in entirely an investigative, in contrast to a

12   tactical, capacity with the FBI.  I deployed from the library

13   where HRT -- where we briefed, and they briefed with a few

14   local SWAT Teams that they integrated into their team in order

15   to take perimeter duty.  But I deployed from there with the

16   thought that I would likely need to come in contact with

17   Tsarnaev for investigative purposes as soon as he was safely

18   arrested and had come into FBI custody.

19   Q.   So, is it fair to say that you were acting in an

20   investigative agent capacity at the scene?

21   A.   Exclusively, yes.

22   Q.   And how many other investigative agents were there present

23   at 69 Carriage Drive that day?

24   A.   Because of the suddenness of our deployment, I was the

25   only, sole investigative body there at the scene.  It was

1    otherwise a tactical element of HRT with -- again, they

2    involved some other local tactical teams.

3    Q.   When did you arrive at 69 Carriage Drive that day?

4    A.   I arrived just behind HRT.  We effectively rolled up

5    together.  I was in a vehicle driven -- a State Police vehicle

6    with the two Majors from the State Police I just mentioned, as

7    well as a ranking officer from the Rhode Island State Police.

8    We staged about a block from the apartment, a block down on

9    Carriage Drive.

10    Q.   What happened after you and HRT had arrived at the scene?

11    A.   The HRT pulled up effectively in front of the apartment on

12    Carriage Drive.  They deployed other SWAT Teams to establish a

13    perimeter around the building in a good distance, in some

14    instances, behind and to the side of the building, and then HRT

15    called out using a megaphone.  They called out the occupants of

16    the building.  They effectively called out Dzhokhar Tsarnaev

17    and told him to exit the building.

18    Q.   And what happened next?

19    A.   Dzhokhar Tsarnaev did not exit the building.

20         Dzhokhar Tsarnaev was, obviously, not in the building.

21    Three persons who were in the building did exit the building at

22    the instruction of HRT.

23    Q.   And, obviously, Special Agent Walker, you didn't know at

24    the time that Dzhokhar Tsarnaev wasn't in the building, because

25    you believed he was?

1   A.    We firmly believed -- I firmly believed, and I know my

2   Agency did, yes.

3   Q.    Where were you standing when the people came out of the

4   apartment?

5   A.    I was a block away.  Where was I standing?

6   Q.    Yes.

7   A.    First, I was sitting in the same police vehicle, and as

8   the callout procedure was concluding, I went to the back of the

9   police vehicle and donned my ballistic vest and my FBI raid

10  jacket for purposes of identification and awaited contact from

11  those on scene that it was appropriate for me to approach.

12  Q.    So, what happened after the people came out of the

13  apartment?

14  A.    They were instructed to come out with their hands up.

15  They were instructed to -- they followed the commands of the

16  HRT in ensuring that they did not possess any weapons, to

17  include explosives, and they were restrained by Hostage Rescue

18  Team members with plastic flex cuffs, and then they were placed

19  into three different unmarked vehicles.  They may have been

20  leased vehicles; I simply don't know.  But I didn't recognize

21  them as being FBI vehicles with radio packages and so forth.

22  And those cars were situated on Carriage Drive.

23  Q.    At that point, when they were pulled out of the apartment

24  and they are restrained, did the FBI believe that these

25  individuals, the defendants in question, were involved in

1    either the bombing or concealing Tsarnaev?

2    A.   I thought it highly possible that, yes, in fact, but my

3    immediate focus was to determine who was in the apartment,

4    because at this point the apartment hadn't been cleared by FBI.

5    We had simply called out.  This was not a warrantless entry

6    that was effected by a dynamic force into the apartment.  That

7    would have been foolhardy for obvious reasons.  So, instead, we

8    did a relatively -- for HRT what would have been a relatively

9    routine, but the safest exercise, calling out the residents so

10   that we had full command as they exited the premises.

11   Q.   So, what happens after the occupants of the apartment are

12   then restrained and put into unmarked vehicles?

13   A.   I was called forward, if you will, and I began to speak

14   with the three residents, three occupants of the apartment, and

15   my colleagues in the HRT and my Special Agent Bomb Tech

16   colleagues, the SABTs, there were two of them that were

17   dispatched with HRT including because -- insofar as there may

18   be explosives in the apartment, and they began the work of

19   safely entering the apartment, determining whether the fugitive

20   was there, and then ensuring that the apartment was secured

21   from other hazards other than a person, namely explosives or

22   components thereof.

23   Q.   So, was there a preliminary or cursory inspection done of

24   the apartment at that time to see if there were any bombs or

25   explosives in it?

1   A.   No, I don't believe that it was done immediately, and I

2   don't think it would have been safe.  So, I immediately began

3   questioning intermittently and briefly and quickly and with

4   enormous focus the residents who had come out of the apartment,

5   namely, where was Dzhokhar Tsarnaev, was he in the apartment

6   and, perhaps importantly, was there any thing, person within

7   the apartment that might pose a threat to my colleagues who

8   were preparing to enter the apartment.

9   Q.   At this point, when you are questioning the occupants, how

10   quickly were you able to identify who the occupants of the

11   apartment were?

12   A.   Immediately upon my first encounter with each of them.

13   Q.   And at this point do you see two of the occupants that you

14   spoke to that day in the courtroom?

15   A.   I see -- yes, I see both of them.

16   Q.   Can you name them for the Court?

17   A.   Azamat Tazhayakov and Dias Kadyrbayev.

18   Q.   And at that time on April 19th, when you are speaking to

19   them in the unmarked vehicles, did you have any belief as to

20   what threat was posed by them?

21   A.   Yes.  As I mentioned, I had both concern that they

22   possessed information that might allow a quick resolution of

23   our strong suspicion, strong belief that a fugitive potentially

24   bearing arms and IEDs was inside the apartment.  Separately, I

25   came upon three people that I had never laid eyes on before,

1    and I naturally had heightened suspicion that they, having been

2    described as so close to a terrorist, an accused terrorist,

3    suspected terrorist, that suspected terrorist having been in

4    that area 24 hours earlier, and that terrorist, that accused

5    terrorist, excuse me, having been described as visiting that

6    particular location on so many occasions, I naturally needed to

7    rule out that they were either involved in the bombing itself

8    or that they were involved in some manner in harboring the

9    fugitive, because the fugitive naturally at this time was still

10   a fugitive.

11   Q.   Because this is at a time when you are still looking, the

12   FBI is actively looking for a person that has committed

13   multiple acts of violence in Massachusetts, correct?

14   A.   We are both looking there actively in Watertown and

15   throughout Massachusetts, but at the same time literally we are

16   receiving different intelligence streams from New Bedford and

17   North Dartmouth that the fugitive may be located in other areas

18   there right at that time.

19   Q.   At that exact time as the defendants had come out of the

20   apartment, right?

21   A.   While I am speaking with them we had -- yes, yes.

22   Q.   And where in that vicinity were the reports that Tsarnaev

23   might be?

24   A.   Prior to, and perhaps after, but I'm aware that prior to

25   intelligence that suggested to us that a device used by --

1   subscribed by Dzhokhar Tsarnaev was located and active within

2   that particular apartment. We had similar information

3   suggesting to us that another of the phones that was also

4   subscribed by Tsarnaev was active at two locations about a

5   quarter of a mile away, within the whole Carriage Road

6   apartment complex.

7          Further afield, slightly, at UMass Dartmouth we

8   received another, I believed to be erroneous, a false, in

9   retrospect, indication that at or about 4:40 p.m. Dzhokhar

10   Tsarnaev had again logged onto the UMass Dartmouth network I

11   think specifically within the Physics Department. So, some

12   tactical units at the University were deploying to that

13   location. Ultimately, some of my colleagues on HRT left

14   Carriage to respond there. Another group left to respond to

15   basically a couple of streets away, because we thought that

16   another phone was active there.

17   Q.   So, is it fair to say that there was a lot of information

18   that you and the FBI had at the time that pointed to the fact

19   that Tsarnaev was in that general vicinity?

20   A.   Yes.

21   Q.   So, you indicated a few minutes ago that you started

22   speaking to both defendants. And was there another individual

23   that came out of the apartment as well?

24   A.   There was.

25   Q.   And who was that?

1    A.    The girlfriend of Dias Kadyrbayev.

2    Q.    And what was her name?

3    A.    Her name is Bayan Kumaskali.

4          THE COURT:  Ms. Siegmann, I am going to have to take a

5    short break, because I have to make a telephone call at this

6    point.  So, we will take maybe five minutes.

7          THE CLERK:  All rise.

8        (The Honorable Court exited the courtroom at 1:48 p.m.)

9                            (Recess taken)

10         THE CLERK:  All rise.

11       (The Honorable Court entered the courtroom at 1:54 p.m.)

12         THE CLERK:  This Honorable Court is back in session.

13   You may be seated.

14         MS. SIEGMANN:  Your Honor, do you want me to go find

15   counsel?

16         MR. DEMISSIE:  I'll go.

17         MS. SIEGMANN:  Okay.

18         THE COURT:  You may proceed.

19         MS. SIEGMANN:  Thank you, your Honor.

20   BY MS. SIEGMANN:

21   Q.   Special Agent Walker, you indicated before the break that

22   you had spoken to the defendants and Kadyrbayev's girlfriend in

23   the vehicles.  Do you remember?

24   A.   Yes.

25   Q.   Can you tell us who did you speak to first?

1    A.    Ms. Kumaskali.

2    Q.    Why did you choose to speak to her first?

3    A.    At that point she was unknown to me, and I decided that I

4    would speak with her first and Kadyrbayev last in order to

5    develop information that I could best use when speaking with

6    Mr. Tazhayakov and Mr. Kadyrbayev.

7    Q.    Why did you decide to speak to the defendant Kadyrbayev

8    last?

9    A.    His name, of all the intelligence that we developed that

10   day relative to Tazhayakov, I just had more suggesting that

11   Kadyrbayev had a closer link to Tsarnaev, and so I wanted to

12   start from the periphery and go to the core.  I had a

13   relatively short period of time to be speaking with them, so

14   that's the order I chose.

15   Q.    What information did you learn from Ms. Kumaskali that

16   day?

17   A.    I learned some basic identifiers.  I needed to know who

18   she was.  She told me who she was.  She told me a date of

19   birth.  I asked her where she lived.  She told me she was a

20   Kazakhstan national.  She gave me an address in Almaty.  She

21   told me that she was the girlfriend of Dias Kadyrbayev.  She

22   told me that she was simply there for the weekend.

23          She told me that she, Tsarnaev, Kadyrbayev and

24   Tazhayakov participated in a family plan, a calling plan with

25   the mobile telephones, and she gave me Dias' telephone number.

1   Most importantly, and preliminarily, she told me that she did

2   not know where Tsarnaev was located, and she did not know of

3   any threat by person or thing that might cause injury to my

4   colleagues preparing to enter the apartment.

5   Q.   And then did you speak to both defendants?

6   A.   I did.

7   Q.   And were the questions that you posed to them similar?

8   A.   Similar especially with regard to, "Where is Tsarnaev?  Is

9   he in your apartment?  Are there threats?  Are you telling me

10  the truth?  Is he in your apartment?  Are there threats to my

11  colleagues about to enter the apartment?"

12          Thereafter, because of, again, the intermittent

13  quality, the relatively short exchanges that I had with them,

14  as I went car to car and then returned car to car, I did not

15  duplicate information that I perceived to be effectively

16  accurate.  In other words, I didn't challenge, ask necessarily

17  Tazhayakov or Kadyrbayev what the association was with this

18  woman, Kumaskali.  Certain things I took for granted, but then

19  I moved and I spoke with the defendants as they sat in the

20  cars.

21  Q.   And could you give the Court an idea and describe as much

22  as you recall about your demeanor when you were talking to them

23  at this time, and what you said and how they responded?

24  A.   Yes.  Initially, my demeanor was quite, very direct.  It

25  was stern, it was focused, and it was that part of it, "Where

1    is he?  What threats are there in the apartment?", as the

2    relatively short interviews continued, and I began to perceive

3    that those answers were accurate.  I did not perceive with

4    regard to those questions, i.e., threats to personnel or

5    neighbors, that they were deceiving me.

6         As the information got to more -- I needed to

7    determine the weight of this information, who these people were

8    and what their association was with the fugitive to give it

9    weight, and as the focus shifted from, "Where is Tsarnaev?", to

10   simply, "What is your association, where do you think he could

11   be now?", it became less stern; continually focused but less

12   stern.

13        With regard to the two defendants, actually, each of

14   them, I asked each initially whether they spoke English.  They

15   all replied in the affirmative.  When I addressed the two

16   defendants, I asked them at different times, as they both

17   looked away a little bit, I perceived that they weren't

18   necessarily being deceptive, but they weren't entirely

19   forthcoming, and I just perceived that there may be more

20   information.

21        And so I asked them each to look at me, a couple of

22   times each, "Look at me," and I asked them each, as I spoke

23   with them, to tell me what I just said.  And I described for

24   both of them, in order to impress upon them the gravity and the

25   urgency of the information that I required, i.e., "Is there a

1    threat to my colleagues about to enter that apartment?", I said

2    words to both, words to the effect of, "This is enormously

3    important."  I think I used the words, "This is the biggest

4    thing to ever happen in Massachusetts.  You have to understand

5    this is your opportunity, and you must tell me the truth."

6            And I said to each of them, effectively, "Dzhokhar

7    Tsarnaev, he's dead.  Whether he is still living, or whether he

8    is going to go away, his life is over.  Your life does not have

9    to be over, and you must tell me the truth.  Look back at me,"

10   and again in a couple of instances, "Repeat back what I just

11   said," and they did that.

12           When it became apparent that he wasn't in the

13   apartment, or at least I believed we would not find him in the

14   apartment, the demeanor changed.

15   Q.   And how did it change?

16   A.   It changed to me as receiving information from any witness

17   that I interview, and it has been my experience that the single

18   best, perhaps only way, to receive information is to have the

19   person to show all manner of respect, to have the person, if

20   nothing more, if no other words, to like you, or at least not

21   dislike you.

22   Q.   And, Special Agent, did you use vulgarity when you were

23   speaking to the defendants?

24   A.   I do not believe I used any vulgarity.  My sternness of

25   tone was sufficient to impress upon them the gravity of the

1    situation.

2    Q.   Well, in your 23 years of experience, or based upon your

3    23 years of experience, is it your practice to use vulgarity

4    when speaking with subjects or witnesses?

5    A.   It is neither my professional practice or my personal

6    comportment to use vulgarity, particularly gratuitously and to

7    spice up.  It is inelegant.  It is I think a mark of an

8    uneducated person, and I don't need to do it in the course of

9    my work in the FBI, and I do not believe that I did it there,

10   notwithstanding -- I do not believe that I did it there.

11   Q.   So, Special Agent Walker, was anyone else besides you

12   talking to the defendants at this time when they're in the

13   vehicles?

14   A.   I did not observe any of my colleagues speak with them

15   while they were in the vehicles.

16   Q.   So, you were the only one that was speaking to them in the

17   vehicles?

18   A.   Yes, but I was at one vehicle at a time.  But I did not

19   observe any of my colleagues speak with any of them as they sat

20   in the vehicles.

21   Q.   And how was it that you were speaking to them, through an

22   open door, or through the front passenger seat of the vehicles?

23   A.   Both.

24   Q.   So, at times you would speak to them through the door and

25   sometimes from the front passenger seat?

1    A.   Yes.

2    Q.   Did either of the defendants appear to have any problems

3    understanding you?

4    A.   None whatever.

5    Q.   Did their responses appear appropriate and coherent?

6    A.   Yes.

7    Q.   Did either of them tell you they didn't understand

8    English?

9    A.   No.

10   Q.   In response to your questions, what did Defendant

11   Tazhayakov tell you?

12   A.   He told me that he was a student at UMass Dartmouth.  He

13   told me that he and Mr. Kadyrbayev resided together and were

14   the joint and only lessees of that apartment.  He told me that

15   he had seen Tsarnaev a couple of days after the bombing, and he

16   further told me that he last saw him at or about 4:00 on

17   Thursday, April 18, when Tsarnaev, driving a green Honda,

18   dropped him off at the 69A Carriage apartment, and that he and

19   Tsarnaev and someone named Robel, whose last name

20   Mr. Tazhayakov did not know, departed the area of the

21   apartment.

22   Q.   As a result of hearing this information, were you more or

23   less concerned about the defendants?

24   A.   It heightened my suspicion that I needed to rule out their

25   potential involvement in crimes.

1    Q.   And did you also obtain any information from defendant

2    Kadyrbayev?

3    A.   I did.

4    Q.   And was it similar to what you had heard from

5    Mr. Tazhayakov?

6    A.   Similar.  Actually, Mr. Tazhayakov provided his mobile

7    telephone number, and I did not ask the same of Mr. Kadyrbayev,

8    because, again, at that point in time I had more knowledge from

9    Kumaskali, and I did not effectively repeat myself as I went

10   along.

11        But he mentioned that they were both residents and

12   co-lessees.  He may have not used that particular term, but I

13   needed to establish who had ownership and control over the

14   apartment, and that's effectively what he told me.

15   Q.   So, while you were talking to the defendants and

16   Ms. Kumaskali, did HRT go into the apartment?

17   A.   They eventually did, yes.

18   Q.   And by around 6:00 p.m. that evening did you know whether

19   Tsarnaev was in the apartment?

20   A.   Yes.  I knew that he was not, based on the work of the

21   HRT.

22   Q.   When, approximately, did you start talking to the

23   defendants that evening while they were in the vehicles?

24   A.   I started speaking with Ms. Kumaskali at approximately

25   5:15; I started speaking with Mr. Tazhayakov at approximately

1    5:20; and I started speaking with Mr. Kadyrbayev at about

2    5:25 p.m.

3    Q.    So, by around 6:00 p.m. you learned that Tsarnaev is not

4    in the apartment; is that right?

5    A.    Correct.

6    Q.    And what did you do at that point in time?

7    A.    I asked each one of the residents, the occupants,

8    Kumaskali and the two defendants, I said to them that the FBI

9    was very much interested in speaking with them in greater

10   detail and in a more discreet, comfortable setting, and I asked

11   each of them whether they would be willing to accompany law

12   enforcement to the Barracks of the Massachusetts State Police

13   at North Dartmouth.  I explained to them I had been there that

14   morning, that it was close, that it was, in fact, a discreet

15   location.

16         At the time, there was a minor spectacle on Carriage

17   Drive and a growing spectacle with neighbors, residents,

18   people, I perceived a gathering crowd of media there, and it

19   became an untenable environment to speak with them.  So, I

20   asked each of them to go elsewhere with us to talk with us.

21   Q.    How did they respond to that request?

22   A.    They responded positively, and immediately or close to

23   immediately they responded with a seeming eagerness.  They

24   seemed as eager as I was to leave that location, because I

25   perceived that they were exposed to growing onlookers, and I

1    perceived they felt some discomfort as a result of that.

2    Q.    How did they agree?  Did they agree verbally to go?

3    A.    They agreed verbally, and they agreed by also shaking

4    their head and evidencing, again, a seeming eagerness to leave

5    that location as quickly as possible.

6    Q.    Now, by the time that you asked these questions of the

7    defendants whether they were willing to go answer further

8    questions by the FBI at the State Police Barracks, had you been

9    able to eliminate your suspicions about them and their

10   involvement with Tsarnaev?

11   A.    No.

12   Q.    Why is it, Special Agent Walker, that you didn't attempt

13   to interview them in the apartment?

14   A.    The apartment was not a safe location to do anything other

15   than to have Special Agent Bomb Technicians go in and ensure

16   there were no explosives within the apartment, and that had not

17   occurred at that time.  Separately, it would have been, and it

18   was later, a subject of enormous public and media attention,

19   the apartment itself, and that, too, would have been an

20   untenable place for any interview.

21   Q.    So, the defendants agreed to be transported, then, to the

22   State Police Barracks?

23   A.    They did.

24   Q.    By this time had any additional investigative personnel

25   arrived to assist you in your efforts?

1    A.    Not there on Carriage Drive, no.

2    Q.    Were people actually leaving that scene at this time?

3    A.    The troops were saddling up and heading off to the

4    other -- I came to learn they were heading off to the other two

5    threats that we perceived at the time, other locations where

6    Tsarnaev may be located, one down on -- the name of the road

7    escapes me right now -- but about a quarter of a mile away from

8    Carriage Drive in that neighborhood and, secondly, I believe,

9    heading back to UMass Dartmouth, where on the closed campus

10   they were running about trying to locate Tsarnaev because of

11   the login at about 4:40.

12   Q.    After the defendants agreed to go to the Barracks, did you

13   arrange transportation for them?

14   A.    Yes.

15   Q.    With whom?

16   A.    With the New Bedford Police Department.

17   Q.    Why didn't you transport them yourself?

18   A.    I didn't have a car, and even myself I would not have

19   transported one agent, one person under those circumstances.

20   Typically, we do it two at a time, but I didn't have the

21   resources to do so.

22   Q.    Was anyone at the Mass. State Police Barracks to meet

23   them?

24   A.    Not at the time they agreed to go there, no.

25   Q.    So, what did you do to ensure that there was someone there

1    to interview them?

2    A.   I responded to a message I had received from a colleague,

3    from our New York Joint Terrorism Task Force that evidently had

4    been deployed to the area at an earlier request that I made for

5    additional personnel there, and I told him at 6:19 p.m., I

6    said, "Go to MSP Dartmouth."

7           MR. STAHL:  Judge, could we use names so it's just

8    easier?

9           THE COURT:  Yes.

10          If you could identify the agent.

11          THE WITNESS:  Absolutely, Judge.  Special Agent Farbod

12   Azad.

13   BY MS. SIEGMANN:

14   Q.   And can you spell the last name for the court reporter,

15   please.

16   A.   A-Z-A-D.

17   Q.   Now, sir, I'm sorry, you said that the New Bedford Police

18   Officers agreed to transport the defendants?

19   A.   Yes.

20   Q.   And how quickly did the New Bedford Police Officers

21   transport the defendants or leave the scene with the

22   defendants?

23   A.   It seemed pretty quickly, perhaps even more quickly than I

24   would have expected.  But they left fairly quickly.

25   Q.   And after they left, did you ask that anyone come back to

1    the scene?

2    A.    I did.

3    Q.    Why was that?

4    A.    Because I wanted to seek the consent from the two lessees

5    of the apartment to conduct a search of the apartment, and so I

6    asked that they return.  They hadn't been gone too long, and I

7    did not perceive they had made it to, and they, in fact, had

8    not made it to the State Police Barracks yet, so I asked that

9    they be returned to Carriage Drive.

10   Q.    Were the defendants both brought back to the scene?

11   A.    They were not.

12   Q.    Who was?

13   A.    Mr. Kadyrbayev.

14   Q.    What did you do with Mr. Kadyrbayev when he arrived back

15   at the scene?

16   A.    He arrived in a police vehicle.  In this instance, I

17   stooped down next to an open door and talked to him through the

18   open door.  I explained to him that the FBI was interested in

19   searching his apartment, and that the FBI, if he would allow

20   consent, would take from the apartment anything the FBI

21   considered material to its investigation.  I told him that he

22   didn't have to agree to afford consent for such a search, but

23   he indicated preliminarily that he would do so.

24          He was restrained at the time, continued to be

25   restrained with the flex cuffs.  I asked that a police officer

1    from New Bedford assist me in cutting the cuffs off of his

2    hands, and then I read to Mr. Kadyrbayev a standard form, a

3    Consent to Search Form that the FBI uses in those cases.

4              MS. SIEGMANN:  Your Honor, at this point the

5    Government would like to -- let me mark this.  Can I mark it

6    Exhibit No. 1, your Honor?

7              THE COURT:  Yes.

8              MS. SIEGMANN:  The original is with the Court Clerk,

9    Mr. Lovett.

10             THE COURT:  Okay.

11             MS. SIEGMANN:  Just for the witness at this point,

12   Jarrett.

13             MR. STAHL:  Your Honor, again, could we have the name

14   of that police officer?

15             THE COURT:  If you know the name of the police

16   officer.

17             THE WITNESS:  Yes, I do, your Honor.  I believe it's

18   Officer DeMello (ph).

19             MS. SIEGMANN:  For some reason this is not coming up.

20   Hold on.  The ELMO, can you make it -- it's showing the witness

21   now on the screen.  Thank you.

22   BY MS. SIEGMANN:

23   Q.   Special Agent Walker, do you recognize what I have put up

24   on the screen just for the witness?

25             THE COURT:  There are screens around, and in the back

1  row of the jury box between the chairs there are screens

2  accessible that you can pull out.  They are a little bit like

3  the old TV screens on airplanes.  For everybody in the back

4  row, in between your chairs there should be -- in the back row

5  itself, not only in the front row -- there should be the

6  screens.

7       We will be taking names about damage to federal

8  property.

9                    (Laughter)

10       MR. STAHL:  He's treating it like an airplane, Judge.

11       THE COURT:  Yes, I see that.  That is why there is not

12  going to be any food.

13       I am permitting everyone to see this now.  It is

14  admitted.

15            (Exhibit No. 1 received into evidence)

16  BY MS. SIEGMANN:

17  Q.   Special Agent Walker, do you recognize the document that

18  has been marked Government Exhibit 1?

19  A.   I do.

20  Q.   What is it?

21  A.   From memory, it's an FD-26, but I don't see the top.

22  Q.   Oh, sorry.  Here, let me show it to you.

23  A.   Is it an FD?  Yes, FD-26.  It's a standard form, old line

24  Consent to Search Form of the FBI, and that is the document

25  that I read to and executed with the defendant.

1    Q.    So, can you take us through what did you read on this form

2    to the defendant?

3    A.    I read the entirety of the form, beginning with numbered

4    Paragraphs 1 through 4.

5    Q.    So, "I have been asked by Special Agents of the Federal

6    Bureau of Investigation to permit a complete search of..."

7          So, you read that part there?

8    A.    I did, and I did not read the parenthetical.  What I did

9    when it described the premises, I asked him and I pointed, I

10   said, "I need to now describe where I am going to search," and

11   I asked him what his address -- how he described his apartment.

12   Q.    So, did he give you that information that you wrote on the

13   form?

14   A.    He did.

15   Q.    And then, moving on to No. 2, did you read that as well to

16   him?

17   A.    Yes.

18   Q.    "I have been advised of my right to refuse consent"?

19   A.    Yes.

20   Q.    "I give this permission voluntarily"?

21   A.    I read that, yes.

22   Q.    "I authorize these agents to take any items which they

23   determine may be related to their investigation."

24          Did you read that as well?

25   A.    I did.

1  Q.   And when you asked Mr. Kadyrbayev for his consent, what

2  was his response?

3  A.   He indicated a willingness to sign the form, and so with

4  that, I asked him, I said, "Well, presuming that you would

5  continue to like to proceed," I gave him the form.

6  Q.   What did you ask him to do?

7  A.   I asked him to read the form.

8  Q.   What was his response when he was reading the form?

9  A.   He began to read the form, and after a matter of some

10 seconds he looked up at me sort of quizzically, and he looked

11 at me and he said, "That's what you just read to me."

12 Q.   What did you say?

13 A.   I said, "Exactly.  Please continue to read the form."

14 Q.   Did you watch him as he continued to read the form?

15 A.   I did.

16 Q.   And after he had finished reading it, what happened?

17 A.   I asked him whether, having read the form, he was still

18 willing to permit a search of his apartment, and he said,

19 "Yes."  I said, "Great.  We're going to both sign here.  You're

20 going to sign --" that is my date.  I put the date down.  I

21 asked him to sign, and then I told him I would be signing as a

22 witness, and I did sign as a witness.

23 Q.   What did you do next?  Or what happened next?  Excuse me.

24 A.   I think I thanked him, but that concluded our business

25 there.  And I said, "All right.  Now, you're heading on to the

1    Barracks."

2    Q.   And before getting back into the police vehicle after

3    having signed this, what happened?

4    A.   He had not left the police vehicle when he signed it.  He

5    simply was unrestrained.  He was sitting in the backseat of the

6    car.  He was leaned over and he had -- when he was reading the

7    form, he had the form on the backseat of the cruiser next to

8    him.  I was directly in front of him, stooped in the middle of

9    the street, and then the police officer began to put cuffs on

10   him, handcuffs, metal cuffs.

11   Q.   What did you do in response to seeing this?

12   A.   What did he do?

13   Q.   What did you do in response to seeing the police officer

14   putting handcuffs on the defendant?

15   A.   Yes.  I advised the police officer that he was not under

16   arrest, and he did not need to be handcuffed -- that he was not

17   under arrest, he was not a prisoner, but he did not need to be

18   handcuffed.

19   Q.   And how did the New Bedford Police Officer respond?

20   A.   The New Bedford Police Officer responded that he was still

21   going to handcuff him for his protection, and, given the

22   circumstances, given what the police officer likely just

23   witnessed, I acquiesced in that further restraint.

24   Q.   Was he handcuffed in the front or behind?

25   A.   In the front.

1    Q.   And what happened after he was handcuffed?

2    A.   He was driven away.

3    Q.   Now, Special Agent Walker, you indicated that the

4    defendant Tazhayakov wasn't brought back to the 69A Carriage

5    Drive vicinity; is that right?

6    A.   That's correct.

7    Q.   But did the agents wait for his consent before executing

8    the consent search of the apartment?

9    A.   Yes, that's my understanding, they did.

10   Q.   At about the same time the defendants were being

11   transported to the Mass. State Police Barracks what was going

12   on in Watertown?

13   A.   A 911 call came in to Watertown Dispatch at approximately

14   6:45, it may have been a few minutes earlier, and it was from

15   the owner of the boat, if you will, I think on Franklin Street.

16   He reported having seen a person inside his boat, and the

17   Dispatch call reported that complaint to whom I believe to have

18   been the Field Commander, and then for the next two hours there

19   was a sizeable police response to that sighting in the boat.

20   Q.   So, did that at that point in time become the priority of

21   the FBI and the JTTF, to figure out if Tsarnaev was in that

22   boat in Watertown?

23   A.   The priority of the FBI, and seemingly the focus of much

24   of the World, but certainly Massachusetts, yes.

25   Q.   Is it fair to say that at this time there were few

1    available resources to conduct witness interviews?

2    A.    Yes.

3    Q.    What time was Dzhokhar Tsarnaev arrested?

4    A.    At approximately 8:46, I've seen 8:47, he was taken into

5    custody and positively identified.

6    Q.    At any point that evening did you go back or go to the

7    Massachusetts State Police Barracks?

8    A.    I returned -- as I mentioned, I left the State Police

9    Barracks that morning to go to UMass, and I was next at the

10   Massachusetts State Police Barracks in North Dartmouth at

11   between approximately 12:30 a.m.

12   Q.    So, it was actually on April 20th?

13   A.    On April 20th, yes, excuse me.

14   Q.    And what were the defendants doing when you arrived at the

15   Mass. State Police Barracks?

16   A.    I think they were sleeping.  I didn't see Mr. Kadyrbayev.

17   Mr. Tazhayakov was visible up front.  I think he was sleeping.

18   He was very quiet at the time.  And I don't think until we

19   drove them home I did not see Ms. Kumaskali at all.

20   Q.    At that point what had the FBI learned about the

21   defendants' involvement in criminal activity?

22   A.    At the time that I arrived?

23   Q.    Yes.

24   A.    We learned that -- we believed, suspected, based on their

25   statements, statements of the two defendants and Ms. Kumaskali,

1  that they had likely obstructed our investigation of

2  Dzhokhar Tsarnaev.

3  Q.   And, specifically, had they removed evidence from his

4  dormitory room?

5  A.   They told us that they removed evidence of --

6        THE COURT:  Just so it is clear, the person to whom

7  these statements are made was not you?

8        THE WITNESS:  No, Judge.

9        THE COURT:  Go ahead.

10       MR. STAHL:  Judge, I also would object on relevancy

11  grounds to the suppression hearing.  The actual statements are

12  not at issue in this hearing, it is the circumstances of the

13  statements, and I would move to strike and bar any testimony by

14  any agent.

15       THE COURT:  I do not think it has to be very specific,

16  but, according to Agent Walker, they learned additional

17  information concerning involvement of the defendants, and we

18  will leave it at that.  Because I understand that the

19  Government is not going to be offering these statements.

20       MS. SIEGMANN:  I'm sorry?

21       THE COURT:  You are not going to be offering these

22  statements at trial.

23       MS. SIEGMANN:  The statements at the Barracks?  We are

24  talking about the Barracks now, the interviews at the Barracks.

25  We will be offering the substance of the confessions that

1    Special Agent Walker is talking about right now, but not

2    through this witness.

3         THE COURT:  Not through this witness.

4    BY MS. SIEGMANN:

5    Q.   Special Agent Walker, based upon the information that the

6    defendants had provided that evening, were any searches

7    conducted that you were involved with between the hours of

8    1:00 a.m. and 4:00 a.m. on April 20th?

9    A.   Yes.  I was involved in searching a garbage dumpster

10   located not far from the defendants' apartment.

11   Q.   What were you looking for?

12   A.   We were looking for the items that the defendants had

13   described --

14        THE COURT:  No.  What were you looking for, not

15   indirectly telling us what the defendants said?

16        THE WITNESS:  Okay.  We were looking for a black

17   plastic garbage bag with red ties, within which there may be a

18   backpack containing spent or manipulated fireworks.

19   BY MS. SIEGMANN:

20   Q.   And who went with you to conduct this search?

21   A.   FBI Special Agents Megan Dolan and Steven Schiliro from

22   New York.

23   Q.   Was your search successful?

24   A.   We completed the search.  We did not find the bag that I

25   described.

1    Q.   Did you return to the Barracks after the search?

2    A.   Yes.

3    Q.   And when you returned to the Barracks, did you have any

4    conversations with either of the defendants?

5    A.   I did.

6    Q.   Can you please describe that conversation?

7    A.   I saw Mr. Tazhayakov, and he made a statement to me at the

8    time, and he said, "I am beginning to think we are being held

9    here against our will."

10   Q.   How did you respond?

11   A.   I said, "You're free to leave.  There is a taxicab waiting

12   outside for you, and you're free to take that taxicab, or we're

13   finishing up here and would be pleased to drive you home," and

14   he accepted the offer of a ride home.

15   Q.   So, rather than go in the taxicab that was waiting outside

16   the Barracks, he wanted you to drive him home, the FBI?

17   A.   He made that decision, yes.

18   Q.   Do you recall who you drove that evening back to the

19   Carriage Drive apartment?

20   A.   I do.  Mr. Kadyrbayev was sitting in the passenger seat

21   next to me.

22   Q.   And when you arrived at the Carriage Drive address, did

23   you get out of the car?

24   A.   Yes.

25   Q.   Can you describe what happened after you got out of the

1    vehicle?

2    A.   There were six agents in three vehicles with the two

3    defendants and Ms. Kumaskali.  We walked toward their

4    apartment, and we asked if we could come in, and they said,

5    "Yes."  We walked in as a group inside the apartment, and we

6    stood for a few minutes near their dining room table adjacent

7    to their kitchen.

8    Q.   What was the demeanor of the defendants at this time?

9    A.   They seemed very happy to be home.  They were friendly.

10   They were joking at one point.  They seemed very pleasant.

11   Q.   And they were speaking to you and pleasant -- with

12   pleasantries at this time?

13   A.   Yes.  And just as they had been pleasant, and they were

14   very pleasant when they got home, back to the apartment.

15   Q.   And what happened when you were inside the apartment?

16   A.   There was some agent, I don't know whom, noticed two

17   items, and there was some conversation about an ashtray and a

18   baseball cap.  It became clear to me -- I inferred that it was

19   clear to them, based on interview or other information, that

20   somehow the ashtray and the baseball cap were meaningful,

21   specifically that they belonged to Dzhokhar Tsarnaev.

22        THE COURT:  You said, "Clear to them."  Who is the

23   "them"?

24        THE WITNESS:  To the five agents that I was with.

25   BY MS. SIEGMANN:

1   Q.   Well, was there a discussion or a question posed to the

2   defendants whether those are the items that they took from

3   Tsarnaev's room?

4   A.   It was either a question or a statement that those items

5   were not only his, but they had been taken from his room, and

6   we asked -- I may have asked, I don't recall, but -- "Would you

7   mind if we took those?  You don't have any interest anymore in

8   those, I assume."  I think it was me.  "Can we take those

9   items, because they belong to Dzhokhar Tsarnaev?"

10  Q.   What was the response of the defendants?

11  A.   The defendants immediately agreed, proffered the ashtray

12  and the baseball cap.  Mr. Kadyrbayev put on the baseball cap

13  briefly and was, in joking tone, kind of words to the effect

14  of, "Well, I kind of like this hat, I might want to keep it,"

15  smiling.  And Mr. Tazhayakov and Ms. Kumaskali seemingly

16  admonished him to tell him to give the hat to the FBI or to

17  give up the hat, and he handed us the hat.

18  Q.   So, those items were willingly given to the FBI by the

19  defendants at that point?

20  A.   Yes, yes.

21  Q.   After obtaining those items did you have either of the

22  defendants sign some type of receipt?

23  A.   I did.  I had Mr. Tazhayakov sign a property receipt.  I

24  listed the two items, and we both executed the form.

25  Q.   After that what happened?

1   A.   We left.  We, the FBI, six FBI agents, left the apartment.

2           MR. STAHL:  Judge, I'm sorry.  Again, could we have

3   the names?  We are talking about five other agents.

4           THE COURT:  If you know the names of the persons.

5           THE WITNESS:  I think I do, your Honor.  Special Agent

6   Megan Dolan, Steven Schiliro, Farbod Azad, Sara Wood and

7   Michael Blane.

8           MR. STAHL:  Thank you.

9   BY MS. SIEGMANN:

10  Q.   When next did you see the defendants?

11  A.   At approximately 3:15 that afternoon, April 20th.

12  Q.   Can you describe how it was that you saw them?

13  A.   Yes.  About an hour, an hour and a half before that I was

14  conducting an investigation on the UMass campus.  I received a

15  call and/or email from my Command Post.  They advised me that

16  Special Agents of the Homeland Security Investigations were

17  going out to arrest Mr. Kadyrbayev and Tazhayakov.

18          I was instructed to join in that effort.  I did join

19  in that effort.  I met up with my colleagues.  We surveilled

20  for a short period of time a vehicle owned by the defendants,

21  and ultimately I arrived at the apartment, back at the

22  apartment, and saw the two defendants and Ms. Kumaskali.

23  Q.   By the time you arrived, had HSI agents already entered

24  the apartment?

25  A.   They had.

1   Q.   And specifically they were being arrested for what?

2   A.   For the immigration violation.  They were both overstays.

3   Both of their F1 Student Visas had been revoked, and they were

4   arrested by HSI.

5   Q.   So, when you entered the apartment that day, what were the

6   defendants doing?

7   A.   The defendants were sitting on a couch together in the

8   living room.

9   Q.   Were they restrained?

10  A.   No.

11  Q.   Were they talking?

12  A.   Yes.

13  Q.   And how did the defendants react to seeing you enter the

14  apartment?

15  A.   They smiled, gave me a greeting.  I was a friendly face.

16  I said something to the effect to them, "I bet you guys didn't

17  expect to see me again or see me so soon."

18          I communicated with my Command Post that I had

19  arrived, and that things were quiet, and then I went over and

20  spoke briefly with the defendants.

21  Q.   How were the defendants dressed when you arrived?

22  A.   They were sitting.  Neither of them had shirts on, but I

23  don't know whether they were wearing shorts or long pants, and

24  I didn't see or don't recall what shoes they may have had on.

25  Q.   And you're aware that the prior evening, when they were

1    interviewed at the Barracks, they also didn't have shirts on?

2    A.   I am aware of that, yes.

3    Q.   Could you please describe to the judge the conversation

4    you had with the defendants in the apartment at that time?

5    A.   I can.  The two defendants were sitting on an L-shaped

6    couch in the living room with --

7            THE COURT:  Let me just pause for a minute.  They were

8    under arrest at that point, is that right, if you know?

9            THE WITNESS:  I don't know, Judge, yes.

10           THE COURT:  And do you know whether or not they had

11   been given Miranda warnings before your conversation by anyone?

12           THE WITNESS:  I don't know to this day.

13           THE COURT:  Go ahead.

14   A.   They were sitting on the couch with

15   Ms. Kumaskali and a woman whom I learned was Mr. Kadyrbayev's

16   mother.  I saw a backpack laying next to the back of the couch,

17   a black backpack.  I said to them that the FBI was very much

18   interested in recovering the backpack they had described the

19   night before.  I asked them whether the backpack was then

20   located within the apartment.  They both denied that, and they

21   told me in unison that the backpack had been thrown into a

22   dumpster, and that they had seen the dumpster removed by a

23   refuse truck on Friday.

24   Q.   So, the dumpster had been emptied, right?

25   A.   Yes.  The ref. (ph) truck had taken the dumpster away.

1      Q.   So, how did you respond to hearing this?

2      A.   Well, I asked them to describe for me where the dumpster

3      was located, and a description was given.  Mr. Kadyrbayev

4      described in accurate measure where the dumpster was located

5      that I had searched the night before.

6      Q.   What was their demeanor, the defendants' demeanor, that

7      is, when you talked to them on the couch that day?

8      A.   As pleasant as they were the morning -- when I last saw

9      them that morning.

10     Q.   And what do you mean by, "As pleasant as they were in the

11     morning?"  Can you just give us some more information as to

12     what you mean by that?

13     A.   I didn't sense that they were under any -- I didn't sense

14     that they were anxious.  Their response with regard to having

15     seen the dumpster leave was similarly sort of enthusiastic.

16     They happened to do it at the same time in the same manner as

17     when I asked them whether they would be willing to come with me

18     or come with law enforcement to the State Police Barracks.

19     There was a little bit of head shake as well, and they

20     seemed -- there was a short but a cooperative, pleasant

21     exchange.

22     Q.   At any point the prior evening when you were questioning

23     the defendants did you see either of them cry?

24     A.   No.

25               MS. SIEGMANN:  Your Honor, if I could just have a

1      moment with co-counsel?

2              THE COURT:  Yes.

3                  (Counsel conferred off the record)

4              MS. SIEGMANN:  Your Honor, no further questions.

5              THE COURT:  Mr. Stahl, this would be a point to take

6      an afternoon break, if it is agreeable to you.

7              MR. STAHL:  I'm sorry, your Honor?

8              THE COURT:  This would be a point to take an afternoon

9      break, if it is agreeable to you.

10             MR. STAHL:  Yes, it is.

11             THE COURT:  So, we will take a 15-minute break.  Let

12     me outline the schedule.

13             I do want to take up a series of *ex parte* motions that

14     have been made by several of the parties, and I want the other

15     parties to be present.  I would like to do that I think at the

16     end, and I would say probably at 3:30.  That will finish the

17     testimony for today.

18             I know that Mr. Demissie had another obligation, I

19     believe, tomorrow.  But you are no longer effectively in this

20     part of it, and I assume that you have no objection to the

21     hearing going forward tomorrow.

22             MR. DEMISSIE:  Yes.

23             THE COURT:  So, we will have a full day tomorrow, 9:00

24     to 1:00, 2:00 to 4:00.  Now, beyond that I said --

25             MR. DEMISSIE:  And I would ask that I be allowed to

1   come and attend the afternoon session.

2          THE COURT:  Yes.  I understand that you will be able

3   to be here for some portions of it, but because you are not

4   directly involved, I think we can go forward in your absence,

5   and the transcript will be available.

6          MR. DEMISSIE:  Thank you.

7          THE COURT:  So, I will deem 15 minutes to be 2:45.

8          THE CLERK:  All rise.

9      (The Honorable Court exited the courtroom at 2:35 p.m.)

10                        (Recess taken)

11         THE CLERK:  All rise.

12     (The Honorable Court entered the courtroom at 2:50 p.m.)

13         THE CLERK:  This Honorable Court is back in session.

14  You may be seated.

15         THE COURT:  You may inquire.

16         MR. STAHL:  Thank you, your Honor.  Do I have to --

17         THE COURT:  I prefer it.  It is just easier to keep

18  track of where people are.

19                      CROSS-EXAMINATION

20  BY MR. STAHL:

21  Q.   Good afternoon, Agent Walker.

22  A.   Good afternoon.

23  Q.   We've met a number of occasions, correct?

24  A.   It's been my pleasure, yes.  Thank you.

25  Q.   Thank you.  And you know that I represent Dias Kadyrbayev,

1    correct?

2    A.    I do.

3    Q.    I take it from your direct -- and there is no doubt that

4    you are a very, very experienced FBI Agent, correct?  You've

5    got 23 years on the job?

6    A.    I have 23 years on the job, yes.

7    Q.    What did you do before you were an FBI Agent?

8    A.    I was an attorney.

9    Q.    Really?  Where?

10   A.    Here in Boston.

11   Q.    Did you practice criminal law?

12   A.    I did not.

13   Q.    And you went into the Bureau, then, after your JD program,

14   or you practiced for a number of years?

15   A.    I practiced for six years here at a Boston firm, yes.

16   Q.    And, in addition to your basic training at FBI in

17   Quantico, you have received on-the-job training, correct?

18   A.    With the FBI, yes.

19   Q.    Yes.  From folks on the FBI?

20   A.    Yes.

21   Q.    And you have attended other formal training seminars at

22   various locations through the FBI as well, correct?

23   A.    Many, yes.

24   Q.    And were a number of those classes interview techniques of

25   individuals?

1   A.   No.

2   Q.   You have never received training in how to interview a

3   subject?

4   A.   At the FBI Academy, but not thereafter.

5   Q.   And that is a skill that you have developed, then, on the

6   job?

7   A.   Yes.

8   Q.   And as you said before on your direct, you have approached

9   things when you were -- you said you were basically an

10  interviewing agent, correct?

11  A.   When?

12  Q.   As opposed to, you are not HRT, you are not --

13  A.   Precisely correct.  At the time in question I was there

14  strictly in an investigative but not a tactical capacity, yes.

15  Q.   Have you ever worked in a tactical capacity?

16  A.   I have.

17  Q.   And when was that?

18  A.   I was a member of the FBI SWAT Team in the Portland

19  Division when I was in Oregon.

20  Q.   Just, approximately, what years was that?

21  A.   1995 through 1997.

22  Q.   And when you say the "SWAT Team for the Portland

23  Division," is that different from this very elite full-time

24  unit, the HRT team you were talking about?

25  A.   Yes.

1    Q.    What is the difference?

2    A.    They are the varsity of the varsity.  They are a selection

3    process, two-week, think of SEAL Team Six, introduction, highly

4    skilled group, full-time trained.  We were part-time trained

5    and part-time or infrequently deployed.

6    Q.    So, HRT, that's all they do, correct?

7    A.    They train and deploy in high-risk situations, yes.

8    Q.    They are the hardcore, real-deal guys?

9    A.    As I described, I think they are the World's finest

10   Civilian Tactical Team, yes.

11   Q.    And you said you were a supervisor for a period of time?

12   A.    For 11 1/2 years, yes.

13   Q.    And was that at the Boston Field Office?

14   A.    In addition to other places, yes.

15   Q.    In your capacity now, are you a supervisory Special Agent?

16   A.    I am not.

17   Q.    You were talking on direct about your involvement in this

18   investigation.  Let me clarify.  You started talking about

19   overall the Marathon bombing investigation, correct?

20   A.    Yes.

21   Q.    Were you involved with that from day one?

22   A.    From the first hour, yes.

23   Q.    And so, you and your colleagues were kept up-to-date, you

24   had briefings at different command centers, or via email

25   messages, or other forms of communications as the course of the

1    investigation went on?

2    A.    Yes.

3    Q.    And were you at the beginning tasked with specific roles,

4    in other words -- let me try to be clearer.  Were different

5    groups of agents broken out to different assignments?

6    A.    They were.

7    Q.    And were you in charge of a group of agents?

8    A.    No.

9    Q.    Who did you work for or report to at the time?

10   A.    That week, early on that week and in the first hours I was

11   tracking leads around the City of Boston.  So, a few hours

12   after the bombing I was on Boston Common interviewing people.

13   For the next couple of days I continued to respond to random

14   leads that arose toward the latter part of the week before my

15   assignment down to North Dartmouth.  I assisted in the office

16   in streamlining our lead process.

17   Q.    And during the course of the week, how many FBI agents

18   from around the country were TDY-ed to the Boston area?

19   A.    Over 100, probably, FBI personnel generally.  Probably

20   less than 200, but certainly over 100.

21   Q.    Approximately, how many FBI agents are in the District of

22   Massachusetts normally?

23   A.    The Boston Division -- it's a little difficult.  I don't

24   know the answer to that.  We have a four-state region, and if I

25   recall correctly, we have a couple of hundred in the Division.

1    I don't know how many are here in the District.

2    Q.   So, approximately a couple of hundred here locally in this

3    four-state area, and then approximately a couple of hundred

4    other agents came in to assist, correct?

5    A.   Yes.

6    Q.   And was HRT -- where are they based out of?

7    A.   Quantico, Virginia.

8    Q.   And were they temporarily assigned up here as well during

9    that week?

10   A.   They were temporarily assigned here during a portion of

11   the week.  I don't know when they first arrived.

12   Q.   Just skipping ahead for a moment, on April 19th where were

13   they located when you called for their assistance?

14   A.   I didn't call for their assistance.

15   Q.   Who did?

16   A.   They were deployed by our command post.

17   Q.   And that command post was somewhere in the Boston area,

18   correct?

19   A.   We had two command posts.  I don't know who deployed them,

20   and I don't know from which command post they were deployed.  I

21   think it was probably from a forward command post in Watertown,

22   because they were flown from Watertown down to New Bedford to

23   respond to this particular threat that afternoon.

24   Q.   By helicopter?

25   A.   Yes.

1    Q.    Now, I want to focus your attention on April 19th.  You

2    spoke about on direct that you were tasked down to the

3    North Dartmouth, the UMass area, correct?

4    A.    Yes.

5    Q.    And you spoke generally and then a little more

6    specifically about intelligence information that started to be

7    gathered about this area of the state, correct?

8    A.    Yes.

9    Q.    And when is the first bit of intelligence information

10   developed that leads anyone, whether it's you or anyone from

11   the FBI or the JTTF, to the North Dartmouth/UMass area?

12   A.    Sometime in the early morning hours of April 19.

13   Q.    And by "early morning," I think I have seen emails that

14   the Government provided last night to us, it started at

15   approximately 6:00 a.m., early morning, correct?

16   A.    We were aware sometime during the early morning hours, I

17   don't know the time, that the fugitive, Mr. Tsarnaev,

18   subscribed to four phones at that address, and that work was

19   relatively early in the morning.  I don't know exactly what

20   time.

21   Q.    And that intelligence information, one was that there were

22   phones registered that were of interest to Carriage Drive,

23   correct?

24   A.    That four phones were subscribed by Tsarnaev at that

25   address, yes.

1   Q.   Did you or any of the JTTF members contact the provider,

2   meaning -- I believe it was AT&T in this instance, correct?

3   A.   Yes.

4   Q.   Did you or any JTTF member contact AT&T to inquire further

5   what was going on with the phones?

6   A.   I'm not sure what you mean.

7   Q.   Well, you are familiar that there can be multiple people

8   on family plans or friend plans or group plans, correct?

9   A.   I think my family has one.  I'm not part of it.  But, yes.

10  Q.   Those ads on TV now about invite your friends and family

11  as a way of saving money, correct?  You just have to answer out

12  loud.

13        THE COURT:  If there is a question before you, you

14  have to answer it verbally as well as by expressive conduct.

15  A.   My family has one, because I'm sure it saves us some

16  money.  So, yes.  I will allow that, yes.

17  BY MR. STAHL:

18  Q.   Okay.  What I am specifically referring to is did you or

19  anyone from the JTTF contact AT&T?  This was Thursday during

20  the day, correct, and you have the ability to contact the

21  carrier providers, correct?

22  A.   Absolutely.

23  Q.   And it is something you do in the normal course of your

24  everyday investigations, correct?

25  A.   It's something we did here, yes.

1    Q.   And so, then I take it someone did contact AT&T to develop

2    further hard evidence about what those phones were and who they

3    were registered to, correct?

4    A.   Likely, and every bit of data the phone company possessed

5    with regard to those phones, including data that might allow us

6    to locate Tsarnaev, yes.

7    Q.   If I understand you correctly, you just don't know that

8    aspect of the investigation?

9    A.   No, I just didn't *do* that aspect of the investigation.

10   But I know firmly that we obtained every bit of information and

11   data we could from AT&T, the toll records and any data that

12   would assist us in locating the user of any of those phones.

13   Q.   So, was Mr. Kadyrbayev's name one of those linked with

14   this group plan of cell phones?

15   A.   Within AT&T's database?

16   Q.   In any information you received from AT&T, correct.

17   A.   I don't believe so, no.

18   Q.   Did you review those records personally, or you are going

19   on some hearsay?

20   A.   I did not review those records personally.

21   Q.   You also said that approximately 6:19 a.m. on the morning

22   of April 19th, that information was received that Jahar had

23   logged onto a computer system on the UMass Dartmouth campus,

24   correct?

25   A.   It was not contemporaneously received, but it was received

1    that at 6:19 that did, in fact, occur, yes.  I came in receipt

2    of that information hours later.

3    Q.    About how long, how many hours later?

4    A.    Probably about six hours later.

5    Q.    So, about noon?

6    A.    Or slightly after, yes.

7    Q.    And so, it's fair to say at least by noon you have several

8    pieces of information that in your mind is tying this

9    Carriage Drive address to something to do with Jahar, correct?

10   A.    Yes.

11   Q.    You then had information about some of the content of the

12   phones and their communications, at least the phones, not

13   knowing who, but with contacts with Russia and other locations,

14   correct?

15   A.    I know of one, and I described it at 10:06 a.m.

16   Q.    And then at 10:20 a.m., I think you testified that another

17   phone bounced off a tower that you thought was about a mile

18   from campus, correct?

19   A.    Let me clarify.  My receipt of the information about the

20   10:06 call, which is the only call that I am aware of that

21   bounced off a tower that morning, I received about 20 minutes

22   after that.  It caused me to do something, that is, go over to

23   the campus.  So, I am only aware to date of a call, and it

24   occurred at 10:06 a.m.

25   Q.    I'm sorry.  Did you just say you learned about that

1    contemporaneously, so at 10:06 you learned about that call near

2    the campus?

3    A.    Nearly contemporaneously.  I probably received the call at

4    about 10:40 that morning, when I was at the State Police

5    Barracks, and my command post told me that about 20 minutes ago

6    a phone linked to -- and it was told to me -- I recall

7    receiving a report that it was a "Black Hat's" phone.  That

8    told me that they were telling me that Tamerlan Tsarnaev's

9    phone had transmitted a message to Russia 20 minutes earlier.

10   They were referring to, I know retrospectively, to a single

11   call that was transmitted from the phone bearing the suffix

12   9049 at 10:06 a.m., is the only one I am aware of.

13   Q.    I'm sorry.  You said that the information was "Black Hat"

14   was Tamerlan, the older brother, correct?

15   A.    That's what I heard when my command post called me, yes.

16   Q.    And that he had sent the phone message?

17   A.    Yes.  The message I received was that a message on

18   Tamerlan's phone to his parents in Chechnya was transmitted

19   20 minutes ago, and it bounced off a tower a mile from the

20   UMass Dartmouth campus.

21   Q.    When was the shootout with Tamerlan?

22   A.    Sometime before 1:00 a.m. same day.

23   Q.    So, hours before?

24   A.    Yes.

25   Q.    About eight hours before.  We could do military time.

1    A.   (Witness nodded head).

2         THE COURT:  I may be confused now.  Just so I

3    understand, the phone call that you referred to was on the

4    morning of April 19th; is that right?

5         THE WITNESS:  Yes, your Honor.

6         THE COURT:  The shootout, or fire fight, or however we

7    characterize it, was concluded by what time?

8         THE WITNESS:  Judge, I think that by 1:01 a.m. we were

9    in contact with the late Tamerlan Tsarnaev, so it had to

10   precede that, Judge.  I think it was before 1:00 a.m.

11        THE COURT:  1:00 a.m. on the 19th?

12        THE WITNESS:  Yes, sir.

13   BY MR. STAHL:

14   Q.   So we are correct, that it couldn't have possibly been a

15   phone call that Tamerlan had instigated, correct?

16   A.   No, sir.  It was reported his device, his phone.

17   Q.   So, you had the computer logons near the University or at

18   the University, you had the cell phones, and you had some

19   information from another student that Jahar was friends with or

20   friendly with the residents at 69A Carriage Drive, correct?

21   A.   In fact, more than one student, but, yes.  And other

22   information, yes.

23   Q.   And all of this information you have somewhere around

24   12:00 noon to 1:00 p.m., correct?

25   A.   No.

1    Q.   You have the cell phone information and the computer

2    information by then, certainly?  You just testified about that?

3    A.   Yes, sir.

4    Q.   And then you have information from a number of students

5    that Jahar was friends with some of the people in that

6    apartment and had visited that apartment, correct?

7    A.   Likely only one by the time that you described.  Several

8    later in the afternoon.

9    Q.   Okay.  I'm sorry.  Likely only one by that time?  I don't

10   understand.  Likely only friends with one person in that

11   apartment by 1:00 that afternoon?

12   A.   Yes.  We had probably only received collectively

13   information from a single friend of Tsarnaev.  We were

14   interviewing many associating Carriage Drive to Tsarnaev.

15   During the course of the afternoon we heard from several

16   others, the last of whom was the defendant Phillipos.

17   Q.   You testified on direct that at this point, meaning the

18   knowledge that we have been talking about, that you suspected

19   that Jahar could be hiding out at 69A Carriage Drive, correct?

20   A.   By the end of the afternoon I firmly believed it, yes.

21   Q.   And even before that you were suspecting it, correct?

22   A.   Yes.

23   Q.   Your beliefs became firmer as the day went on, correct?

24   A.   Yes.

25   Q.   Or that it could be where another cell is located, I think

1    you said?

2    A.    I don't believe I said that, no.

3    Q.    Well, you have said that in the investigation, the FBI's

4    investigation, and you said you were, in particular, concerned

5    that there were other cells out there, meaning potential other

6    people involved in the bombing, correct?

7    A.    Yes.

8    Q.    Or that there could be other bombs planned, correct?

9    A.    Without question, yes.

10   Q.    Other attacks?

11   A.    Yes.

12   Q.    And April 19th was a Thursday, correct?

13   A.    No, April 19th was a Friday.

14   Q.    Friday.  And as the agent -- were you in charge of this

15   part of the investigation by that time?

16   A.    What part?

17   Q.    The Carriage Drive part.

18   A.    I was the senior and one of very few FBI Agents in that

19   region.  So, yes, I was working with the unified command,

20   speaking for the FBI.

21   Q.    Agent Walker, you have been an agent for 23 years,

22   correct?

23   A.    Yes.

24   Q.    You have testified, what, hundreds of times?

25   A.    No, no.

1    Q.    Fifty times or more?

2    A.    A dozen, perhaps.  Not 50.

3    Q.    And you have been an investigative agent, case agent, or

4    lead agent on I think you said thousands of investigations?

5    A.    No.  I said that I had interviewed over a thousand people,

6    but I have been case agent probably hundreds of cases.

7    Q.    And as case agent or line agent, have you applied for

8    search warrants?

9    A.    Yes.

10   Q.    And approximately how many search warrants would you say

11   you've applied for?

12   A.    Dozens.

13   Q.    And I am sure you have been involved in many dozens more

14   as not the affiant but a participant in the search warrants,

15   correct?

16   A.    Many more, yes.

17   Q.    So, you understand what it takes to put together an

18   affidavit for probable cause to search a residence or a

19   location, correct?

20   A.    Yes.

21   Q.    And, in fact, you did not apply for a search warrant for

22   69A Carriage Drive, did you?

23   A.    Are you asking me personally or my agency?

24   Q.    You personally.

25   A.    I did not.

1    Q.   And I am focusing on the time period before 5:05 p.m.,

2    when the assault on the residence occurs --

3    A.   Yes.

4    Q.   -- not after, okay?

5    A.   Yes.

6    Q.   And no one from the FBI applied for a search warrant from

7    the time that intelligence information was developed till HRT

8    hit the residence, correct?

9    A.   You mean coming to a Court and seeking Court approval when

10   you say "applying;" is that right?

11   Q.   Correct.

12   A.   I do not believe that anyone did that by that time, yes,

13   correct.

14   Q.   Well, certainly you had no search warrant on scene when

15   you first surrounded the residence, correct?

16   A.   Correct.

17   Q.   And certainly you had no search warrant on the scene once

18   the individuals were forcibly removed from the apartment and

19   cuffed, because you needed Mr. Kadyrbayev's consent to search

20   the apartment, correct?

21   A.   I don't know that they necessarily follow, but I did not

22   have a search warrant, the FBI did not, by the time of the

23   events you describe, correct.

24   Q.   And you certainly had time to apply for a search warrant,

25   correct?

1          MS. SIEGMANN:  Objection.

2          THE COURT:  He may answer the question.

3     BY MR. STAHL:

4     Q.   I'm just focusing on time, Agent.  Given the number of

5     hours between, let's say, 1:00, when you developed this

6     information, and in your words you have -- well, you had

7     reasonable suspicion, correct?

8     A.   I don't necessarily agree that we had sufficient time to

9     apply for a search warrant, as I have come to understand the

10    process by which search warrants are obtained and authorized in

11    terrorism investigations.

12    Q.   Well, Agent Walker, you're certainly aware from your

13    decades on the FBI and your involvement in other search

14    warrants that search warrants can be obtained quickly when the

15    circumstances arise, correct?

16    A.   Yes.

17    Q.   And you are aware that there are even provisions for

18    telephonic search warrants, affidavits and search warrants,

19    correct?

20    A.   I don't know if that pertains with regard to this

21    investigation.  Specifically, I don't know whether the

22    Department of Justice will authorize a telephonic search

23    warrant in a terrorism investigation, so I am not competent to

24    answer that.

25         MS. SIEGMANN:  Objection to this line, because the

1    witness just said he is not competent to testify on that.

2         THE COURT:  Well, it is probing the areas that he

3    understands.  I think it is probably peripheral, but I will

4    permit it.

5    BY MR. STAHL:

6    Q.   In any event, no search warrant was obtained before entry

7    into the apartment, correct?

8    A.   Yes.

9    Q.   Now, without going back and repeating the history of the

10   investigation, I just want to focus on, you spoke about the

11   extreme caution and dangerousness of the situation as you and

12   the FBI perceived the Carriage Drive location, correct?

13   A.   Correct.

14   Q.   And you testified on direct that in your mind there was a

15   high probability that Jahar was present at the location,

16   correct?

17   A.   Yes.

18   Q.   And that, based upon the information that was developing,

19   he was your suspect -- one of the suspects in the bombing,

20   correct?

21   A.   Yes.

22   Q.   And, therefore, the extreme caution and the massive amount

23   of manpower was brought to bear on the Carriage Drive location,

24   correct?

25   A.   I don't understand your question.

1    Q.   You have testified on direct that you were going to

2    surround a location where you thought a very violent criminal

3    was present, correct?

4    A.   Yes, sir.  Yes, sir.

5    Q.   And that that demanded special measures, special tactics?

6    A.   Yes.

7    Q.   And that it would not be a normal situation, where you or

8    other interviewing agents would just go up and knock on the

9    door and see if he was there, correct?

10   A.   Correct.

11   Q.   And so, that's where we come in to set up surveillance,

12   first, of the apartment, correct?

13   A.   Surveillance was established, yes.

14   Q.   And I think you testified that that was mainly done by

15   Massachusetts State Police, correct?

16   A.   Yes, sir.

17   Q.   And they were part of your Joint Terrorism Task Force?

18   A.   Yes.

19   Q.   Who else is part of the Joint Terrorism Task Force to this

20   case?

21   A.   Twenty-five, thirty different agencies, federal, state and

22   local.  Every agency that participates on the Joint Terrorism

23   Task Force participated in this investigation.

24   Q.   All right.  So, at least, just briefly, I'm not going to

25   try and name all 25, but we have FBI, correct?

1    A.    Yes.

2    Q.    Homeland Security, correct?

3    A.    Yes, sir.

4    Q.    ATF?

5    A.    Yes.

6    Q.    DEA?

7    A.    They participated, yes.  They are not typically party to

8    the JTTF, but they were working it, along with many agencies

9    that we normally don't see.  OIG, for instance, yes.

10   Q.    Office of the Inspector General?

11   A.    Yes.

12   Q.    U.S. Customs?

13   A.    Yes.  They don't exist anymore.  They exist within the

14   Department of Homeland Security.  Yes.

15   Q.    A very large, all-encompassing agency.

16         And the Massachusetts State Police.  I think you

17   mentioned Rhode Island State Police were involved?

18   A.    Yes.

19   Q.    Was New Bedford Police Department part of the JTTF?

20   A.    No.

21   Q.    How about UMass Campus Police?

22   A.    No.

23   Q.    When an agency is part of the JTTF, how is it structured?

24   Who do they report to?  So, you have all these agents and

25   police officers assigned, and they report to the FBI?

1          MS. SIEGMANN:  Objection, your Honor.  This is beyond

2     the scope of --

3          THE COURT:  Oh, not really.  It was opened up, not

4     altogether fruitfully.  But, in any event, I will permit some

5     response to get a sense of the hierarchy.

6     A.   The different agencies come to a common investigative

7     platform that the FBI found meaningful in the late, perhaps

8     early '90s in New York, and we're operating with common

9     reporting.  FBI reports were a common -- typically a memorandum

10    of understanding for each agency.  We're sitting in FBI space.

11    We're typically -- each colleague is furnished with FBI

12    equipment, and what we're doing is we're communicating and

13    acting as if we were a group of FBI agents.  We're fungible in

14    that regard, and the agencies are varied.

15         So, when the JTTF goes and conducts either a minor

16    interview or a major investigation, it really doesn't matter so

17    much to us whether it's an FBI Agent going out and doing it, or

18    a State Police Trooper or Boston Police Officer.  They are

19    coming back, the information is coming into the FBI system.  We

20    are all sharing and sharing intelligence.

21         The leadership in a critical incident like this

22    typically will devolve automatically to the FBI Special Agent

23    in Charge, but we're reasonable people.  If one Agency's

24    internal administrative procedures conflict, we'll work that

25    out.  But we're one group working together toward a common

1   cause.

2   BY MR. STAHL:

3   Q.   Okay.  And just a brief follow-up, I don't want to go too

4   far, but this is significant for certain reasons, is, so you

5   said that all the law enforcement people that are assigned to

6   JTTF then work with the FBI and out of FBI space, and they

7   write 302s, correct?

8   A.   Yes.

9   Q.   So, whether they are Massachusetts State Police or Boston

10  Police, they're not going to write Boston Police reports when

11  they are assigned to the JTTF; they will write FBI-style forms

12  onto your computer system, correct?

13  A.   If they are furthering the work of the JTTF, that's

14  correct, yes.

15  Q.   And they are deputized as Federal Agents, correct?

16  A.   Those that need Federal deputation, yes.

17  Q.   Now, approximately when did the first surveillance start

18  of 69 Carriage Drive?

19  A.   Shortly before noon.

20  Q.   How was it set up?  Let me be specific.  How many, we'll

21  say agents or police officers, law enforcement, were assigned

22  around the apartment?

23  A.   I don't know.

24  Q.   Were they in SWAT clothes, meaning -- you understand what

25  I mean by "SWAT clothes," right --

1    A.    I do.

2    Q.    -- whether it's camouflage, like HRT, or the solid colors

3    by Boston SWAT or other SWAT Teams?

4    A.    I understand that early on I knew that we had what we call

5    a "soft perimeter," and later we hardened the perimeter.  Early

6    on I do not believe anyone was in any tactical regalia.  Later,

7    I believe that at actually quite a distance from the apartment

8    there were members of the Massachusetts State Police Tactical

9    Team, their STOP Team.

10   Q.    In fact, your ASAIC, Assistant Supervisory Agent in

11   Charge, emailed you and was curious or wanted to confirm that

12   there was no marked police presence around the apartment,

13   correct?

14   A.    Yes.

15   Q.    The purpose of the surveillance was to gather intelligence

16   information?

17   A.    No.

18   Q.    The purpose was to ensure that no one left the area?

19   A.    To ensure that Tsarnaev did not flee the area, and people

20   that were occupants of the apartment did not flee the area

21   without us having an opportunity to talk to them.

22   Q.    Now, you said that your concern and the concern of the FBI

23   was that this location, 69 Carriage Drive, could have contained

24   Jahar, correct?

25   A.    Yes.

1    Q.    And it also could have contained explosives or bomb-making

2    devices, correct?

3    A.    Yes.

4    Q.    And that was based upon your misinformation, as it turns

5    out, that Jahar was present, correct?

6    A.    I don't, again, know that the two follow.  He was not

7    there, correct.  Yes.

8    Q.    Well, and you found no bomb-making materials on the

9    premises, correct?

10   A.    Correct.

11   Q.    But at the time, meaning April 19th, starting around

12   midday and moving later into the afternoon, that was your

13   concern and your fear, is that there was a danger to that

14   community and it had to be contained, correct?

15   A.    Among other things, yes.

16   Q.    So, did any law enforcement officer, SWAT Team or anyone

17   from the FBI, start to move and evacuate the surrounding

18   buildings and the neighbors from that four-person apartment?

19   A.    I do not believe so.

20   Q.    So, you described the premises, and it is an

21   apartment-style complex, correct?

22   A.    Yes.

23   Q.    Two-story buildings?

24   A.    Yes, two-story buildings within the complex.  Yes.

25   Q.    And they are aluminium-sided or vinyl-sided in a light

1  color, correct?

2  A.   Yes.

3  Q.   And each entryway, the front entrance, leads to a common

4  hallway, and there will be two apartments on the first floor

5  and then two apartments above, correct?

6  A.   At least in that building.  I have not been elsewhere in

7  the interior of the buildings, but at least in that building.

8  Q.   And then you said that this was a -- I believe your

9  description was it was a heavily populated, heavily trafficked

10  area, correct?

11  A.   Yes.

12  Q.   So, a good-size apartment complex, correct?

13  A.   Yes.

14  Q.   And then you testified that Carriage Drive itself, across

15  the street are single-family residences, correct?

16  A.   Correct.

17  Q.   And your testimony is, to the best of your knowledge, no

18  effort was made to move the residents of any of the

19  single-family homes or the surrounding apartments to an area of

20  safety, correct?

21  A.   Not until HRT arrived, correct.

22  Q.   Well, even once HRT arrived, no one was moved until well

23  after the people were taken out of the apartment, correct?

24  A.   I believe that's correct.  No one was moved prior to the

25  occupants of the apartment leaving the apartment.

1    Q.   Now, you testified that you were on scene with HRT,

2    correct?

3    A.   Correct.

4    Q.   I think your term was you "rolled" in together?

5    A.   Yes.

6    Q.   So, from the best of your recollection, how many officers

7    were present surrounding 69A Carriage Drive?

8    A.   Probably in excess of 50, perhaps 60 or more.

9    Q.   Fifty, 60 or more, correct?

10   A.   Yes.

11   Q.   And what type of vehicles were they in?

12   A.   Most operated unmarked cars.  Some of them may have been

13   leased by HRT when they arrived.  I don't know that.  But

14   unmarked.  At one point later in my work there, I saw a

15   Mass. State Police tactical vehicle, black, might have been

16   lightly -- probably lightly armored, but a tactical vehicle.

17   Q.   Right.  The ones we have seen throughout the pictures of

18   Boston, the armored-up, big vehicles that the SWAT Team hangs

19   on the side as they approach, correct?

20   A.   A sizeable vehicle, yes, sir.

21        MR. STAHL:  Judge, I am about to move into another

22   area, and I would like to pre-mark some exhibits, so perhaps

23   this is a good time.

24        THE COURT:  So, we will break for the testimony today.

25        I was just talking to Mr. Lovett.  Both of us feel far

1   from home, and I am probably going to ask the Marshal's Service

2   and Systems about the prospect of going back to Courtroom One.

3   We chose this courtroom because it provided the

4   maximum amount of places that people could view this, but I am

5   not sure that in-person interest is that substantial at this

6   point.  So, I think that is what we will try to do, if we can

7   work that out.

8   So, we will try and probably try this case tomorrow

9   morning in Courtroom No. One.

10   But we will take the break at this point, and I do

11   want to take up a couple of *ex parte* matters.  The first one is

12   one that is raised by the Government.  I would ask, however,

13   that counsel for the other defendants remain present, because I

14   may want to discuss that with them afterwards.  By "present," I

15   mean outside of the courtroom.

16   MR. STAHL:  Your Honor, I presume that we are

17   following our normal procedure, that the witness is on cross,

18   the Government won't talk to --

19   THE COURT:  If you want me to issue an order --

20   MR. STAHL:  I think that's appropriate.

21   THE COURT:  -- to that effect, I will.

22   So, now that you are on cross-examination, no

23   discussion of the substance of your testimony with anybody.

24   Let us put it that way.

25   THE WITNESS:  Yes, your Honor.

1          THE COURT:  So, we will break at this point.  I will

2     hear the Government *ex parte*.  I would ask counsel to remain

3     outside, because I will, I think, be inviting you in

4     afterwards.

5          THE CLERK:  All rise.

6        (The Honorable Court exited the courtroom at 3:30 p.m.)

7                         (Recess taken)

8            (Sealed *ex parte* hearing held on the record)

9              (WHEREUPON, the proceedings adjourned)

1                      C E R T I F I C A T E

2

3

4            I, Brenda K. Hancock, RMR, CRR and Official Reporter

5    of the United States District Court, do hereby certify that the

6    foregoing transcript constitutes, to the best of my skill and

7    ability, a true and accurate transcription of my stenotype

8    notes taken in the matter of *United States v. Kadyrbayev, et*

9    *al*,  No. 1:13-cr-10238-DPW.

10

11

12

13

14   Date:  May 23, 2014              */s/ Brenda K. Hancock*
                                     Brenda K. Hancock, RMR, CRR
15                                    Official Court Reporter

16

17

18

19

20

21

22

23

24

25