1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA          )
                                       )
5    vs.                               )
                                       )
6                                      )  No. 1:13-cr-10238-DPW-2
     AZAMAT TAZHAYAKOV,                 )
7                                      )
                          Defendant.   )
8                                      )

9

10   BEFORE:  THE HONORABLE DOUGLAS P. WOODLOCK

11

12                        DAY ONE OF JURY TRIAL

13

14

15          John Joseph Moakley United States Courthouse
                          Courtroom No. 1
16                        One Courthouse Way
                          Boston, MA 02210
17                        June 30, 2014
                            8:40 a.m.
18

19

20

21          Brenda K. Hancock, RMR, CRR
                     Official Court Reporter
             John Joseph Moakley United States Courthouse
22                        One Courthouse Way
                          Boston, MA 02210
23                        (617)439-3214

24

25

```
 1   APPEARANCES:

 2        U.S. ATTORNEY'S OFFICE
          By:  AUSA B. Stephanie Siegmann
 3             AUSA John A. Capin
          1 Courthouse Way
 4        Suite 9200
          Boston, MA 02210
 5        On behalf of the United States of America.

 6

 7        LAW OFFICE OF BUKH & ASSOCIATES PLLC
          By:  Nicholas Wooldridge, Esq.
          1123 Avenue Z
 8        Brooklyn, NY 11235
          On behalf of the Defendant Azamat Tazhayakov.
 9

10        MYERS, SINGER & GALIRADO, LLP
          By:  Matthew Daniel Myers, Esq.
11        299 Broadway, Suite 200
          New York, NY 10007
12        On behalf of the Defendant Azamat Tazhayakov.

13

14        LAW OFFICE OF DIANE FERRONE
          By:  Diane Ferrone, Esq.
          205 W. 54th Street
15        #2D
          New York, NY 10019
16        On behalf of the Defendant Azamat Tazhayakov.

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2                                                          PAGE

3
     HEARING IN COURTROOM 1.............................4
4

5    JUDGE ADDRESSES JURY VENIRE IN JURY ASSEMBLY ROOM....8

6
     HEARING CONTINUED IN COURTROOM 1.....................28
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          P R O C E E D I N G S:

2          THE CLERK:  All rise.

3     (The Honorable Court entered the courtroom at 8:40 a.m.)

4          THE CLERK:  This Honorable Court is now in session.

5     You may be seated.

6          This is the matter of United States versus Azamat

7     Tazhayakov, Criminal Action 13-10238.

8          THE COURT:  Well, I want to go over choreography,

9     first.  That is why I asked Mr. McAlear to be clear.  As I

10    understand it, and Mr. McAlear will correct me if I am wrong,

11    what we are going to do is have Mr. Tazhayakov just outside the

12    jury area.  The entrance to the jury doors out there will be

13    closed down when we are ready to see him.  He will walk in, and

14    I think I would like to have in that area as well Government

15    counsel and his counsel.  They will lead, that is, Government

16    counsel going first, defense counsel will go in second,

17    Mr. Tazhayakov third, and they will be set up as Mr. McAlear

18    has them set up.  Once they are in place, then I will be called

19    to come in.  I will try to do that promptly right after, that I

20    will be in the clerk's area anyway, maybe in the jury office

21    there.  With respect to my clerks, I suppose they can simply

22    stand at the side over in the corner.

23          Mr. McAlear, is that?

24          MR. McALEAR:  If that's all right with the Marshals.

25          THE MARSHALL:  Yes, your Honor.

 1           THE COURT:  And then we will be off and running.  I

 2    think that is clear.  Is it clear enough for everybody here and

 3    for the Marshals as well?

 4           MS. FERRONE:  Yes, your Honor, it's clear.

 5           MR. CAPIN:  I think it's clear.  We're talking simply

 6    about the choreography of what we are doing on the second

 7    floor?

 8           THE COURT:  Yes, this morning.

 9           MR. CAPIN:  This morning.  And I take it counsel will

10    be introducing ourselves.

11           THE COURT:  No.  I will be doing that.

12           MR. CAPIN:  You will be doing that?

13           THE COURT:  Yes.

14           MR. CAPIN:  Thank you.

15           THE COURT:  I will just simply make reference to

16    counsel during the course of it, but you will be coming in and

17    be seated before I get into the jury room.

18           MR. CAPIN:  Understood.  Thank you.

19           THE COURT:  So, that is, I think, all we really need

20    to know.  The Marshals will understand that counsel will be

21    there as well and the order of the parade.

22           You are free to go, Jim.  Thank you.

23           MR. McALEAR:  Thank you, your Honor.

24           THE COURT:  I just wanted to be sure I did not make

25    another mistake in this.

1          MR. McALEAR:  Sounds great.

2          THE COURT:  Just for scheduling today, I just received

3     the Government's Opposition to the Motion to Exclude the

4     exhibits.  I will look at it.  But what I would like to do, I

5     think, is get us back together around 2:00, at which point I

6     will go through the deposition and this Motion to Exclude and

7     any other things that are kicking around.  At that time I will

8     give you an indication of my view about the Government's

9     reference in opening statement to the statements of the

10    defendant at that time as well, so you have some sense,

11    sufficient sense to prepare for the trial.

12         Thereafter, we think probably 2:30, 3:00 we will get a

13    disc of all of the questionnaires; it can be provided to

14    counsel, and then you are going to have to start looking at

15    those discs.

16         I think what I am going to want to do is get back here

17    around 8:30 tomorrow morning again, before we have the next

18    collection of jurors come in, and begin the discussion about

19    what we do with the jurors that had filled out questionnaires

20    on Monday.  Some of them will be, I think, pretty clear, some

21    of them will not, and I am going to encourage the parties to

22    agree upon, as best they can, some of these people, and I may

23    well refer to some so that you do not have to think about them

24    at all.

25         And the process on Tuesday, I think, in the morning

1    will be just getting the names of the persons who filled out

2    questionnaires on Monday, who will be called in for Wednesday,

3    and the same process will go forward on Tuesday, questionnaires

4    as well.

5           If we are lucky, we will be able to get 40-or-so

6    jurors from the Monday group after some form of voir dire on

7    Wednesday, and then we would do peremptories either the end of

8    Wednesday or beginning of Thursday.  If it takes a little bit

9    longer, we will go a little bit longer with the Tuesday group.

10   But that is the plan.

11          Now, are there other things that you have got in mind

12   you want to talk about at this point?

13          MR. CAPIN:  The Government left you a copy, your

14   Honor, of our exhibits, so you can look at them and decide the

15   motion that is pending.

16          THE COURT:  All right.  Anything else?

17          So, why don't you remain here.  We will get a call

18   from Mr. McAlear and troop down there, and we will go from

19   there.

20          MR. CAPIN:  Thank you.

21          THE COURT:  I will address the jury for probably 10

22   minutes or so.

23          We will be in recess.

24          THE CLERK:  All rise.

25        (The Honorable Court exited the courtroom at 8:48 a.m.)

1              (Recess taken)

2        THE COURT ADDRESSES VENIRE IN THE JURY ASSEMBLY ROOM:

3        THE CLERK:  All rise for the Honorable Court.

4      (The Honorable Court entered the Jury Assembly Room at

5  9:05 a.m.)

6        THE CLERK:  This Honorable Court is now in session.

7  You may be seated.

8        This is Criminal Action 13-10238, the United States

9  versus Azamat Tazhayakov.

10       THE COURT:  Good morning, ladies and gentlemen.

11       I want to introduce myself and welcome you, formally,

12  to the United States District Court for the District of

13  Massachusetts.

14       My name is Douglas Woodlock.  I am the Judge of the

15  Court who will preside over the trial in United States versus

16  Azamat Tazhayakov.  The Court has summoned you here today as

17  potential members of the jury in that case, and I want to thank

18  you for your presence and your attendance today.

19       This morning what I am going to do is explain to you

20  about the jury selection process, some important principles for

21  you to understand, today's schedule, and a little bit more

22  about the case.

23       However, first, let me start with some preliminary

24  remarks about the importance of the jury system in our society.

25       The jury is central to the administration of justice

1     under our system of law in the United States.  In both criminal

2     and civil cases verdicts are rendered by a jury composed of

3     citizens like you.  The founders of our nation believed that

4     the right to a jury was so important that they put it into the

5     *U.S. Constitution* and the *Bill of Rights*.

6              We are a democracy, where people rule.  As a

7     consequence, we do not look to lawyers or judges to make a

8     factual determination in legal proceedings.  We look to the

9     cross-section of the community to exercise their common sense

10    in doing so.

11             It is the responsibility of every citizen to appear

12    and serve as a juror, when called.  Such service is both an

13    obligation of citizenship, and it is an opportunity to serve a

14    vital public and civic function.  Juries have been composed of

15    citizens taken from all walks of life, each of whom brings

16    their own special individual perspective and life experience to

17    the table.  You do not need to have some particular education

18    or experience to be a juror.

19             Your participation in the jury selection in this case

20    or in any other case is no small thing.  It is, in fact,

21    central as a central component of our enduring democracy.

22             Acknowledging the importance of jury service is not to

23    ignore the obvious point that your appearance here is, at the

24    very least, inconvenient.  Certainly, serving on a jury, if you

25    are chosen to serve, will be a disruption to your daily lives.

1      You should not, however, assume that your jury service, if you

2      are chosen to sit on this jury, will be burdensome.  Jurors

3      regularly report to my colleagues and to me that they found

4      their service to be one of the most interesting and memorable

5      experiences of their lives.

6              After most trials, I meet briefly with jurors and

7      thank them for their service.  I do not make, in fact it would

8      be improper for me to make any inquiry about their

9      deliberations or have any discussion about the deliberations.

10     That is confidential, between you and your fellow jurors.  But

11     I do inquire about their experience as jurors and whether there

12     is anything that the Court can do to improve service for future

13     jurors.

14             Uniformly, during the course of those discussions, the

15     jurors tell me that the experience was both worthwhile,

16     interesting, and fundamentally important to them.  If you are

17     chosen to serve in this case, I expect and hope that you will

18     find the experience to be the same.

19             So, let me start by explaining the important purpose

20     of the jury selection process and the jury selection process

21     that we are going to follow in this case.  Both parties have a

22     right to a jury that is fair and impartial, one that is not

23     biased or prejudiced in any way.  To obtain a fair jury, we

24     have a selection process.  This process is not meant to be

25     intrusive.  The parties and I have worked very hard to avoid

1    that.  It is important to ensure that the parties have a fair

2    and impartial jury to hear the case, and so you are going to be

3    hearing those words over and over again:  "fair and impartial."

4    It is important that each of you understand what I mean by that

5    phrase.

6            To serve fairly and impartially as a juror means to

7    hear the evidence in this case and decide the outcome without

8    bias or prejudice or predisposition.  You have to consider the

9    testimony of all the witnesses who are properly before you,

10   consider all of the evidence that I permit to be presented to

11   you.  It means that you base your verdict only on the evidence

12   that is presented in court and in light of the law as I will

13   give you.  That is, both parties are entitled to a jury that

14   does not have its mind made up ahead of time one way or the

15   other about any of the issues in the case before they hear the

16   evidence and have been instructed by me to begin their

17   deliberations.

18           There has been media coverage of this case, and I

19   suspect there will be coverage during the trial.  The mere fact

20   that you have been exposed to, you have read, or heard

21   something about this case does not mean that you cannot be a

22   fair and impartial juror.  The critical issue, the one that we

23   are going to be probing about and asking you about, is whether

24   if you have read or seen or heard something about this case or

25   something that you think touches on this case, whether you can

1    put it aside and decide the case solely on the basis of the

2    evidence that is presented in court at trial and according to

3    the law.

4            The jury selection process that we are about here is

5    designed to ensure the fairness and the impartiality to both

6    sides of the case in that way.

7            I have always thought that there is an image which

8    captures what it is to be a fair and impartial juror.  It is

9    the statute of Lady Justice that you see sometimes on the top

10   of a courthouse, not this courthouse, but some courthouses.

11   She is a woman who is holding a scale in one hand, she is

12   holding a sword in the other, and she has got a blindfold on.

13           It is pretty easy to understand why she is holding the

14   scale.  She is there to weigh whatever evidence is placed

15   before here.  It is pretty easy to see why she is holding a

16   sword.  She is obligated to enforce the law as the judge tells

17   her the law requires.

18           But why does she have a blindfold on?  I am going to

19   suggest to you that she has a blindfold on because she has an

20   obligation to shield herself from all extraneous matters, from

21   bias, from prejudice, from undue sympathy, from predisposition,

22   and any other matter not properly placed in the scales

23   themselves.  That is what it means to be a fair and impartial

24   juror.  That is what it means to decide the case solely on the

25   basis of the evidence presented in court and in light of the

1   principles of law on which I will instruct you as the case

2   proceeds.

3           The jury selection in this case is going to proceed in

4   three parts.  The first part will begin this morning, after I

5   conclude my remarks and you are sworn.  Mr. McAlear, the

6   Court's Jury Administrator, and our court staff will then

7   distribute a jury questionnaire to each of you.  As you

8   complete this questionnaire, please do not discuss any of the

9   questions or your answers with anyone else in the room,

10  including any other potential jurors or any of the court staff.

11  You have to do this on your own.

12          Do not fight the questionnaire.  Answer the questions

13  as best you can.  They are designed to elicit information that

14  will be helpful to us from you without you receiving some

15  advice from somebody else.  I want you to keep in mind that

16  there are no right or wrong answers to any of the questions on

17  the questionnaire.  What is most important is that you each

18  answer, and you answer each and every question truthfully and

19  to the best of your abilities.

20          The questions are not designed to pry into personal

21  matters or beliefs unnecessarily.  Rather, they are designed to

22  assist the Court and counsel in determining whether a juror

23  should sit or not sit.

24          In this case, to ensure that we can move through the

25  selection process as efficiently and as smoothly as possible,

1    please be sure to answer every question and answer every

2    question completely.  At the end of the questionnaire, you must

3    sign it, confirming that you have had no assistance in

4    completing the questionnaire, and that you have answered the

5    questions truthfully.

6           As you will see on the questionnaire, if you believe

7    that your response to any question is of a personal or a

8    private nature that you would not like to have made public,

9    there is a place at the end of the questionnaire to identify

10   each such question and to offer your reasons why you think it

11   is private or personal.  Although there may be follow-up

12   questions that I need to ask you about this matter, I will

13   endeavor to do so, bearing your concerns in mind.

14          Please know that the completed questionnaires are for

15   the review by the Court and counsel in this matter solely for

16   the purposes of jury selection.  Although there may be

17   follow-up questions that I need to ask you individually and in

18   public about some particular question that you answered on the

19   questionnaire, you should understand that the questionnaires

20   will be treated as confidential, and they will remain under

21   seal in this court, unless and until this Court or some other

22   Court that has responsibility for it, orders any unsealing, and

23   even then I expect that sensitive information will remain under

24   seal.

25          Once you have completed the questionnaire and signed

1    it and handed it to the court staff, you are free to leave for

2    the day.  But I want you to remember two important points.

3    First, do not speak to anyone, your family members, your

4    friends, your co-workers, anyone, about the jury selection

5    process, the questionnaire or your answers to it.

6          Second, do not speak to anyone, again, not to your

7    family, or your friends, or your co-workers, or anyone else, or

8    communicate in any way about this case, the Court, the parties

9    or anything related to the case.  If your family or friends or

10   co-workers are curious about where you spent your morning

11   today, then you will just tell them that you were called for

12   jury duty and may need to return for further service, and that

13   you have been instructed by the judge not to say anything more,

14   so do not.

15         I expect, as I said, there may be press coverage about

16   this matter.  But you must not read, listen to, be exposed to

17   any media coverage, whether it is print, TV, Web, radio or any

18   form, until this case is completed or until you are told that

19   you will not be a juror in this matter, or, if you are selected

20   as a juror, until you are discharged as a juror at the end of

21   the case.

22         Before you leave for the day, you will be instructed

23   to call the jury information phone tomorrow, Tuesday, after

24   6:00 p.m. to listen to a pre-recorded message that will inform

25   you about your future service in this matter.  For some of you,

1    the phone message will indicate that you are excused from

2    service in this case and you do not have to return to the

3    courthouse on this case.  For other jurors, the message will

4    indicate that you will have to return to the courthouse

5    sometime on Wednesday or Thursday for further proceedings.

6         For those jurors who will be asked to return later

7    this week, let me tell you a little bit about what will happen

8    between now and your return to the courthouse and what the

9    process for the second part of the jury selection process will

10   be.

11        After the questionnaires are completed, the

12   questionnaires are copied, and they are going to be provided to

13   the Court and to the parties.  This will give the lawyers and

14   the Court an opportunity to review them before we see you again

15   so that we can move through the second phase of jury selection

16   as efficiently as possible.

17        If you are asked to return on Wednesday or Thursday,

18   you will initially report to this Jury Assembly Room, and, in

19   all likelihood, you will see me again in my courtroom, which is

20   Courtroom Number 1 up on the third floor.  There, I am going to

21   give you a sense of the schedule for the day and some

22   additional preliminary remarks, and that we may have some

23   follow-up oral questions for some of you about particular

24   answers to the questionnaire.

25        That process will be conducted with a juror

1    individually but in public view in the presence of the counsel

2    and the parties.  Consequently, much of the questioning will be

3    public, as it must be under the law.  If, as I explained to you

4    earlier, as a result of your request or my initiative, I can,

5    if warranted, exclude from public view any sensitive matters

6    that we discuss that you have asked not to be publicly

7    disclosed, I will do so.

8           The initial two phases of this jury selection process

9    are aimed at challenges for what we call "cause," that is,

10   eliminating people from jury service who the Court determines

11   cannot or should not serve on this jury for some reason or

12   another.

13          The third and final portion of this process will be

14   for the parties to exercise what are called "peremptory

15   challenges."  By law, each side gets an opportunity to excuse a

16   small number of prospective jurors who are otherwise found to

17   be impartial.  It's an opportunity for the parties to have a

18   role in the shaping the ultimate jury.  Your answers to the

19   questionnaires will provide the parties with information so

20   that they can exercise those discretionary challenges.  After

21   the parties either exhaust their preemptory challenges or are

22   satisfied with the jury, the jury will be sworn and seated for

23   the case.

24          Trial is scheduled to begin next Monday, July 7th.

25          I want to tell you a little bit about the case, this

1    case of <u>United States versus Tazhayakov</u>.  This is a criminal

2    case.  It is brought by the United States Government against

3    the defendant, Mr. Tazhayakov.  The Government in this case is

4    represented by, and I will ask them to stand, Assistant United

5    States Attorneys John Capin and Stephanie Siegmann.

6              MR. CAPIN:  Good morning.

7              MS. SIEGMANN:  Good morning.

8              THE COURT:  The defendant, Mr. Tazhayakov --

9              And, Mr. Tazhayakov, if you could stand.

10             The defendant is represented here by his attorneys,

11    Diane Ferrone, Matthew Daniel Myers, and Nicholas Wooldridge.

12             MR. WOOLDRIDGE:  Good morning.

13             THE COURT:  Please keep in mind that I give you this

14    brief summary of the charges now so that you have some

15    understanding of the Government's allegations against the

16    defendant.  However, I want to emphasize that the charges in

17    the indictment are merely allegations.  The indictment is a

18    piece of paper that starts the process.  It is not evidence.

19    It is simply a description of the charges against the

20    defendant.

21             Mr. Tazhayakov, like every other defendant in a

22    criminal case, is presumed innocent unless and until the

23    Government can prove beyond a reasonable doubt each essential

24    element of the charges made against him.  And that is not a

25    mere formality or a technicality.  It is a Constitutional

1     principle of the utmost importance.

2           The defendant has pled not guilty, and he denies

3     committing the crimes that are alleged.  The defendant is,

4     consequently, presumed innocent, and he may not be found guilty

5     by you, unless at the end of the trial the jurors unanimously

6     find that the Government has met its burden of proving his

7     guilt beyond a reasonable doubt, and that is a heavy burden.

8           I will instruct you about these principles in greater

9     detail, but I want you to understand those fundamental

10    principles that are the overarching architecture for criminal

11    prosecutions in this country.

12          What is it that the Government has set out to prove?

13    Mr. Tazhayakov has been charged by the Government with two

14    violations of federal law involving what the Government says

15    was a role in obstruction of justice in connection with the

16    investigation of the Boston Marathon bombing.

17          In Count One, the Government alleges that

18    Mr. Tazhayakov and one or more others were part of a conspiracy

19    to, in the language of the statute, knowingly alter, destroy,

20    conceal, or cover up tangible items belonging to Dzhokhar

21    Tsarnaev.  Mr. Tsarnaev has been separately charged in another

22    case with the bombing itself.

23          And I want to emphasize that Mr. Tazhayakov is not

24    charged in any way with being involved with the bombing itself.

25    What he is charged with is obstruction of the following

1    investigation of the bombing.

2            In Count Two, the Government alleges that

3    Mr. Tazhayakov engaged in obstruction of justice or aided and

4    abetted in obstruction of justice, again, in connection with

5    that investigation.  And I want to underscore, again,

6    Mr. Tazhayakov is not accused of being involved, himself, in

7    the bombing.  This is the follow-up after the bombing that the

8    Government is alleging.

9            If you are chosen to be a juror in this case, you

10   will, of course, hear much more about the charges that are

11   alleged and about which the Government must prove, if it is to

12   be successful, each essential element beyond a reasonable

13   doubt, and I will explain to you what the elements of such an

14   offense are.

15           These brief descriptions are just that; they are an

16   effort to orient you to what the case is about in a general

17   sort of way.  But I want to stress again, and you will hear me

18   stress it throughout, that they are only charges.  They are

19   allegations.  They are nothing more.

20           The defendant, Mr. Tazhayakov, has pled not guilty to

21   these charges, and he is presumed innocent.  He may be found

22   guilty only if the Government proves him guilty beyond a

23   reasonable doubt.  The Government bears that demanding burden

24   of proof.  Indeed, in our system of justice a defendant who is

25   charged in our courts can simply sit back, look the Government

1    straight in the eye and say, "Prove it," and unless and until

2    they do, the defendant cannot be found guilty.

3         Now, the defendant is under no obligation to submit

4    evidence himself, but he may.  He can also challenge the

5    evidence, develop the case, challenge the Government's case,

6    and in the end you will evaluate all of the evidence that is

7    properly before you to determine whether or not the Government

8    has overcome the defendant's presumption of innocence and has

9    satisfied you beyond a reasonable doubt of the truth of either

10   or both of the charges it now makes against the defendant.

11        The issue that I am sure many of you are most

12   concerned about at this point is the commitment of time that

13   will be required of you if you are selected to serve.  Once the

14   jury is selected and trial begins, and I assume or expect that

15   we will start on July 7th, next Monday, we will be sitting from

16   9:00 to 1:00 from Monday through Friday.  We anticipate the

17   case will not last any longer than three weeks, and, perhaps,

18   less.  That means it may extend into the week of July 21st.  We

19   will not sit in this trial on Friday, July 18th, because I am

20   going to be holding court in Springfield that day.  When the

21   case is given to the jury for its deliberations, the jurors

22   will do so for the full day, that is, roughly 9:00 a.m. to

23   5:00 p.m., until the jury returns a verdict.

24        Now, the trial could be shorter than expected, and

25   there is always some possibility that it could be somewhat

1    longer, but the Court and counsel will work very hard to ensure

2    that it is not.  My experience has been that I am very helpful

3    with counsel in encouraging the case to be presented in a

4    concise way.

5            As I suggested at the beginning of these remarks, I am

6    not insensitive to the disruption that jury service can have on

7    your daily lives and your routines, particularly given the

8    expected length of trial in this case, which I should tell you

9    is maybe roughly in the middle of the length of trials that are

10   tried in this court, in the Federal Court.  Some are much

11   longer, some are shorter.

12           As I suggested at the beginning of this discussion,

13   part of the reason that I make most of the trial days

14   themselves for the receipt of evidence run only until 1:00 is

15   to ease the disruption, as best we can, to mitigate it and give

16   you an opportunity to return to your daily lives, at least for

17   the afternoon.  Even with this scheduling, I understand that

18   for some of you the length of the trial will pose an extreme

19   hardship, and you will have an opportunity to explain the

20   circumstances to me, if that is the case, in the questionnaire.

21   Although I will give serious consideration to a request to be

22   excused from service based upon extreme hardship, I cannot tell

23   you that you are necessarily going to be excused from jury

24   service if you request it.

25           We all recognize the problems.  It is also an

1   obligation that all of us, as citizens, have, and I will try

2   and balance that as fairly as I can.  We all recognize that

3   service on this jury, like service on any other jury, will be

4   an inconvenience in some way or other to anyone who serves, and

5   I will need to balance your situation against the need for

6   sitting a fair and impartial jury that is comprised of a fair

7   cross-section of the community.

8        Now, although I have given you a brief outline of the

9   charges in this case and you have not heard any evidence, it is

10  still very important for me to emphasize again, and at the risk

11  of being somewhat humorous, I hope, you will find me to be a

12  little bit like the lawyer that the judges fear the most.  It

13  is the fellow who knows how to spell "banana" but does not know

14  when to stop.  I am going to be saying the same thing over and

15  over again, because it is important and I want to emphasize it.

16  And that is, in this connection, that do not allow yourself to

17  be exposed to or have any discussion with any other person from

18  this day forward regarding this case.  This is necessary

19  because a juror's decision must be free from outside influence.

20       As I said before, you may not discuss this case with

21  any other persons.  You may not discuss any matters related to

22  it with any other persons until I excuse you or, if you are

23  seated as a juror, the trial is completed.  You may, as I said,

24  mention that you reported to jury duty and, as may be

25  necessary, discuss the schedule with your family or employer or

1    others so that they will know when you might not be available.

2    However, you must not discuss this case, not even the nature of

3    the case, whether it is civil or criminal, the names of the

4    parties, or anything else, with anyone, including each other,

5    until you are excused or the case concludes.

6          One of the things that you will learn about a trial is

7    that the evidence comes in in bits and pieces.  It is unfair to

8    the parties for you to start discussing the case, even among

9    yourselves, until all the pieces are assembled and you can see

10   it in full framework.  It is unfair to start developing

11   provisional thoughts about it.  You are here to receive all of

12   that evidence.

13         My instruction to you that you may not speak to anyone

14   about this matter includes any member of the media.  Certainly,

15   there is a legitimate public interest in this case.  However,

16   it would be improper for you to discuss this case or anything

17   about it with them.  If anyone approaches you to discuss this

18   case, you must decline, politely, to discuss it.  If anyone

19   persists, and I do not think this is going to happen, but if

20   anybody persists in asking you about it, please inform the Jury

21   Administrator or my Deputy Clerk, Mr. Lovett, about that, and

22   we will take the appropriate steps to deal with it.

23         In the same vein, I must remind you not to read, not

24   to look at, or listen to any media reports about this case

25   until you are excused.  Take a vacation from the media.  If you

1   should, by chance, encounter such a news story or newspaper or

2   radio or TV matter or something on the Internet, for example,

3   you must turn the page, change the channel, close the screen

4   and bring it to the attention of the Jury Administrator, so

5   that we can be assured that we have got people who are

6   unpolluted by extraneous matters, by people who have not pulled

7   down that mask that Lady Justice has over her eyes.

8           Similarly, do not make any use of any social media,

9   Facebook, or Twitter or the like in a fashion that might relate

10  to this case.  When the trial is completed, you will no longer

11  be subject to restrictions on commenting, but during the trial

12  you must observe the rules regarding your duty not to discuss

13  the case or be exposed to any discussion about the case.  The

14  reason, I think, is quite obvious.  It would be immensely

15  unfair to the parties for a jury to be exposed to discussion

16  outside of the courtroom.  The genius of the jury system and

17  our trial is that all of the evidence is before everybody at

18  the same time so that the parties can confront it and bring to

19  your attention their refinements or their views about it.  And

20  if something is happening backstage or out of their view, then

21  they do not have that opportunity to confront it.  You would

22  not want somebody talking about you behind your back, and if

23  you were involved in a case as serious as this case, and every

24  criminal case brought in the Federal Court is serious, you

25  would not want a juror that was exposed to such backstage

1    discussions.  Do not let yourself be involved in that.  In

2    fairness to the parties in this system of justice, you must not

3    let yourself be exposed to any discussion of this case that

4    does not occur in the courtroom and under the control of the

5    Court.

6         So, let me recap today's schedule.  Once you have

7    completed and signed the questionnaire, please turn it in to

8    one of the court staff.  You will then be free to leave,

9    bearing in mind my instructions, which I will not repeat again,

10   about not discussing this case with anyone.

11        As you complete the questionnaire, please write and

12   print clearly, answer every question completely.  And,

13   remember, there are no right or wrong answers to any of the

14   these questions.  There are instructions at the beginning of

15   the questionnaire.  Please follow those instructions.

16        As I was looking at the questionnaire this morning,

17   one thing occurred to me that might justify a further

18   instruction by me.  There are references to whether you,

19   yourselves, or members of your family, or close friends have

20   been exposed to something or knew something or were involved in

21   some particular kinds of activity or particular kinds of

22   employment.  Let me define "close friend."  A "close friend" is

23   someone who is close enough that they could effectively live

24   with you, that kind of closeness.  We are not talking about all

25   your acquaintances, but we are talking about the people with

1    whom you have a special relationship when that phrase "close

2    friend" is used.

3            The most important thing that you can do in completing

4    the questionnaire is to answer all of the questions truthfully.

5            Because your answers to the questionnaires and

6    throughout this jury process must be truthful and made under

7    the pains and penalties of perjury, I am now going to ask my

8    Deputy Clerk, Mr. Lovett, to swear you as the panel from which

9    the jury will be selected in this case.

10           Mr. Lovett.

11           THE CLERK:  Ladies and gentlemen of the jury pool,

12   will you each rise and raise your right hand.

13                       (Jury venire complied)

14                   (Jury venire duly sworn by the Clerk)

15           THE CLERK:  You may be seated.

16           THE COURT:  Ladies and gentlemen, I am reminded, in

17   listening to you, that one of the newest judges of this court

18   took an oath here last Friday.  We have three new judges coming

19   on board, and Judge Indira Talwani took a public oath that

20   required her to swear that she would do equal justice to all

21   persons, rich or poor, accused or not.  That is the kind of

22   oath that you have just taken in this case.

23           I want to thank you for your attendance, for your kind

24   attention to my remarks, for your attention to your duties with

25   respect to the questionnaire.  We are now going to adjourn this

1    proceeding for purposes of the attendance of the parties and

2    counsel and me, and Mr. McAlear and the court staff will now

3    distribute those questionnaires to you.

4           Thank you very much.

5           THE CLERK:  All rise.

6       (The Honorable Court exited the Jury Assembly Room at

7    9:40 a.m.)

8                        IN COURTROOM 1:

9           THE CLERK:  All rise.

10     (The Honorable Court entered the courtroom at 2:35 p.m.)

11          THE CLERK:  This Honorable Court is back in session.

12   You may be seated.

13          Court is back on the record in the matter of United

14   States versus Azamat Tazhayakov, Criminal Action 13-10238.

15          THE COURT:  Well, let me deal briefly, first, with the

16   outstanding issues.

17          I will permit the Government to make reference to the

18   defendant's statements in opening.  That is as a result of a

19   preliminary view that I have taken after review of the record

20   here, but it is not the final determination, and the Government

21   I think is on notice that they do so at their own peril if I

22   strike the statements at a later point.

23          But we are faced, as we generally are, when there is

24   not a determination on a Motion to Suppress, with the various

25   competing considerations, one of them having to do with the

1    schedule in the case and my concern that further hearing at

2    this point will generate publicity.  Now, I have been pretty

3    forceful, I think, with the potential jury about publicity.

4    Perhaps the more prudent approach is not to stir things up

5    further with preliminary testimony.  I am prepared to revisit

6    it, if we have some time and if it appears prudent to do it,

7    before the jury is actually sworn.

8         But, in any event, the Government asked for some

9    direction.  That is the direction I can give you on that.

10        I have also received a corrected Government's witness

11   list that has an individual on there that I had not brought to

12   the attention of the jury venire.  I will do that maybe in

13   individual voir dire, rather than change things.  It is very

14   hard to make changes in the questionnaire afterwards, and I

15   think it is contingent upon a motion that we have right now.

16        MS. SIEGMANN:  I don't know how he fell off the list,

17   your Honor, and we just learned of it recently.

18        THE COURT:  Well, in any event, I think that, fine,

19   and maybe I will skip the order that I was going to go in, at

20   least, and outline what I hope to accomplish this afternoon.

21        I had the jury clerks do a kind of quick run-through

22   of the questionnaires to see the degree of problematic answers.

23   They did not do a thorough analysis, but they focused on

24   questions of hardship and also questions about whether or not

25   someone has been exposed to victims or has close relationships

1   to victims or matters arising out of the bombing itself, and a

2   number of other things.  I have told them to be quite liberal

3   in their thought about that, because I think I will be quite

4   liberal in this case, at least for purposes of any problematic

5   answers.  They have come up with over 100 questionnaires that

6   have problematic answers, which, as far as I am concerned, in

7   this case is probably a pretty good yield.

8        What I would be prepared to do, to save the parties

9   some time, is just walk through some of the questionnaires and

10  see if there is any objection to my excluding people for cause.

11  I do not want to interfere with your making an independent

12  judgment about that without even having looked at the

13  questionnaires yet, but it may save you some time, it may not

14  save you some time.  It is really going to be up to you to

15  think about what you want to do.

16       There were two individuals, however, who I did take

17  action with or at least give direction to the Jury Clerk.  One

18  is a juror, she is Number 141, who is a technician with one of

19  the TV stations.  Her obligations are to provide technical

20  support for this case, and, while she said she would do her

21  very best not to listen to what other people had to say, I,

22  frankly, will underscore this by saying I am very impressed, as

23  I always am, by the candor of virtually every juror.  There are

24  a couple of wiseguys in every jury panel, but of people coming

25  to grips with the questions and indicating their willingness to

1-31

1    do whatever the Court says, but also their willingness to

2    recognize that they may have a particular problem.

3         In her case I told Mr. McAlear that she could be told

4    that she was excused.  I assume there is no objection.

5         MR. MYERS:  No objection.

6         MS. SIEGMANN:  No objection.

7         THE COURT:  Then there is another juror, Number 15,

8    who has a business trip on Wednesday, and she said if she would

9    be called back she wanted to know if she could come back on

10   Thursday.  I told Mr. McAlear she could come back Thursday.

11   That would take her out of the list that you have, but just so

12   you know.  I have not looked at either of their questionnaires;

13   I am relying on Mr. McAlear's responses here.

14        But that brings me back to the question of the

15   questionnaires that I have, you do not, in the sense that you

16   do not have the discs at this point, and I am prepared to, but

17   I leave it to you, whether or not, when we get through the

18   other business that we have, we just start going through some

19   of these questionnaires, which I will have to highlight for

20   you, because there is only one copy now available until you get

21   that.  So, think about whether or not you are prepared to do

22   that or you just want to go through this by yourselves.

23        I will tell you that what I really want you to do is,

24   obviously, go through the questionnaires, agree upon those that

25   you think we can exclude here based on the questionnaires, and

1    any that you agree upon I am likely to agree upon myself, and,

2    as I said, I will use a fairly liberal view about excuses in

3    this setting or challenges in this setting.

4         So, let us, then, turn to this question of excluding

5    exhibits, which is the defendant's -- I do not have a number

6    for it -- but a motion the defendant made styled "Motion to

7    Preclude Certain Exhibits."  I received, as I indicated this

8    morning, the Government's opposition to it.  I have tried to go

9    through it as well as I can under the circumstances.

10        I guess my larger view about this is to ask why we

11   would have to have the exhibits themselves rather than a

12   narrative of the exhibits -- I will just start with that from

13   the Government's point of view -- apart from the fact that the

14   Government would like to use the exhibits themselves?  But

15   there are embedded in here things that I think can be

16   inflammatory and distracting from the trial in this case, and

17   so one of the ways in which I thought to deal with that is to

18   say there can be, for example, references to the photograph of

19   Mr. Tsarnaev and the backpack and another individual, but the

20   photograph itself would not be shown, at least in the form that

21   it exists now.

22        Now, there is an offer in the Government's submission

23   to redact it.  I am not sure what "redaction" might mean under

24   these circumstances, if it would be like one of those pictures

25   of the Politburo during the 1950s in which some poor member of

1    the Communist Party, who has fallen into disfavor, is whited

2    out.  But, in any event, I guess why can't we deal with it by

3    narrative form, or at least have that as a default?

4          MS. SIEGMANN:  Well, globally, just to talk about the

5    exhibits, so the Government wants to put in evidence,

6    obviously -- one of the key issues is what the defendant knew

7    and when he knew it and what he did, and so, this exhibit

8    shows, these documents show, first of all, his Internet

9    history, what he was doing the moments before they go into the

10   dorm room and the moments after.

11         THE COURT:  I think I understand what the documents

12   do.  It can be done another way, and that is what I am asking

13   about, with respect to at least ones that arguably come within

14   the scope of 403 considerations.

15         MS. SIEGMANN:  I guess the issue is -- obviously, you

16   are making this determination -- but unfairly prejudicial.

17   Many of these exhibits, again, go directly to the heart of the

18   case and what the defendant knew and when he knew it.  Many of

19   these articles contain images of Tsarnaev that he was looking

20   at, surveillance video that he was looking at that night over

21   and over again.  He was Googling.

22         THE COURT:  Well, more accurately, although I am going

23   to permit you to argue this at the appropriate time, more

24   accurately, that these were sites that were visited by the

25   computer that is associated with the defendant, unless there is

1    some other evidence about the defendant's actual observation of

2    these sites himself.

3           MS. SIEGMANN:  The Government will prove at trial that

4    he was actually the one using the computer that evening, and

5    that's the Internet history that --

6           THE COURT:  Just kind of a sneak preview, how do you

7    plan on doing that; that he was the one using it as opposed to

8    one of his friends or others who were present?

9           MS. SIEGMANN:  Well, first of all, we have the phone,

10   the phone that was on the defendant.  That is, obviously, a

11   different issue.  But when he gets back to the apartment at

12   approximately 11:00 he signs onto WebAssign and does a homework

13   assignment, and we have --

14          THE COURT:  Can I just understand that?  I want to

15   understand the weight of the proof.  As I said, I am likely to

16   say that there is sufficient evidence from which a finder of

17   fact could find that the use of his computer could have been by

18   him, but I am now testing the weight of that evidence.  So, you

19   have him signing on, using a password or some mechanism to get

20   to computer usage.

21          MS. SIEGMANN:  His user name and that his assignment

22   is due midnight that evening.  It's actually Exhibits 162 and

23   163, and the Government exhibits show the forensic examiner

24   went into and did forensic analysis from the computer, and it

25   shows the name that he signed in under, his name, "tazamat," it

1    had his special password, and that he worked on the assignments

2    for at least five minutes.  Interspersed with that were CNN

3    inquiries that he was doing and he was looking at the

4    surveillance images from the video from the sidewalk showing

5    both Tsarnaev brothers.

6         In addition to that, we have VK account sign-ins under

7    "tazamat" that are interspersed through that evening, again

8    showing that the person that was using that computer, your

9    Honor, was the defendant.

10         THE COURT:  So, it is as I expected it to be, that

11    there is sufficient evidence to justify that inference on the

12    part of the jury.  It may be an inference that is going to get

13    challenged in some fashion, but that is where it stands.

14         Now the question is particular photographs, particular

15    videos.  Those are the ones I guess I am getting at, why it is

16    that we cannot deal with some of those by simply having whoever

17    the witness is who talks about this, and I suppose it is

18    Agent Eppard?

19         MS. SIEGMANN:  Special Agent -- I'm sorry.  He's not a

20    Special Agent.  He is the Chief of the fbi.gov and Internet

21    Operations.  He only will be testifying to a small segment of

22    the exhibits having to do with what the fbi.gov website looked

23    like.

24         THE COURT:  But there is somebody who is going to say,

25    "I have reviewed this.  Here is how I have gotten to this.

1    Here is how I evaluated this."  And that person is going to

2    say, "What did you see when you looked on that?", and he can

3    say, "I saw a photograph of Tsarnaev and a photograph of the

4    backpack."

5            Why wouldn't that be enough?

6            MS. SIEGMANN:  There is also -- the forensic examiner

7    will testify what was actually on the defendant's computer and

8    the remnants of websites that he went to that night.  He will

9    testify about the texts on those websites that were accessed by

10   the computer he would have seen.  And that does go, your Honor,

11   to knowledge.  I mean, the issue is --

12           THE COURT:  It certainly does.  The question is we are

13   talking about what the form of proof is going to be, that is

14   what I am getting at, and whether or not particular photographs

15   will be used or videos will be used in doing that.

16           One photograph, in particular, seemed to me to be

17   quite inflammatory.  It had circles around the relevant -- what

18   the Government, anyway, thinks is the relevant part.  It may

19   have appeared on the Internet that way as well.  But it seems

20   to me one that I would be very careful about permitting it to

21   be disclosed to the jury, and you recognize -- I should not say

22   you recognize it -- but you have got a backup position, which

23   is redaction.  But I guess I am trying to deal with this

24   universally.  I will get to the particulars of them.

25           My default position would always be to let the

1    documents or photographs, if there is a reason to believe that

2    the defendant reviewed them at the relevant time, come in; but

3    I take a second cut at it, and that is the 403 cut at it, which

4    is inflammatory, distracting, potentially redundant in various

5    sorts of ways.  And so, I do not know what the problem is with

6    at least certain of those, and I will use the photograph as an

7    example, doing it that way.

8            MS. SIEGMANN:  Well, can I address your redundancy

9    issue?

10           THE COURT:  Not yet.  Just assume that I have 403

11   concerns, and I will, when I get to the defendants, get to very

12   specifically which ones that I want to keep out, specifically

13   keep out, because not everything, at least as I understand it,

14   is going to be kept out.

15           But you are on your feet, so you have to answer the

16   question first.

17           MS. SIEGMANN:  Yes, your Honor.  Well, the issue is

18   that, in addition to proving his knowledge that his friend,

19   Tsarnaev, was the bomber, we have to prove that he knew there

20   was a bombing investigation, there was an investigation by the

21   FBI.  The fact that he was going onto multiple websites that

22   evening and reading about the FBI's investigation clearly is

23   relevant.

24           THE COURT:  I am cutting you off, but with a purpose.

25   Let's just talk about that particular photograph.  If I say

1    that the photograph is inflammatory, subject to 403 exclusion

2    in its current form, then it seems to me there is no problem

3    for you to have a narrative:  "What else did you see, Agent,"

4    or whoever it is who is testifying to this.  "Well, I saw a

5    photograph, and the photograph had these things in it."  Now,

6    "these things" will be not all the things in the photograph as

7    it presently exists.  What is the problem with that?

8              MS. SIEGMANN:  The other issue is, as the night

9    progressed, the photographs became clearer and clearer, and

10   that photo, in particular, isn't a very clear photo of

11   Tsarnaev.  I am not suggesting that the other photos aren't,

12   but this one is, the circle around Tsarnaev's head -- and, by

13   the way, that was not something that the Government did,

14   obviously.  That was something he got on the Internet in that

15   fashion.

16             THE COURT:  It was in that form when he saw it?

17             MS. SIEGMANN:  Yes.  And the way that we looked at the

18   computer was what did he know and when did he know it?  That

19   was what he was looking at that evening, and that's how we put

20   the exhibits together.

21             THE COURT:  Let us just talk about the other

22   individual who appears in that.  I do not know what you mean by

23   "redaction."  Do you mean that all of a sudden it will become a

24   portrait rather than a landscape photograph?

25             MS. SIEGMANN:  That's what I was thinking about, is

1    doing it so that the picture would not -- it would not look

2    like there was somebody whose face was redacted, essentially,

3    because that would not be -- I just don't think it would be

4    fair to anybody and I don't want to --

5              THE COURT:  Well, it raises the continuing problem of

6    telling somebody not to think about a pink elephant, at which

7    point they think about nothing but a pink elephant.  So, you

8    obscure the face, and they ask, "What face is that?"

9              MS. SIEGMANN:  That would not be our intention.  Our

10   intention would be to change that --

11             THE COURT:  So, if I understand what the Government is

12   saying, it is basically, "This is what the evidence will show,

13   from our perspective, that Mr. Tazhayakov saw that evening,"

14   and it would derogate from the integrity of the presentation of

15   the evidence to cut and paste in some fashion, although you are

16   prepared to do it on this particular piece.

17             Now let's deal with the question of the bombings over

18   and over again.

19             We will get to -- I'm sorry, Ms. Ferrone.

20             MS. FERRONE:  Okay.  Your Honor, I just would want to

21   speak to that photograph before you jumped ahead.

22             THE COURT:  You will have time.

23             MS. FERRONE:  Okay.  Thank you.

24             THE COURT:  The bombing --

25             MS. SIEGMANN:  The 15th.

1          THE COURT:  -- videos.

2          MS. SIEGMANN:  So, on April 15th, the Government has

3    put together, again, what the defendant knew and when he knew

4    it, because before they go into the dorm room -- I know I'm

5    going between dates, but I'm just trying to focus the Court's

6    attention -- the testimony will be that he is contacted by

7    Kadyrbayev and said, "You know, you need to come home now," and

8    he didn't have a lot of time to do research before going into

9    the room.  He still did some.  But what is in his mind at that

10   point is the stuff that he had seen earlier in the week about

11   the bombing and the fact that the bombing occurred, and that he

12   actually did Google searches on his devices showing that he

13   read articles.  He viewed articles pursuant to the computer

14   records, and, therefore, that's why those exhibits are also --

15         THE COURT:  But let me just pause to deal more

16   specifically with the question I raised, which is the videos.

17   Do we know that he saw those videos?

18         MS. SIEGMANN:  It was in what's called the "cache" or

19   temporary files, which the forensic examiner will testify that

20   that means that, since they were found there, that they were

21   played on his computer.

22         THE COURT:  In their entirety?

23         MS. SIEGMANN:  Yes.  It's only a six-second video,

24   your Honor.

25         THE COURT:  That is the only video that you plan on

1    playing with respect to the bombing?

2              MS. SIEGMANN:  To the bombing.  And then there's the

3    bombing -- I'm sorry -- the surveillance video that was

4    published by the FBI showing the two Tsarnaev brothers walking

5    along the sidewalk.

6              THE COURT:  Video?

7              MS. SIEGMANN:  Video.

8              THE COURT:  Did he see that?

9              MS. SIEGMANN:  Yes.  He watched it at least six times

10   on YouTube.

11             THE COURT:  All right.

12             So, Ms. Ferrone, let me hear from you on this.  As you

13   can see, I am focused very specifically on individual exhibits

14   and not on the universe, although I am thinking about the

15   universe in terms of alternative methods of presentation as to

16   individual exhibits that may be problematic, and maybe the

17   thing for us to do is go to particular exhibits that you have

18   in mind here.

19             MS. FERRONE:  Sure, your Honor.  So, starting with

20   what is --

21             THE COURT:  I do not think there is any need for you

22   to be here, Jim, at this point, unless there is something you

23   want to report.

24             MR. McALEAR:  No.

25             THE COURT:  The next we will see you is probably with

1    two discs in your hand.

2              MR. McALEAR:  Absolutely, your Honor.  Thank you.

3              MS. FERRONE:  So, starting with Exhibit 74, which is

4    this highly inflammatory photo with the circles on it --

5              THE COURT:  Hold on.  I just want to get this in front

6    of me.

7              MS. FERRONE:  Of course.

8              THE COURT:  I guess it was pulled out.  Do we have

9    the --

10             MS. FERRONE:  It was Exhibit A to my motion, if you

11   have that in front of you.

12             THE COURT:  Right, I have that, but do we have it in

13   the form that the Government is going to offer it?  Because all

14   I have here is just the Chrome cache file, or reference to the

15   Chrome cache file.

16             MS. SIEGMANN:  Would you like to use my copy, your

17   Honor?

18             THE COURT:  Yes, if you could pass it up.

19             MS. FERRONE:  So, I have sort of three arguments that

20   I would like to make as to why redacting this photo is not

21   sufficient and why it should be excluded completely.

22             First, as Ms. Siegmann admitted, there are videos,

23   videos and pictures of Mr. Tsarnaev and his brother walking on

24   the sidewalk.  We don't object to those videos.  So, there are

25   photos of Mr. Tsarnaev and video that we do not object to.

1          This picture -- second, your Honor, we have stipulated

2     to the photographs that were released by the FBI.  Ms. Siegmann

3     made an argument that the photos get clearer.  We stipulated

4     that these photos came out in two sets.  This photograph is

5     entirely irrelevant and not necessary, because there's a lot of

6     pictures that we don't object to that contain Mr. Tsarnaev.

7          THE COURT:  So, your argument is one of redundancy on

8     top of inflammatory.  But it is unfairly inflammatory that we

9     are concerned about.

10          So, let's assume that there is a redaction that just

11     cuts a portion of it off.  There is, I suppose, a portrait

12     orientation that is quite narrow in its width, does it pretty

13     effectively.  What I assume is alleged to have been the

14     backpack is on the same axis as the fellow with the white hat.

15          MS. FERRONE:  Yes, your Honor, but in addition to 403

16     prejudice, there is 403 misleading the jury.  The Government's

17     opposition paper says that this photograph shows the

18     significance of the backpack that my client and Kadyrbayev

19     chose to remove.  Everyone in the world knows that the backpack

20     that is circled in that photograph blew to smithereens.  That

21     picture is nothing but confusion to the jury and prejudicial.

22     There's no need for it.

23          THE COURT:  I do not know if I think that is the case.

24     I think it is a powerful argument, "But, ladies and gentlemen

25     of the jury, what are they showing you the backpack that was

1    obliterated for, except to somehow mislead you?"  That is an

2    argument.  On the other hand, that backpacks are the means of

3    conveyance for various kinds of contraband is I think relevant,

4    or at least they can make the argument about that.

5          So, I do not see that as problematic.  I see it as

6    perhaps an opportunity for the defendant to make an argument

7    about the Government misleading, but I do not see it as

8    something I am going to exclude.

9          MS. FERRONE:  Okay.  And then, last, I will just add,

10   again, there are probably half a dozen photos and a few videos

11   that we don't object to that are in, and I just don't see

12   including the ones that Ms. Siegmann mentioned, him and his

13   brother walking on the sidewalk.  We don't object to those --

14         THE COURT:  We will go through all of them that are,

15   from your perspective, problematic.  But as I understand it,

16   there are six or so that you do not object to; is that right?

17         MS. FERRONE:  And perhaps even more.  Perhaps even

18   more.  I just don't see why this one photo --

19         THE COURT:  It is not overwhelming, it seems to me.  I

20   am likely to permit in photographs that a jury could find, not

21   that they have to, but a jury might find are capable of -- or

22   could have been viewed by Mr. Tazhayakov that evening.

23         MS. FERRONE:  Can I add one last thing, your Honor?

24         THE COURT:  Sure.

25         MS. FERRONE:  As the Government's opposition papers

1   make clear, my client viewed this 5:00 a.m. on April 19th.  We

2   have already stipulated that he has seen clearer pictures of

3   Mr. Tsarnaev that were released by the FBI at 2:00 a.m.  I

4   think that further supports that this picture is just

5   completely unnecessary.

6          THE COURT:  I overrule it.  The stipulation is helpful

7   sometimes, and sometimes it is sufficient, but I think the

8   Government can be permitted to prove its case in its own way,

9   subject to a scalpel on this picture.

10         So, what is going to happen, I think, is that the

11  Government will redact it.  It will be a very thin portrait.

12  All that will be included will be the woman just to -- we

13  assume Mr. Tsarnaev -- just to his left as we face him, and it

14  will just be cut right up that side there.

15         MS. SIEGMANN:  Yes, your Honor.

16         THE COURT:  And the witness will be prepared to

17  testify that this is a portion of a photograph that was viewed

18  by the defendant at, I am told, 5:00 in the morning.

19         MS. FERRONE:  Do you want me to speak to the videos

20  now, your Honor?

21         THE COURT:  I want to get through everything, so, yes,

22  go to the videos.

23         MS. FERRONE:  Okay.  So, turning now to the exhibit --

24         THE COURT:  I should pass this back, unless I should

25  put it in my binder now.

1          MS. SIEGMANN:  Your Honor, if you would like to keep

2     it, you can have it.

3          THE COURT:  At some point I want a full binder.

4          MS. SIEGMANN:  I don't know how that was taken out of

5     your binder.

6          THE COURT:  Go ahead.

7          MS. FERRONE:  So, turning, first, to Exhibit 56, the

8     six-second video.

9          THE COURT:  56?

10         MS. FERRONE:  Yes.

11         Your Honor, I am not going to pull any punches.  This

12    is a six-second video of one of the bombs exploding at the

13    Finish Line.

14         THE COURT:  But let me just ask the preliminary

15    question.  Do you dispute that this was viewed on some device

16    of Mr. Tazhayakov?

17         MS. FERRONE:  I can't speak for what the Government's

18    expert is going to testify.  I'm happy to hear what

19    Ms. Siegmann has to say about that.

20         THE COURT:  Well, that is what she told me.

21         MS. FERRONE:  I don't recall when my client is alleged

22    to have watched it, though, and I do think that that's

23    extremely relevant.

24         MS. SIEGMANN:  Can I explain the exhibit so that you

25    understand?

1          THE COURT:  Sure.

2          MS. SIEGMANN:  On Exhibit 57 --

3          THE COURT:  I thought Ms. Ferrone was referring to 56.

4          MS. SIEGMANN:  She was, and I am trying to explain how

5     you know what time he actually watched it.  If you go to

6     Exhibit 57, that is the records pertaining to the cache file

7     pertaining to that video, and it shows that the path where it

8     was found on the defendant's computer and the time that he

9     watched it was on 4/15 at 4:16 p.m.

10          THE COURT:  Accessed.

11          MS. SIEGMANN:  Yes.

12          THE COURT:  So, that is what the Government's proof is

13     on this, I guess.

14          MS. FERRONE:  I might be wrong, and I think

15     Ms. Siegmann will correct me if I am, but I'm fairly certain

16     that's two days before they allege the conspiracy began.  I

17     mean, I don't see how this is relevant.  I think this is a case

18     where the prejudice --

19          THE COURT:  It is certainly relevant.  It is relevant

20     to his knowledge of the underlying circumstances with respect

21     to the investigation.  It is relatively close in time.  It does

22     not have to be evidence that was created or accessed during the

23     period of the conspiracy.  The process of developing the

24     knowledge necessary to make a choice to join the conspiracy is

25     relevant.

1          MS. FERRONE:  I misspoke, your Honor.  What I really

2     meant to say is that any probative value is substantially

3     outweighed by the prejudice here.  I think your Honor said it

4     perfect this morning.  My client isn't charged with anything to

5     do with the Boston Marathon bombing, and showing the jury a

6     six-second clip --

7          THE COURT:  Well, I do not think I said it quite that

8     way, or if I did I was not quite meaning that.  It is he is not

9     charged himself in being involved himself in the bombing itself

10    but is being charged with being involved in the obstruction of

11    the subsequent investigation, and in order to understand the

12    subsequent investigation it is necessary to understand what it

13    was about.  So, the question really is, from my perspective,

14    whether or not it is unduly inflammatory.

15         MS. FERRONE:  Your Honor, can I show you the video?

16         THE COURT:  Yes, sure.  But let me just say one of the

17    things that will be on my mind, which is, the constant replay

18    of the video or a video like this or bombing like this or

19    anything like that, no.  Not to be glib about it, I do not mean

20    to be too glib, but this is not going to be Groundhog Day, when

21    the Government presents evidence of the bombing itself.  It is

22    simply going to present, if it is permitted to, some evidence

23    that shows the knowledge of this defendant regarding the

24    circumstances that led to the investigation.

25         So, we have got a six-second video.  I can take a look

1    at it.

2           MS. FERRONE:  Your Honor, and I really don't want to

3    belabor, because I really don't, but I'm really at a loss to

4    see how this video is not extremely prejudicial, isn't going to

5    inflame the jury.

6           THE COURT:  "Extremely"?  I do not want to fence with

7    words, but the word is not "extremely."  It is "unfairly."

8           MS. FERRONE:  Okay.

9           THE COURT:  So, the question is whether or not it is

10   unfair to show what it was that caused the investigation in

11   this form.  So, if you want to show it, I will take a look at

12   it.

13          MS. FERRONE:  If I may approach?

14          MS. SIEGMANN:  It is on the JERS disc.

15          THE COURT:  It is easier to do it this way, I think,

16   probably.

17          MS. FERRONE:  Which way?  Me approach?

18          THE COURT:  You approach.

19          MS. FERRONE:  Do you guys want to come up?

20                         (Pause)

21          THE COURT:  In this form does it stop as it appears on

22   this thing?

23          MS. FERRONE:  Yes.

24          THE COURT:  So, it is the stop and start?

25          MS. FERRONE:  Yes.  Six seconds of explosion.

1            (Video clip shown to the Court)

2            THE COURT:  I do not see a problem with it.  So, I

3    will permit the Government to show it on the basis that it was

4    seen by the defendant here.

5            So, what additional exhibits do you want me to be

6    dealing with?

7            MS. FERRONE:  Your Honor, turning to the second video

8    that the Government seeks to introduce, I believe it's 95.

9    Yes.  And this is an eight-plus-minute video, and it is --

10           MS. SIEGMANN:  Your Honor, I don't think that it is

11   necessary for us to play that video at the trial, so we will

12   take that off our exhibit --

13           THE COURT:  So, it is off the list.  It is not in

14   dispute.

15           Anything else by way of the motion that you have?

16           MS. FERRONE:  Oh, certainly.

17           THE COURT:  So, let us go through them.  I have given

18   you some idea of my approach.  I am happy to go through any

19   exhibit that you challenge, but you have got some sense of what

20   may really be in dispute.

21           MS. FERRONE:  Absolutely.  Turning, your Honor -- I

22   don't know if you have my motion in front of you.

23           THE COURT:  I do.

24           MS. FERRONE:  Section 2 is sort of the dozen-or-so

25   articles and websites and the content of websites that the

1    Government alleges my client, you know, looked at.

2              THE COURT:  Right.

3              MS. FERRONE:  While I understand that their argument

4    is --

5              THE COURT:  It looks to me, if I am looking at your

6    motion correctly -- I guess the motion itself -- I have been

7    looking at the Memorandum -- but we have dealt with Section 2

8    of the Memorandum, which is the photograph with circles on it.

9    We have dealt with question of the videos of the explosion

10   itself.  Maybe they are not covered by Number 1 in your

11   schedule.

12             MS. FERRONE:  1B is where I meant, really, starting

13   with the Government's opposition.

14             THE COURT:  Yes.

15             MS. FERRONE:  So, this is a collection of -- it's sort

16   of broken down into two sets.  There are exhibits that show web

17   pages visited by my client as well as Google searches conducted

18   by my client, and then the second set is -- I think it's about

19   at least half a dozen and I think more articles, the full text

20   of articles that the Government wants to put into evidence, and

21   you discussed earlier that why wouldn't a summary work.  I

22   really do think that the Government makes an argument that,

23   well, the more and more articles he looked at bolsters the

24   inference of his motive, and I think the exact opposite.

25             THE COURT:  Knowledge, I think.

1          MS. FERRONE:  Knowledge.  But I think what the

2     Government misses is that the more and more articles or

3     websites that my client views actually supports the fact that

4     he didn't read the entirety of the article or the full content,

5     and I think submitting all of the content, I just think there

6     is no basis for it, there is no basis of knowledge that my

7     client read these articles.

8          THE COURT:  That, again, is, to some degree, argument.

9     But let me understand the amount of time that defendant spent,

10    let us say, on Exhibit 61, which I think is one of the ones

11    that is in dispute.  We know his visit date and Eastern

12    Daylight Time.  Do we know how long he was on?

13         MS. FERRONE:  I don't believe so.  That's not evident

14    on the face of Exhibit 61, your Honor.

15         THE COURT:  So, Ms. Siegmann, do we know how long he

16    is on?

17         MS. SIEGMANN:  We have the time that he visited the

18    site.  We don't know how long he was on that particular site,

19    your Honor.

20         THE COURT:  What is the next site he visited?

21         MS. SIEGMANN:  Well, the master spreadsheet is

22    Exhibit 58, if you go to that.

23         THE COURT:  So, we can look at that and see what he

24    surfed to next?

25         MS. SIEGMANN:  Yes, exactly.

1          MS. FERRONE:  I can help you, your Honor.

2          THE COURT:  Sure.

3          MS. FERRONE:  If you want me to point on Page 7 of

4     Exhibit 62 -- or, no -- of Exhibit 58, Page 7.

5          Right?  Is that what you said, Exhibit 58?

6          MS. SIEGMANN:  Yes, exactly.

7          MS. FERRONE:  So, 58, your Honor, lists all of the

8     websites that my client allegedly went to from 9:21 on.

9     April 18th, to 1:20 a.m. on April 19th.  If you flip to

10    Page 7 --

11         THE COURT:  Just so I am clear on this, what is the

12    difference between 58 and 59 in that regard?

13         MS. FERRONE:  Without speaking for the Government, 59

14    are searches my client did.  So, for example, if he went to

15    Google --

16         THE COURT:  So, Facebook kind of searches; is that it?

17         MS. FERRONE:  Exactly.

18         THE COURT:  Is that the distinction?

19         MS. SIEGMANN:  But everything is on 58, your Honor.

20    It's a master spreadsheet, and there's also a summary

21    spreadsheet, but this is the master that shows all --

22         THE COURT:  So, what is 59?

23         MS. SIEGMANN:  59 is just the specific search terms

24    that he was searching that evening, so, if you want to see, you

25    know, what he typed in and what he did at certain points in

1    time that evening.

2              MS. FERRONE:  It's actually Page 8, your Honor.  I

3    misspoke.

4              THE COURT:  I am going to have to count it, because

5    the version I have I do not think is paginated.  Is there a

6    pagination on it?

7              MS. SIEGMANN:  No, there is not.

8              THE COURT:  So, I can count to eight.  So, I am

9    looking at --

10             MS. FERRONE:  So, you see at the top, according to the

11   Government's exhibit, at 20:08 and 57 seconds a.m., my client

12   went to Fox News and that's the subject of 62, the example --

13   or 61, rather, the example.  Less than 20 seconds later he was

14   on the Russian Facebook, VK.  So, if you look four lines down,

15   it says "VK.com."

16             THE COURT:  Right.  But it looks to me like he is

17   still on Fox News through at least going to VK, and that is, as

18   you say --

19             MS. FERRONE:  Fourteen seconds.

20             THE COURT:  From the start.  But are these, each one

21   of these Fox News references, the three separate ones at

22   2:08:57, 2:09:09, 2:09:09, are they all separate screen shots?

23             MS. SIEGMANN:  Yes, your Honor.  And what the live

24   video shows is, actually, he is watching the live video on Fox

25   News, and there is a high likelihood that he had multiple

1    screens open at the same time.  A lot of people do that, they

2    will open different screens, and he could have been listening

3    to the video at the same time that he is reading things on the

4    computer.

5              THE COURT:  So, 20 seconds of observation of multiple

6    screens.

7              MS. FERRONE:  Well, your Honor --

8              THE COURT:  Let me just frame it.  Then you can

9    respond.

10             In that 20 seconds the Government's view is he would

11   have seen and absorbed all of the information that is on this

12   web text page?  That is No. 61?

13             MS. SIEGMANN:  Let me explain.  This is the web page

14   text that was actually saved on the computer and, again, in

15   what is called -- they were actually able to recreate with a

16   tool that they used.  Not all of this, obviously, pertains to

17   the bombing.  On the top here in the first paragraph, that's

18   likely that he saw, the Search for the Suspects, and that was.

19             THE COURT:  Why do you say that?  Because that is your

20   theory of the case.  But is there any reason to think that

21   "Missing Student Holly Bobo Found By Dog" might have captured

22   his attention?

23             MS. SIEGMANN:  Because the breaking news was -- that

24   was the breaking news, which it says, I believe at the top of

25   the exhibit, it actually talks about the images -- the "FBI

1    identifies two suspects in the Boston Marathon bombings."  The

2    other stuff towards the bottom is likely on the bottom of the

3    page and, again, is not associated with breaking news of the

4    moment, which our argument would be that, if you look at the

5    Exhibit 58, that's what he was doing that evening, looking at

6    the breaking news relating to this one specific investigation

7    repeatedly to see how close they were to the bombers.

8                THE COURT:  Well, that is your argument.

9                MS. SIEGMANN:  Yes.

10               THE COURT:  My judgment is this is all argument, but

11   fair argument.  This is the screen.  You can argue that he was

12   interested in Holly BoBo and the dog or not, but that is part

13   of the process of attempting to persuade.

14               MS. FERRONE:  Your Honor, there are 17 exhibits that

15   fall into this category.  Are you inclined to let them all?

16               THE COURT:  Yes, I am.

17               MS. FERRONE:  You are?

18               THE COURT:  I am, yes.

19               So, that, I think, deals with those exhibits.  What

20   else do we have?  Are there other matters that we should be

21   taking up on the defendant's motion?

22               MS. FERRONE:  I guess the first aspect of argument one

23   was our client's Internet history and the articles he viewed on

24   April 15th, and while I understand that your Honor is now

25   allowing the video, I do think the question becomes, well, how

1    much can they keep -- I mean, we are going to eventually get to

2    the point where it is unfairly prejudicial, because everything

3    is coming in, and I think --

4            THE COURT:  No, that is not true.  I am considering

5    each of the exhibits that you are objecting to.  I want to

6    understand what you have to say.

7            So, now, I take it, you are focusing on the Internet

8    history on April 15, 2013.  What is the exhibit number I should

9    be looking at?

10           MS. FERRONE:  As a point of clarification, I think I'm

11   confused, your Honor, because I thought a second ago, and if I

12   misheard you, please let me know, I thought you said that all

13   17 -- it's actually there were three I omitted to include, but

14   I thought you said all 14 were now coming in.

15           THE COURT:  On the basis of what I knew then.  Now you

16   are telling me you have got a different argument, I think,

17   which is that there is too much of the same thing on April 15.

18           MS. FERRONE:  No.  There's actually too much of the

19   same thing on April 19.

20           THE COURT:  Right.  But the first section of your

21   motion is April 15.

22           MS. FERRONE:  Correct, but the exhibit we were just

23   looking at, 61, was actually April 19th.  I started with that,

24   because it's the more voluminous.

25           THE COURT:  Right.  My view is that, with respect to

1    April 19, I do not see any reason not to permit the Internet

2    history, subject, obviously, to the arguments that can be made

3    that the screen may have been dense and involved a variety of

4    other things.  There is no reason to believe, given the short

5    time period here, that he was absorbing all of this

6    information.  You can argue that.  The Government can argue it

7    is the headline on this, it is the thing that changes every

8    time on Fox News.  So, for the 19th that seems to me to be

9    appropriate.

10          MS. FERRONE:  Okay.  I just want to make one more

11    point, just for the record, really.

12          THE COURT:  Sure.

13          MS. FERRONE:  These articles on the 19th have

14    extremely -- very inflammatory material in them.  I quoted some

15    of it.  "Lost limbs."  If we have several articles within it I

16    just think we are really bordering on allowing all these in

17    that we don't even know for sure that he read, and now they

18    have this content that is it unfairly prejudicial.

19          THE COURT:  I guess I disagree, and I disagree for

20    this reason:  That part of the process -- the argument I guess

21    the Government is going to be making is that this was an

22    arresting circumstance, made arresting by the nature of the

23    events, and so the things that you refer to are the things that

24    might have caught people's attention generally, or caught the

25    defendant's attention generally, and that is something that

1    they can argue.

2         But I go back to the point that we are not going to go

3    redo videos of the bombing over and over again or other kinds

4    of matters.  We are talking about what we can say this

5    defendant saw.

6         Now, the Government has withdrawn a longer video.

7    Without having seen the longer video, I think they probably

8    have acted prudently and in anticipation of what I was likely

9    to do with it, so we are kind of shaving it down to the

10   appropriate amounts.  But it is not a sufficient answer to say

11   there is a lot of this, the jury should not see it without

12   considering what the defendant did, and that is the argument, I

13   guess, the Government is making.

14        So, with that framework for analysis, what other

15   exhibits should I be looking at?

16        MS. FERRONE:  Okay.  Just so the record is complete,

17   there's Internet history and articles on April 15th.  There are

18   two exhibits that just show websites and searches my client

19   conducted.

20        THE COURT:  I appreciate there are two audiences here,

21   me and the record, but I would appreciate it even more if you

22   direct me to what it is that you might say at a later point was

23   in the record that you want to have excluded.

24        MS. FERRONE:  I'm not sure I follow your Honor, but

25   Exhibits 52 through 55 we feel predate --

1          THE COURT:  So, let's just look at them.

2          MS. FERRONE:  Okay, sure.

3          THE COURT:  52 is the kind of overview, and then 53 is

4     the queries?

5          MS. FERRONE:  Correct, your Honor.

6          THE COURT:  And 54 is a *News National Post* -- I am not

7     sure -- a post of some sort that falls more or less in the same

8     category, although it seems to have been almost exclusively

9     related to the bombing at about the time or shortly after the

10    bombing took place.

11         MS. SIEGMANN:  The articles that are -- there's two, I

12    believe.  54 and 55 are the texts of articles that are based

13    upon his Internet history that he viewed that day, your Honor.

14         THE COURT:  I guess, without, again, doing a

15    fundamental analysis of the amount of time that he is on there,

16    I am going to leave that to argument.  If he is looking at this

17    thing for ten seconds -- the article I am talking about is 54.

18    Similarly the case with 55, although 55 has got some additional

19    issues, including, "An April Fool's Prank That Will Scare the

20    Crap Out of Your Teen," which may or may not have been the

21    focus of his attention but is kind of available to argue about.

22         But as far as I am concerned, this is argument, that

23    the kids surf on the Internet, they have a short attention

24    span.  I do not have to tell you all the arguments you are

25    going to make, but they are going to make a somewhat different

1    set of arguments, and I am going to permit them to do it on the

2    basis of this evidence, which is his Internet history and

3    provides the inference that he was reading it for whatever

4    period of time.

5         So, I overrule the objections to 51, 52 -- I guess it

6    is 52 through 55.

7         MS. FERRONE:  Okay.

8         THE COURT:  What else?

9         MS. FERRONE:  The next group of exhibits is Exhibits

10   99 to 103, your Honor, the Government categorizes these as

11   screen shots of FBI.gov.  I mean, without belaboring the point,

12   I just think at some point we are getting to the point where

13   the Government is seeking to re-prove over and over the same

14   thing.  And, again, we have stipulated that the FBI released

15   these pictures, we have stipulated that a video came out.  I

16   don't object to them playing the video of the two brothers

17   walking on the sidewalk.

18        And now we are going to have the FBI.gov guy come and

19   take the stand and say, "Well, this is how the web pages

20   looked," and, "Oh, my gosh, he went to FBI.gov."

21        THE COURT:  I do not think he will be saying, "Oh, my

22   gosh."

23        MS. FERRONE:  That's probably correct, your Honor.

24        THE COURT:  The second time he will not be saying it.

25        MS. FERRONE:  So, I just think at some point I would

1    hope that the Court would really draw a line here as to what is

2    allowed to be introduced.

3              THE COURT:  So, I am looking at 98 through --

4              MS. FERRONE:  I think 99 through 103, but perhaps --

5    oh, 98, your Honor.  So, 99, 100 and 101 are actually all the

6    same thing, as I wrote in the motion -- or am I talking

7    about -- hold on.  Let me get my bearings here.

8              Yes.  So, Exhibits 99, 101 and 102 are cumulative, as

9    all they show is that the same surveillance video was uploaded

10   to the FBI, the web page.  Exhibit 98 is a screen shot of the

11   FBI surveillance video uploaded to You Tube.  We don't object

12   to that.  I don't see how four exhibits showing that there was

13   FBI footage uploaded is not cumulative.  I don't see how that's

14   not the case.

15             THE COURT:  So, Ms. Siegmann.

16             MS. SIEGMANN:  Yes, your Honor.  So, if you go to

17   Exhibit 64 -- I know we're jumping around here, but that is the

18   entirety of his --

19             THE COURT:  I am sorry?

20             MS. SIEGMANN:  64.

21             THE COURT:  64.

22             MS. SIEGMANN:  That's the entirety of the defendant's

23   Internet activity related to FBI.gov and YouTube, YouTube being

24   the FBI video that they uploaded onto YouTube.  I'll wait until

25   you get there.

1          So, essentially, and this is -- so, that evening it

2     shows from 11:05 p.m. to 12:00 the next day how much Internet

3     activity the defendant was doing related just to the FBI.gov

4     website.  So, then James Eppard put together screen shots of

5     what the website looked like exactly at that time when the

6     defendant viewed them, and that's what the exhibits are.

7          THE COURT:  So, let us go through them, if we can.

8          98 is not, I gather, in dispute.  99 is, to the degree

9     that it is redundant of 100 and 101?  Ms. Ferrone?

10         MS. FERRONE:  Yes, your Honor.  Sorry.  So, yes, 98

11    through 101, in my opinion, are four of the same exact thing.

12         MS. SIEGMANN:  But they are not.  They are different

13    web pages, your Honor, and that's why there's different ones.

14         THE COURT:  So, I am just looking at them right now.

15    They appear to be different, although the top in 99 and 100 is

16    the same, but then 100 adds five more pictures.

17         MS. SIEGMANN:  Because it's a different picture on the

18    website, your Honor.  That's why there's different ones.  99 is

19    the FBI.gov home page, and then 100 is actually the Boston

20    Marathon page of the FBI.gov website.

21         THE COURT:  So, let me ask in this limited number of

22    exhibits my Groundhog Day question.  Why isn't this Groundhog

23    Day?

24         MS. SIEGMANN:  Well, your Honor, again, if we are to

25    trying to establish, as we are, the knowledge of the defendant,

1    what he was looking at that evening when they were deciding to

2    get rid of that backpack and throw it into the garbage

3    dumpster, the fact that he was repeatedly going onto FBI.gov,

4    and specifically on six occasions that day watching the YouTube

5    video -- I mean, it's one thing for the defendant to say, "We

6    stipulated to the video and the pictures that were released by

7    the FBI."  It's quite another for the Government to prove that,

8    indeed, this defendant watched that video several times and

9    looked at the pictures associated with --

10            THE COURT:  Will they say that he actually watched the

11   video as opposed to simply looked at the page itself?

12            MS. SIEGMANN:  The testimony will be from Special

13   Agent Scripture that these YouTube citations at 11:05 and

14   11:17, the earliest of those, is that when you go on there it

15   automatically plays.

16            So, the fact that he went to this YouTube website with

17   this specific number, which is associated with the FBI video,

18   that video automatically plays, and that's going to be the

19   testimony, and that he did that over and over again, and in the

20   files on the computer there is remnants of not the entirety of

21   that video but about 22 seconds of it.

22            THE COURT:  Why is it just 22 seconds?

23            MS. SIEGMANN:  We believe because the frames are

24   slightly different, and this is the cache file, so the cache

25   file might not have saved the entirety of the video because of

1    space issues as well on the computer.

2         THE COURT:  All right.  I will let them have that.

3         MS. FERRONE:  All of them?

4         THE COURT:  Yes, all that have been marked here and to

5    which you have expressed directly an objection.

6         Now, what else in terms of the exhibits?

7         MS. FERRONE:  I don't know if we were just talking

8    about 99, 101 and 102, which are identical.

9         THE COURT:  Not quite identical.  They are different

10   times of the screen shot, so it is not quite fair to call them

11   "identical," but as a shorthand I suppose that will work.

12        MS. FERRONE:  Okay.  I further object to Exhibits 100

13   and 103.  This is very similar to my earlier arguments.  It

14   contains the text of articles which, apparently, my client was

15   watching videos over and over and over and was also reading

16   articles.  I don't see how that can possibly be the case, your

17   Honor.  So, just like all the April 19th articles that I highly

18   doubt my client read every word of --

19        THE COURT:  Just so I understand, you said that 100

20   and 103 --

21        MS. FERRONE:  100 and 103.  They are also FBI, but

22   they are different than the upload of the video.  They're the

23   text of articles on the FBI website.

24        THE COURT:  When you say "article," just the text of

25   whatever they were posting on the --

1          MS. FERRONE:  Correct, your Honor.  So, that's 100 and

2     103.  So, again, apparently while my client was watching videos

3     over and over and over, he was also reading the texts of the

4     articles on the FBI.  I find that really incredible.

5          MS. SIEGMANN:  Exhibit 100 is the screen shots we were

6     just talking about.  That's showing the images, your Honor.

7          THE COURT:  It has got how can you can join the JTTF

8     -- well, not how you join it, but what it is about.

9          I am not going to exclude this.  I can think of

10    arguments, and if I can with my limited capacity, you can with

11    much greater ability.

12         Any other specific ones you want me to look at?

13         MS. FERRONE:  I missed your ruling.  I take it, I lost

14    on that one?

15         THE COURT:  Well, do not think of it as a loss.  Think

16    of it as some direction on how the case is going to pursue.

17    Maybe you can call it a "loss" if you want to, but I would not.

18         MS. FERRONE:  Okay.  I think that's everything from my

19    motion.  Thank you, your Honor.

20         THE COURT:  All right.  So, I think I have dealt with

21    every exhibit to which I have been directed here, and the

22    rulings will stand.  The overarching concern I have is to avoid

23    unfairly inflammatory or redundant or misleading testimony.

24         I do not think what I have been pointed to does that.

25    Of course, I retain the right to look at this as it actually

1  comes in during the course of trial, but the defendant wanted

2  some idea of what I was going to do, and this is what I

3  presently intend to do on that.

4       So, I have ruled on -- and I am not sure what the

5  number is because I got it hot off the press without looking at

6  CM/ECF -- but I have ruled on the defendant's Motion to

7  Preclude Certain Government Exhibits.

8       Now, the next issue I think is the Kumiskali

9  deposition, and I think we have to walk through that step by

10  step.

11       I note that you were passed a copy of the juror list

12  and the disc here, and maybe you will want to check the disc

13  right now, and we will take a break so you can check the disc,

14  to make sure that you all are able to use it and look at it,

15  and then we will come back and deal with the Kumiskali

16  deposition.

17       MR. CAPIN:  Thank you, your Honor.

18       One thing, because of timing, we haven't had an

19  opportunity to express or to move on objections we have to the

20  exhibits identified by the defense.  I don't know if you want

21  us to take that up orally, or if we would have a chance to

22  brief it.

23       THE COURT:  Well, as I will tell the jury, the lawyers

24  are very quick, I am slow, but steady, and so I need it in

25  writing so that I can slowly but steadily absorb the

1    information and make my decision.  So, in writing.

2            MR. CAPIN:  Would it be fine if we get that to you by

3    tomorrow, your Honor?

4            THE COURT:  Yes, that is fine.

5            MR. CAPIN:  Thanks.

6            MS. FERRONE:  And we will have a brief opportunity to

7    respond, your Honor?

8            THE COURT:  Yes.

9            MS. FERRONE:  Thank you, your Honor.

10           THE COURT:  It is not going to be a pop quiz, but we

11   are moving fast now, so I want to get this taken care of.

12           Why don't we take, let's say, a 15-minute break.  You

13   can check this.  Then we will go to the Kumiskali deposition.

14   Then we can talk about whether or not you want to go through

15   these questionnaires that the jury people thought might pose

16   some sort of problem, or not.  You may just want to get going

17   yourselves and take a look at the questionnaires and start to

18   develop your own views about it.

19           MR. CAPIN:  Perhaps on the break we could consult

20   among ourselves on that issue.

21           THE COURT:  Sure.  So, we will be in recess for 15

22   minutes.

23           THE CLERK:  All rise.

24      (The Honorable Court exited the courtroom at 3:35 p.m.)

25                        (Recess taken)

1          THE CLERK:  All rise.

2      (The Honorable Court entered the courtroom at 3:50 p.m.)

3          THE CLERK:  This Honorable Court is back in session.

4  You may be seated.

5          THE COURT:  Just for scheduling purposes, what is the

6  parties' preference on the questionnaires?  Do you want to get

7  at them yourselves first, is that it, or what?

8          MR. CAPIN:  If we understand correctly -- and I think,

9  first of all, I think we're all able to open the discs.  That's

10  not an issue.  If we understand correctly, the Court has made a

11  preliminary cut on some of the --

12          THE COURT:  I had not so much as the Jury Clerks were

13  directed to look at potentially problematic questions, really

14  Question 15, which is a question having to do with schedule,

15  and then the 40 range, which are, "Can you follow the

16  instructions," that sort of thing, "Do you have such strong

17  views that it will interfere."

18          They culled them out and just brought them to my

19  attention so I would get a chance to look at them.  I have done

20  a preliminary look at them but nothing so thorough that I would

21  feel comfortable doing anything without the approval of

22  counsel.

23          The day has moved quickly.  What I thought, after

24  looking at the clock, is, I will go down a list of the ones

25  that the Jury Clerks have found problematic.  That may or may

1    not lead to strict scrutiny on your part as opposed to some

2    sort of intermediate scrutiny of the questionnaires, but it is

3    really up to you.

4            This part of the process is really to see if we can

5    agree on people that I am simply not going to invite back for

6    Wednesday, when we would start talking with specificity about

7    questions.

8            MR. MYERS:  I suggested to Mr. Capin that we just cull

9    out as many as possible and take the physical copy, he and I,

10   and sit here for an hour and try to rid ourselves of 50 or 75

11   of those that are pretty obvious.

12           THE COURT:  Well, I think so, but I think I would like

13   you to use the discs.  I want to hold onto the physical copy.

14   I have no objection to you using the courtroom to do it.  But I

15   am going to be looking at them too, and there is only one

16   physical copy.

17           MR. CAPIN:  We both had some impression that we would

18   be doing something more substantive on the specific flagged

19   jurors, but you are suggesting, then, we will simply lead with

20   the list of ones that might require some level of scrutiny

21   other than --

22           THE COURT:  Right.  I was going to do it, since we had

23   some downtime, but it is not down anymore, or at least it has

24   been consumed to some degree.  But to save you time about what

25   I was going to talk about or work my way through is, I will

1    just give you the numbers where flags were raised, and then you

2    can deal with it.

3              MR. MYERS:  Yeah.

4              THE COURT:  As I say, it was the range from 100 to

5    120.  You will understand my view that I am going to be quite

6    liberal in treating a challenge for cause here to try to get

7    down to a manageable number of people, because those that we do

8    not challenge for cause are those people that I am going to be

9    asking questions of, and I really do not want to spend a lot of

10   time asking questions of people who are not likely to be on the

11   jury, and when you are reading between the lines you can see

12   problematic kinds of things.  I have been very impressed.  I

13   have gone through I think almost all of them very quickly, but

14   I have been very impressed with the candor and thoughtfulness

15   that we have here, but once looking at candor and

16   thoughtfulness, you may both decide that that is also grounds

17   for cause.

18             MR. CAPIN:  Thank you, your Honor.

19             THE COURT:  So, let us talk about the Kumiskali

20   deposition.  I just want to page through to the actual

21   objections on the portion that was provided to me.  The first

22   shows up on Page 9.  Here we have this question of Page 9 of

23   the transcript referring to Page 19 of the deposition.  We have

24   this back and forth about lack of foundation here.  I suppose

25   someone could have tied it down by saying, "Did you see them go

1    to the gym?  Did you see them play Xbox together?"

2              But is this really an issue, a foundational issue?

3              MS. FERRONE:  Your Honor, Ms. Kumiskali testified

4    earlier in her deposition she really was only there on the

5    weekends, so that is sort of why we thought that she really

6    didn't have the knowledge or that there was a foundation to

7    really say that she could speak to a relationship between my

8    client and Jahar.

9              THE COURT:  The basis of this question is not enough.

10   I am excluding it.  So, that excludes Lines 9 through --

11             MR. CAPIN:  Well, your Honor, if I may?

12             THE COURT:  All right.

13             MR. CAPIN:  If I understood the Court correctly, you

14   would consider as foundational material stuff that is, for

15   example, in a 302?

16             THE COURT:  I might, yes.

17             MR. CAPIN:  Well, in the 302, the very first interview

18   of Kumiskali, she says the following things:  She says that she

19   and Tsarnaev and Azamat were on a shared phone plan, which I

20   think he then says a --

21             THE COURT:  No, I am dealing with these specific

22   things.  If it is going to be a general relationship, that is

23   fine, but not for Xbox and the general relationship between

24   Tazhayakov and Tsarnaev being similar to Kadyrbayev.  So,

25   unless it is much more specific than that, I am not sure I want

1    to hear it.

2            MR. CAPIN:  Well, I mean, she says that she's aware

3    that they go to parties together, they play soccer together.

4            THE COURT:  "She's aware"?  What does that mean?  I

5    also am aware.  I would not be a particularly good witness on

6    this.

7            MR. CAPIN:  I understand the point, your Honor.

8            THE COURT:  So, we are excluding Lines 9 through Line

9    14.

10           Turning to the next page, which is Page 10, we are

11   dealing with the objection to on Page 21 -- here, I guess my

12   problem with this one is I do not know what else we have got

13   regarding her being present with Mr. Tazhayakov on April 15th.

14   Mr. Kadyrbayev and Adlet picked her up, but there is nothing

15   else that really ties to Mr. Tazhayakov.  So, I am going to

16   exclude all of that.  That is, all of Page 21 is excluded.

17   Actually, I think I am going to let Lines 1 through 3 come in.

18   It just ties in better with Page 24 there, and the transition

19   would be difficult, but just to show that she met with him that

20   day and she next saw him on Thursday, and around 2:00 may or

21   may not mean they knew something about what was going on.

22           So, the next set is starting at Page 16, going over to

23   17.  I am not sure I understand the defendant's response here.

24   "804(b)(3)"?  What does that mean?

25           MS. FERRONE:  Yes, your Honor.  804(b)(3) is an

1    exception to the hearsay rule, and it basically has two prongs

2    to it; that it is a statement by the declarant against the

3    declarant's interest, and that there is some staple of trust or

4    corroboration.

5         Here, your Honor, obviously the content of the

6    statement here is against Mr. Dias's (sic) interest, and the

7    reason --

8         THE COURT:  Well, but it is not *his* interest.  We are

9    concerned with Ms. Kumiskali's interest.

10        MS. FERRONE:  Well, but she is testifying about what

11   Mr. Dias said to her.

12        THE COURT:  I see.  Go ahead.

13        MS. FERRONE:  That's okay.  And when you have an

14   exception to the hearsay rule, the reason why we have

15   exceptions is because there are these telltale signs of

16   reliability.  Ms. Kumiskali was Dias's girlfriend since they

17   were, like, eight years old.  So, here this is a classic

18   example of where there's corroboration and a relationship of

19   trust, where the declarant is saying something that can be

20   relied upon because of who they are saying it to.  And I think

21   here 804(b)(3) is satisfied on both prongs.  It's obviously a

22   statement against Mr. Dias's interest, because he is talking

23   about fireworks and a backpack, and the person he is saying it

24   to is someone he has known since he was a kid and has dated

25   seriously for many years, supports the telltale signs of

1    reliability to warrant an exception to the hearsay rule.

2           THE COURT:  Well, I think I understand that.  I am not

3    sure why the defendant would want it in.

4           MS. FERRONE:  No, we are trying to -- yeah, we want it

5    in.  Without talking about my defense, we want it in.

6           THE COURT:  Which is another way of saying why does

7    the Government want it out?

8                      (Laughter)

9           MR. CAPIN:  Well, it may be a baby-bath water thing,

10   your Honor.  I guess there are two points with regard to this

11   passage.  First of all, if you look at Page 64 from Line 19 on,

12   those are not Mr. Kadyrbayev's words.

13          THE COURT:  Now I am focusing more specifically on

14   Ms. Kumiskali's present-sense impression when she heard the

15   words that Mr. Kadyrbayev was saying.  It suggests a

16   recognition, even by someone who is not a co-conspirator, of

17   the inculpatory character of the materials.

18          MR. CAPIN:  It does that, and I think the first few

19   lines serve that purpose, but everything beyond that is merely

20   hearsay by Ms. Kumiskali, not subject, certainly, to 804(b)(3).

21          THE COURT:  Well, but why isn't it inculpatory of at

22   least Mr. Kadyrbayev and, consequently, a statement against his

23   interests, and he is confronted with someone who is very upset

24   about this stuff, and she says he seems to be kind of unable to

25   understand what she's saying.  But I am not sure that this is

1    excludable on that ground.

2            MR. CAPIN:  Well, in essence, it is an adoptive

3    admission you are saying, so it is --

4            THE COURT:  No, I am not saying that at all.

5            MR. CAPIN:  I'm sorry, then I don't understand.

6            THE COURT:  I am not saying that at all.  I am saying

7    that she has this conversation with Kadyrbayev.  He says

8    something about fireworks in the backpack.  She decides to

9    speak in Russian, not in English, and that conversation focuses

10   on precisely the kind of evidence that the Government is going

11   to try and introduce in this case to show an awareness and an

12   act on the part of the defendant.

13           Apart from expressing my surprise at the respective

14   positions, and I read it twice to make sure that it was a

15   Government objection, not a defendant's objection, in this

16   posture I would let it come in.

17           MR. CAPIN:  I understand that.  And if I may explain,

18   because it may preview some of the argument you'll hear on

19   another example.

20           This same line of question and answer of Ms. Kumiskali

21   occurs later in the transcript, and at that point it appears --

22   it allows for an inference that it was Kumiskali and Kadyrbayev

23   who came up with the idea of tossing the backpack.  It is that

24   inference that is uncorroborated, and I think defense counsel

25   correctly points out that the case law under 804(b)(3) says

1    that it comes in, but there has to be corroboration on the

2    specific point.

3          THE COURT:  Well, but there is corroboration here,

4    isn't there?  He shows up and tells her he is taking a

5    backpack, and you have got evidence that the backpack was

6    taken.  So, there is corroboration with respect to this

7    particular one.

8          MR. CAPIN:  This particular statement.  I think you

9    will hear an objection from the Government later where there

10   are exchanges that suggest that she told him to get rid of the

11   backpack.  It was a conversation between the two of them, I

12   suspect we will hear from defense counsel at trial, exclusive

13   of the defendant in this case.

14         THE COURT:  Well, let me deal with them step by step.

15   As to this one, I am overruling the objection of the

16   Government.

17         Now I am turning to Page 21, which deals with Pages 74

18   through 75.  I am not sure I understand about the effect on the

19   listener, but isn't this a description of the circumstances in

20   the apartment during a relevant time, and is it admissible on

21   that basis?

22         MR. CAPIN:  The problem here is that, because this is

23   so out of context, I'm not sure what this tells the jury about.

24         THE COURT:  They know it is a very small apartment,

25   and that she hears doors opening, and she is spending time with

1     Mr. Kadyrbayev in the bedroom, with him being gone for some

2     period of time.  That is what she observed.

3              MR. CAPIN:  And we are talking, your Honor, about

4     Page 74, I take it?

5              THE COURT:  Yes, Page 74.  The first of these

6     objections.

7              MR. CAPIN:  Frankly, we withdraw that objection.

8              THE COURT:  So, that can be permitted.

9              MR. CAPIN:  It is the next one that is precisely the

10    point I made a moment ago, your Honor.

11             THE COURT:  So, here we are.  This is one I was kind

12    of surprised at.

13             "What, if anything, did he say to you?"

14             "He just said, like, no more backpack."

15             If you tie Mr. Kadyrbayev to Mr. Tazhayakov on that,

16    that is inculpatory on both of them.  I just do not see what

17    that -- "I just said, 'Where is it?'  And he said, 'Like, far

18    away.'" I don't understand --

19             MR. CAPIN:  We will withdraw that objection, your

20    Honor.

21             THE COURT:  So, that one can be included.  Now we get

22    to -

23             MR. CAPIN:  And I think, your Honor, if I may, because

24    the next objection was -- the Government objection assumed that

25    if what preceded came out, then it should be as well.

1          THE COURT:  So, this is withdrawn, I take it --

2          MR. CAPIN:  Yes.

3          THE COURT:  -- on the basis of the ruling that I just

4     made.

5          So, then we go to Page 26.

6          What is the Government's objection here?  I am not

7     even sure it is hearsay.

8          MR. CAPIN:  Well, it's hearsay and relevancy.  There

9     is a call to somebody named Vovka (ph) who we don't know from

10    any other context, and the witness relays, in essence, the

11    substance of the phone call.  That is Lines 19 through 21.

12    That is hearsay.

13         THE COURT:  Why isn't it notice?  They call Vovka.

14    Vovka says that there are police officers who wanted to talk.

15    I generally look at objections not as a take-home exam in

16    evidence, but why would anyone care?

17         MR. CAPIN:  Well, that's a separate question.

18         THE COURT:  Right.  Well, it is, but I ask it to

19    understand the lack of inculpatory quality, whether or not it

20    is hearsay.  What this appears to be, if I were parsing it

21    through, is to say Azamat learned that there were police

22    looking for him at that point.  Whether they were or not -- I

23    think I know, but the evidence will tie into that.

24         MR. CAPIN:  Well, it's certainly not relevant -- I am

25    not sure what fact at trial this tends to make more or less

1    likely, but at this point in the narrative the backpack has

2    been taken away, the crime is, in essence --

3              THE COURT:  You mean is the conspiracy over at this

4    point?

5              MR. CAPIN:  No, it's not.

6              THE COURT:  So, they are planning -- if the Government

7    were arguing this another way, they are in the process of

8    thinking how they deal with the various challenges they

9    confront by the advent of police officers.

10             MR. CAPIN:  We are going to withdraw that objection.

11             THE COURT:  All right.  Now, I am not sure why the

12   next two on 82 should be excluded.  She is asked to be more

13   specific.  She indicates shortcomings in her memory.  That

14   seems to me to be appropriate to understand what was said

15   earlier.  Again, I am not sure why what was said earlier helps

16   you, but that is your hunt, not mine.

17             MS. FERRONE:  One moment, your Honor.

18             THE COURT:  Sure.

19             MS. FERRONE:  I think we felt that this was hearsay

20   because Ms. Kumiskali is testifying to statements made by

21   others.  I apologize, your Honor.

22             THE COURT:  I will apply the long-standing principal

23   of sauce for the gander.  You have got this thing in over the

24   Government's now-withdrawn objection.  It seems to me it ought

25   to be understood fully.

1          MS. FERRONE:  I think what we really thought is that

2     this entire answer by Ms. Kumiskali is nonresponsive to the

3     question.  She is asked to tell exactly what was said and who

4     said it, and yet that's not what her response is.

5          THE COURT:  Well, she says it wasn't very clear, and

6     she doesn't know whether it was before the police or after the

7     conversation or what it is.  The jury will make of her memory

8     what they will, but this took place after they announced the

9     name that it was Dzhokhar.

10          MS. FERRONE:  Okay, yeah.  And then, just for the

11     record, I do think this is hearsay, because she is actually

12     asking what others said versus what she observed.  I think

13     that's a little bit different.

14          THE COURT:  The only reason what others said is

15     hearsay is if it is offered for the truth of the matter.  It is

16     not hearsay otherwise, and here it does not appear to be

17     offered for the truth of the matter, at least if I am to

18     understand your response to the Government's objection to the

19     previous one.

20          MS. FERRONE:  Okay.  Thank you.

21          THE COURT:  So, I think I am going to overrule, to the

22     degree that you continue to press them, the first two

23     objections on 82.

24          This is hard to follow.  If there were an objection

25     based on perplexity, then I would sustain it, because I am

1     perplexed.  This is her trying to talk about the conversation

2     that we got in here before, and perhaps adding some further

3     enlightenment, but probably not, but that is for the jury to

4     decide.  At least they should understand that when she says

5     something it may not be with the rigor of a biochemist.

6          But is there anything else?  So, I am overruling those

7     objections as well.

8          Then we get to the next page.  It says she is

9     describing a conversation with Mr. Kadyrbayev and

10    Mr. Tazhayakov that she observed or heard.  I do not know what

11    the objections could be here, now that we have got this thing

12    in.  So, I am going to overrule those objections, unless there

13    is some further argument to be made beyond this.

14         Then we get to Page 83.  I think that this goes beyond

15    what is before the jury in this.

16         MS. FERRONE:  Your Honor, may I be heard?

17         THE COURT:  Do not stand up.  I am about to sustain

18    your objection.

19         MS. FERRONE:  Oh, I'm sorry.  I apologize.  Sorry.

20         THE COURT:  This is saying that the conversation

21    between Azamat and Dias was about how they were going to

22    explain their actions concerning the backpack to the police,

23    and then brings Mr. Phillipos in for good measure.  But I do

24    not see this as anything other than the kind of leading

25    question that I would not otherwise permit.

1          Is there something more here?

2          MR. CAPIN:  No, your Honor.

3          THE COURT:  So, I am sustaining the objection to

4   Page 83, Lines 11 through 15.

5          THE COURT:  Then we go to Page 88.

6          These attestations or vouching or descriptions of

7   someone's religious beliefs, political beliefs, anti-American

8   beliefs, seem to me to be unballasted here.  They are the kinds

9   of opinion, observations that I would not let witnesses get

10  into without something more substantive.  So, I am going to

11  sustain this objection.

12         MS. FERRONE:  Two seconds to make the record?  I'm

13  sorry.

14         THE COURT:  Sure.

15         MS. FERRONE:  The reason why I think this is relevant

16  is that, your Honor, there's a lot of argument about knowledge

17  here and what my client's knowledge was, whether he had a

18  conversation with Jahar, and that shows his knowledge, and this

19  sort of -- this goes -- one of those things could be their

20  fate.  One of the things that supports their friendship was

21  maybe not whether or not they had a conversation about what

22  Jahar learned in Chemistry, but the fact that they didn't talk

23  about religion.

24         So, I actually think this does support the friendship

25  and --

1          THE COURT:  They did not talk about religion?  Here

2     the question is, "Would you describe Azamat as extremely

3     religious?"  "No."

4          MS. FERRONE:  I was actually reading a little bit past

5     that.  I'm sorry, your Honor.

6          THE COURT:  Well, "Did he ever discuss his political

7     beliefs with you?", that is, Ms. Kumiskali.  Apparently, he did

8     not care to engage in political discussion with Ms. Kumiskali.

9          But all of that is, it seems to me, not relevant in

10     any way, so I am sustaining that objection.

11          MS. FERRONE:  Okay.

12          THE COURT:  And we turn to Page 91, 31 of the

13     transcript.  I am not sure that smoking marijuana negates the

14     intent to obstruct.

15          MS. FERRONE:  Your Honor, this is something that I

16     would argue is relevant subject to connection.  And I am happy

17     to provide an *ex parte* offer of proof, but I think if I said

18     anything more I would be jeopardizing my client's --

19          THE COURT:  Maybe.  But if what you are saying -- even

20     I picked this one up -- if what you are saying is an argument

21     may be made that their concerns were over marijuana trafficking

22     or distribution or use with the backpack and that information,

23     I understand that.  But that they smoke a lot of dope --

24          MS. FERRONE:  Your Honor, I would ask that you reserve

25     ruling.  I don't know how you can really do that, but if I can

1    just make an *ex parte* -- it's really relevant subject to

2    connection.  It is.  There is something that is going to come

3    out in our case in chief that this completely corroborates.

4            THE COURT:  Well, I think I probably should take an

5    offer of proof on that, because I want the transcript to come

6    in in total, I do not want it to be bits and pieces.  So, maybe

7    an *ex parte* submission that just consists of a brief offer of

8    proof, so I understand more particularly than I think I did

9    what is going on.

10           That, I assume, deals with all of the objections on

11   Pages 92 -- well, on Page 31.  These are all marijuana

12   objections.

13           MS. FERRONE:  Yes.

14           THE COURT:  I am not ruling on that until I look at

15   that to see whether or not it is properly to be introduced.

16           MR. CAPIN:  And, your Honor, simply because we may not

17   have an opportunity to be heard after the *ex parte* -- after the

18   offer of proof, I think the Court has drawn, based on just what

19   we gather the defense may be, the right line, which is that, if

20   somehow the conduct, the obstructive conduct was more about

21   marijuana than about the bombing, then that sounds like a

22   legitimate defense.  On the other hand, to lard on just all of

23   this other stuff about the fact that they all, it seems like,

24   were smoking marijuana, if you look at the entire transcript,

25   you will see it's at the center of their social life.  It seems

1    like it's not probative of anything.

2            THE COURT:  I do not know.  That Ms. Kumiskali is

3    sufficiently familiar with their activities to know that they

4    engage in what -- well, maybe it was not illegal activity at

5    that point, was it?  I am trying to remember the timing.  I

6    guess --

7            MR. CAPIN:  It probably was not illegal.

8            THE COURT:  Right.

9            MR. CAPIN:  But this question would be, I mean, if

10   there was a suggestion that their social life was about

11   drinking to excess, to sort of besmirch --

12           THE COURT:  Well, I think I am sensitive to the

13   Government's concern --

14           MR. CAPIN:  Thank you.

15           THE COURT:  -- and if I think it has some weight, I

16   may just say, well, this will not be introduced during the

17   Government's case.  My hope was to do it in the Government's

18   case, but to the degree that the defendant wants to hold back

19   on something, then maybe I will do it that way to understand it

20   more fully.  But, in any event, I want to understand it, so you

21   will submit something *ex parte* on that.

22           I turn to 94, Page 32.

23           "To the best of your knowledge, during that time frame

24   Dias knew nothing about it, am I right?"

25           The "To the best of your knowledge" suggests lack of

1    knowledge, rather than anything else.  I am going to exclude

2    it.

3            There was once an Assistant United States Attorney,

4    who frequently, when confronted with a principle of law, would

5    respond by saying, "I know of no law to the contrary," which

6    was a commentary on his knowledge of the law, not the state of

7    the law, and that, I think, applies equally here.

8            So, I am going to exclude Lines 21 to 25.

9            On Page 35, Lines 23 and 24 of Page 99, I guess, I do

10   not know the Government's position.  Is this "Silver Blaze,"

11   the dog that did not bark?

12           MR. CAPIN:  If the objection is limited to Lines 23

13   and 24, then I, frankly, do not understand the objection.

14           THE COURT:  Nor do I.

15           MR. CAPIN:  She testified --

16           THE COURT:  But you say he was present for -- I should

17   not say, "Nor do I."  I do.  She says she doesn't know whether

18   the phone call occurred.  I do not know what the Government

19   wants to keep it in for.

20           MR. CAPIN:  I think the point is a fair one, your

21   Honor.

22           THE COURT:  So, we will take that out.

23           Then we get to Page 36.  I am not sure I understand

24   this objection.  She is there and appears to be making

25   percipient observations about texting.

1          What is the objection to this from the defense?  Here

2     the foundation and knowledge seems clear from the testimony.

3          MS. FERRONE:  I think a lack of foundation is just the

4     question itself.  "Then there came a time"?  I mean, it does

5     not really -- it is such an unclear question that it's not

6     certain what she's answering to.

7          THE COURT:  Well, no, I think it is fairly clear.

8     There were phone calls, and it was only her and Dias who were

9     present, and that carries over into the text-messaging.  I am

10    not sure it is inculpatory in any direct way of Mr. Tazhayakov.

11         MS. FERRONE:  If I could just add quickly, there is no

12    foundation that that's, "Well, he showed you his phone who he

13    was texting."  I mean, how does she know who he was texting?

14    How does she know that he texted Jahar?  The questions weren't

15    asked, "Did he have a discussion with you about who he sent a

16    text to?  Did he show you his phone?"  So, that's the lack of

17    foundation.

18         THE COURT:  Yes, there could be more, but it is enough

19    here to show that she was a percipient witness in this fashion.

20    So, I am overruling that objection.

21         Then we turn to -- I mean, what is the Government's

22    objection here, just that they should not sneak in diminished

23    capacity through marijuana use on the balcony?  It provides

24    color to Mr. Kadyrbayev's ruminative state at the time, that

25    "He goes out on the balcony, putting marijuana inside the pipe

1    at that time also, and so he was loading a bowl, a pipe,

2    loading the pipe."

3            It is quite dramatic.  I am not sure it is

4    objectionable.  So, what is the objection?  He also took his

5    shoes off when he loaded the pipe.

6            MR. CAPIN:  I don't see any slipper reference, there

7    isn't a collie in the image, but it is a relevancy objection,

8    your Honor.  I am not sure what fact --

9            THE COURT:  I do not know.  She is able to observe

10   this.  This tells us that she is a percipient witness with a

11   flare for drawing the scene, or the questioner is.

12           But, in any event, I do not see that it should be

13   excluded, so I am not going to, unless there is something more.

14           MR. CAPIN:  No, your Honor.  Although, I don't know if

15   we are limiting ourselves to the passage on 119.  I think the

16   Page on 120 is even less relevant.

17           THE COURT:  That she smoked the pipe can go to her

18   ability to perceive, and it seems to me, while a little

19   strained, I am not going to take it out, and, of course, she

20   made the observation that Azamat did not smoke the pipe.

21           MR. CAPIN:  Which is not relevant to any fact.

22           THE COURT:  Well, it is relevant to his knowledge and

23   ability to perceive the events at the time, and it goes to, for

24   instance, statements that he might have made.

25           MR. CAPIN:  Fair enough, your Honor.  Thank you.

1          THE COURT:  He was not a dope-smoker during this time

2     period.

3          So, I am overruling that objection on 120 as well.

4          Then we turn to the "showing about 3 to 4 inches."

5     This is on Page 45.  I guess this is an editing thing.  I do

6     not know.  The video is going to be shown to the jury, right?

7          MS. SIEGMANN:  Yes.

8          MR. CAPIN:  Yes.

9          THE COURT:  Apart from deposition technique,

10    Mr. Wooldridge, is there any reason why this needs to be

11    memorialized in the --

12          MR. WOOLDRIDGE:  No, your Honor.  We were just

13    discussing amongst counsel that if the video wasn't actually

14    shown, we would need that.

15          THE COURT:  Since it is going to be shown, then we

16    will just keep that out.

17          Then we go to this, I guess, again, perplexity as to

18    the objection.  Dias tells Ms. Kumiskali that the backpack

19    contained fireworks.  That is inculpatory, isn't it?  He told

20    her; he did not show her the backpack.

21          MR. CAPIN:  Understood, yes.

22          THE COURT:  So, unless there is something more, I am

23    going to overrule that objection.

24          MR. CAPIN:  Thank you, your Honor.

25          THE COURT:  Then, I do not know why I should exclude

1    this.  She says Azamat was not in the room when Dias said that

2    the backpack contained fireworks.  So, we did not hear it and

3    did not have an opportunity to say, "Oh, no it did not," or, "I

4    never saw it," or, "I had nothing to do with it."  So, I am

5    going to overrule that objection, too.

6           Then on Page 124, I do not know why I should keep that

7    out.

8           MR. CAPIN:  Well, it's certainly less relevant than

9    any other portion of the passage.

10          THE COURT:  But it indicates a concern about the

11   inculpatory nature, generally, of the backpack being there.

12   She is mad because her boyfriend is talking about this backpack

13   in this way that is likely to get them in trouble, at least

14   those two and, perhaps, as we now see, two others.  So, I do

15   not know why her response to that should be excluded over the

16   Government's objection.

17          MR. CAPIN:  The relevancy is the only point --

18          THE COURT:  I can see why the defendant might be

19   wanting to use it, to show distance between Mr. Tazhayakov and

20   Mr. Kadyrbayev in terms of knowledge and involvement and that

21   sort of thing.  So, I am overruling that objection.

22          This next set of objections is a little bit more

23   meaty.  We are on Page 47.  We are dealing with 127 through

24   130, or this portion of 130.

25          Certainly, Lines 8 through 10 should be out.  She did

1     not have a conversation with Azamat about that, and so the

2     question was never ratified.  It is irrelevant.  There is no

3     evidence of this.  So, 8 and 10 go out.  Then I go on to 14,

4     and now we are talking about Dias, and it is asking her about

5     the implications of the backpack.  That seems to me to come in.

6            Then we turn to a question that is asked of her, that

7     is on Line 2 of 128, that she rephrases, but it elicited an

8     answer that is responsive to the larger issue.  I am going to

9     let that come in.  And she ratifies that when she told Dias

10    about it he had not thought about it, and the answer to that

11    is, "Yes."  Now, whether believable or not is another matter,

12    but, in any event, that is the back and forth.

13           MR. CAPIN:  And I guess the one issue we have is with

14    that last exchange, which purports to be an exculpatory

15    statement by Kadyrbayev to --

16           THE COURT:  I think it is best characterized as a

17    mitigation of the exculpatory character of the exchange.  So,

18    if it is against interest, but not too much, I do not think

19    that that takes it out of 803(b)(4).

20           MR. CAPIN:  804(b)(3).

21           THE COURT:  Dyslexia attacks again.  But, in any

22    event, it does not take it out of it.  Maybe somebody could

23    argue he was too dumb to know what it meant and he needed his

24    girlfriend to tell him.  But what it does show is that there

25    was a discussion in which this defendant was on point, had been

1    directed to the dangers of this, and he nevertheless talked

2    thereafter to the agents during the course of the conspiracy.

3    So, I am not going to exclude that.

4           Then, I am not sure what the objection is here by the

5    Government, "here" meaning on Page 131 through 132.  It is not

6    really hearsay.  She told him to get rid of the backpack.  That

7    is a verbal act.

8           MR. CAPIN:  Fair enough, your Honor.  We withdraw

9    that.

10          THE COURT:  Then we go to the next, which is what

11   happened after she told him to do that, and he left the

12   bedroom.  I see a real problem here as Lines 4 through 8, which

13   is, again, she did not hear that.  It is argumentative.  I am

14   going to exclude it.  So, that is Lines 4 through 8 on Page

15   133.

16          Then we come to Page 58 of the transcript and Page 139

17   of the full transcript.  I do not know why this is not --

18          MS. FERRONE:  Your Honor, we withdraw that.

19          THE COURT:  All right.  Fine.

20          MR. CAPIN:  I'm sorry.  Just so we are following

21   along --

22          THE COURT:  We are on Page 50 of the redacted

23   transcript.

24          MR. CAPIN:  I thought so, your Honor.  Thank you, your

25   Honor.

1            THE COURT:  And it is Page 139 through 140.

2            Then we go to Page 51 of the redacted transcript.  I

3      think that is the remainder of that objection, so it stays in.

4            Then we go to Page 52, and we have got this "no more

5      backpack" discussion, which I have dealt with already, so I am

6      overruling that objection.

7            And the question is did he tell her what he did with

8      the backpack.  Now, I would permit or be prepared to exclude

9      from Page 143 Lines 12 through 14, which is simply that a

10     conversation did not take place.  That just seems to me to

11     be --

12            MS. FERRONE:  Page 142, your Honor?  I think you may

13     have misspoke and said "143."

14            THE COURT:  Oh, I am sorry.  142, Lines 12 through 14

15     can be taken out.

16            MS. FERRONE:  Thank you.  12 through what?  I'm sorry.

17            THE COURT:  Lines 12 through 14.

18            MS. FERRONE:  Thank you, your Honor.

19                          (Pause)

20            THE COURT:  I think I am going to let this in, that

21     is, 143.

22            MR. CAPIN:  143 is out, your Honor?

23            THE COURT:  No, it is in.

24            MR. CAPIN:  For the same reason the Court excluded on

25     Page 142, 12 through 14, shouldn't, at a minimum, 143, Lines 6

1   and 7 be out?

2        THE COURT:  No, because here I think it is important

3   that she is asked specifically if she asked him if anybody went

4   with him, to set up the degree of the communication.  It is

5   tight enough that it seems to me to be permitted here, so I am

6   going to let it stay in.  So, I am overruling that.

7        Then, the rest of this stuff, it seems to me, is not

8   really relevant.  I should not say "the rest of this stuff."  I

9   am on Page 56.  But whether they were in handcuffs, or, more

10  accurately, whether she was in handcuffs or not in handcuffs

11  seems to me to be immaterial for this defendant, unless there

12  is something else here I am missing.  But not hearing that I

13  am, I am going to exclude it.

14       Back to Page 153.  That is focused on her, and that is

15  not relevant here, so I am going to exclude that.

16       MS. FERRONE:  Your Honor, just respectfully --

17       THE COURT:  Sure.

18       MS. FERRONE:  -- the reason why we think this is

19  relevant is for a couple of reasons.  My client, Ms. Kumiskali

20  and Mr. Kadyrbayev were all arrested at the same exact time,

21  they were ordered out of the house at the same exact time, they

22  were ordered out by the same agents, they were taken to the

23  same place, they were interviewed at the same time, the agents

24  were going in and out of the same rooms talking to each other.

25  We have seen video.  So, just to the extent that her

1     questioning is relative to the treatment of my client, I do

2     think it has some relevance.  Thank you.

3          THE COURT:  I will think about letting it come back in

4     at a later point, if it does become relevant, but I do not

5     think that the way in which another potential subject of the

6     investigation was treated is sufficiently related to the issues

7     that are going to be before the jury here.

8          So, I am going to exclude it, subject, obviously, to

9     revisiting if it becomes somehow relevant or somehow disputed

10    that the defendant, this defendant, Mr. Tazhayakov, was treated

11    in the way that he was treated, and that the time that was

12    involved was the time that was involved.  I do not think it is

13    in dispute about how much time was taken, within ranges, that

14    he was without a shirt, and that I think, if I remember

15    correctly, he only had a glass of water.  So, it does not prove

16    anything here.

17         That the agents had phones and they could have used

18    them is certainly interesting but I think not relevant, so I am

19    keeping all of that out.  That is 155, 156, 157.  156 and 157,

20    again, deals with the experience of Ms. Kumiskali, not the

21    defendant himself.

22         MS. FERRONE:  Your Honor, I apologize for

23    interrupting.

24         THE COURT:  Sure.

25         MS. FERRONE:  Page 157 doesn't really deal with the

1    phones.  It sort of just kind of connects to my earlier

2    argument about that perhaps you could revisit it if it becomes

3    relevant about the treatment and statements that were made and

4    not made.

5            THE COURT:  It is not just treatment.  Sure, I will

6    think about it, although right now perhaps it is a limit of

7    imagination, but I cannot imagine how it would be relevant at

8    any point.

9            As to the phones, that is relevant only if they asked

10   if they could use the phone, or asked if they could call a

11   lawyer, which, apparently, the state of the evidence as I now

12   know it, they did not.

13           MS. FERRONE:  Okay.  Thank you, your Honor.  Just 157

14   was the one part.

15           THE COURT:  So, that takes us all the way through, I

16   think, to 174, but, in any event, through -- well, up to Page

17   175.

18           MR. CAPIN:  And, your Honor, if I may, and this may

19   just be a preview of a motion we are going to be filing, but I

20   think that some of the context ended up on the cutting room

21   floor, but the phones in the deposition, if memory serves, the

22   significance of the phones wasn't to make a phone call, but the

23   suggestion was that the interview could have been recorded, and

24   we will be moving *in limine* on whether Government witnesses can

25   be confronted with the recent change, prospective change in FBI

1    policy as regards to recording interviews.

2          THE COURT:  All of this, irrespective of what I say,

3    the policy was not -- how I deal with it -- the policy was not

4    then applicable.  I will, of course, permit the defendants to

5    inquire whether or not they recorded it at that time and the

6    reasons for not doing so.  But I think it is a subsequent

7    remedial action, frankly, to change the policy, at least in a

8    discretionary way.  But I will look at this when it pops up.

9          MR. CAPIN:  Fair enough.  So, we will address it then.

10         THE COURT:  Right, it has got to be raised.  If you

11   want to keep out the new policy, you have got to raise it, and

12   I will rule on it when I have seen it in full context.

13         MR. CAPIN:  Understood.

14         THE COURT:  They will get to ask, "Did you do it?"

15   "You could have done it?"  "You didn't do it?"

16         MR. MYERS:  Just so we are all on the same page and we

17   are all thinking on that note, even after their motion *in*

18   *limine*, you would then prevent the officers from giving their

19   reasons why they didn't, "well, according to our policy 1051 we

20   don't have to do this or that," because that would open the

21   door to me saying, Okay --

22         THE COURT:  It would not open the door, no.  I am

23   going to deal with it in the motion *in limine*.  If the motion

24   *in limine* -- if you can properly introduce this what I have

25   referred to by way of attenuated analogy as a subsequent

1    remedial measure, which is generally not admissible in a civil

2    case, it means that they can have testimony, you can have

3    testimony about what the circumstances were then, but not what

4    the change was, and you can inquire, "Did you have a cell

5    phone?"  "You could have made a recording of this?"  It does

6    not take rocket science to do that.  You will be permitted to

7    do that, but not to say, "And then the Bureau changed their

8    view about this?"  That I have to see in context.

9             Does that clarify it sufficiently for you?

10             MR. MYERS:  The sidewalk cannot be brought up as being

11    fixed?

12             THE COURT:  Right.  That is exactly right.

13             MR. CAPIN:  Well, except, since we have the Court's

14    attention, the sidewalk in this case is a different sidewalk,

15    because even under the new policy, at least our view is that

16    this would not be a presumptive situation.

17             THE COURT:  Look it; the Bureau has gotten itself into

18    this position by its refusal for a long, long time to record

19    when they could have and when other progressive

20    state-of-the-art law enforcement agencies were doing that.

21    They are stuck with that, and I will permit inquiry.  Whether I

22    will permit inquiry to say that they had an agonizing

23    reappraisal and provided for some highly discretionary means of

24    changing that policy, I think I will not, but I will not make a

25    determination about that until I see your motion *in limine*.

1          MR. CAPIN:  Thank you.

2          THE COURT:  But this is fair game.  They are, after

3     all, in a facility that does it all the time.

4          I see the Government's objection to 175, but, again, I

5     am overruling it.  I am not sure why it is meaningful or why

6     the Government is making it, except to distinguish or not to

7     permit the distinction that is being made or will be made

8     between Mr. Kadyrbayev and Mr. Tazhayakov, but I overrule that

9     objection.

10          Turning to Page 62, I guess she can speak for herself

11     on that, but if she is speaking just for herself about this

12     being the first time, then it is irrelevant.  The question is

13     whether or not it was all of them, everyone present.

14          MS. FERRONE:  Well, your Honor, if I may, 8 through 12

15     establishes that they were all together when they first turned

16     on the news.

17          THE COURT:  Yes, but if somebody is watching the news

18     before, if they are watching the Internet through the night,

19     then I have reason to believe that this was no big surprise to

20     Mr. Tazhayakov.

21          MS. FERRONE:  Except for the fact that the question is

22     very specific about 6:00 a.m., and that's when the parties

23     stipulated that Jahar was publicly identified by name.

24          THE COURT:  Right, but that is not in dispute.

25          MS. FERRONE:  Okay.

1       THE COURT:  8 through 12 is not in dispute, as I

2   understand it.  13 through 23 is, and that, it seems to me, is

3   not something that she can testify to, that is shock, except as

4   to her own shock, and her own shock is irrelevant.  So, I am

5   going to sustain that objection.

6       Then we are over on Page 64.  This is the

7   circumstances of Ms. Kumiskali's interrogation.  I think it is

8   irrelevant, because it is not tied directly to her observation

9   of the examination of Mr. Tazhayakov.  So, that, it seems to

10  me, is out.

11      That the agent was pushy with her is kind of

12  interesting but not so interesting as to be relevant for the

13  jury.

14      So, I think that takes it through -- that is 66,

15  Page 66.

16      Then we come to -- I am going to sustain the objection

17  on Page 68.

18      MS. FERRONE:  Your Honor, sorry.  I know they have a

19  hearsay objection, but this is not being offered for the truth.

20  This is classic non-hearsay.

21      THE COURT:  But of course it is being offered for the

22  truth.

23      MS. FERRONE:  No.  It's really being offered to show

24  the effect on the listener, not that Dias actually --

25      THE COURT:  What listener?

1          MS. FERRONE:  Well, it's a discussion between Bayan

2    and Dias.

3          THE COURT:  Right, and Dias says, "Oh, my God, I never

4    thought of it that way."

5          MS. FERRONE:  And she says, "Correct."

6          THE COURT:  That is not inculpatory, so I do not see

7    this getting in.  I guess it is Mr. Stahl's punt on this one,

8    but I do not see it getting in.

9          MS. FERRONE:  Just so I fully understand -- I

10   apologize, your Honor, and I'll be really quick -- but it's an

11   affirmative.  It's not the dog not barking.  It says, "Dias

12   says something to the effect, like, 'Oh, my God, I never

13   thought of it that way.'"

14         THE COURT:  Is that inculpatory?

15         MS. FERRONE:  I think that it is, your Honor.  He is

16   saying --

17         THE COURT:  It is inculpatory?  Well, I do not think

18   so.  So, that is wrong.

19         Now we get to the question of effect on the listener.

20         MS. FERRONE:  I'm sorry to interrupt, your Honor, but

21   it goes to intent.  Of course it's inculpatory, right?  It goes

22   to what he was thinking at the time he took it.

23         THE COURT:  That is not inculpatory.  He had no

24   intent.  "I never thought of it that way.  Who knew?  That

25   would be wrong, that's for sure."  Those are all answers that

1   are not quite inculpatory.

2          MS. FERRONE:  Not the, "Oh, my God"?  That doesn't

3   enhance it?

4          THE COURT:  No.  The deity is not particularly helpful

5   on this point.

6          MS. FERRONE:  Okay.  Thank you for letting me speak,

7   your Honor.

8          THE COURT:  So, I am excluding that.

9          Then we come to -- I guess, threading through this,

10  this is an admission on the part of -- I am now talking about

11  Page 70 -- on the part of Mr. Tazhayakov, because ultimately he

12  says he is sorry, indicating that he had misled Agent Walker.

13         MS. FERRONE:  The issue is that the Government doesn't

14  overcome the double hearsay.  Bayan is not a party to this

15  conversation, so she is not --

16         THE COURT:  I thought she was.

17         MS. FERRONE:  No, she absolutely was not.

18         THE COURT:  I thought she observed this.  She says

19  when he came in, that is, Agent Walker came in, "and I was just

20  sitting next to Aza when we were all sitting, and I just like

21  he said like to Aza like, hey, like why didn't you tell me

22  earlier that a dumpster car came to pick up, or why did I have

23  to like go and like check out the whole trash before like if

24  you didn't tell me that you already saw how the dumpster took,

25  like, trash from the dumpster -- the trash car, that's what."

1           Now, this is a little bit like waiting for McDough

2    (ph) in terms of staging, but when we get to the end, she is

3    asked, "Did Azamat respond?"  And she says, "Yeah.  He was,

4    like, 'Oh, I'm sorry,' because he was.  I, like -- that's why,

5    like, John Walker, like -- that's why my car smell like trash."

6           That seems to me to be, once you thread your way

7    through it --

8           MS. FERRONE:  So, assuming it's single hearsay, I

9    don't see how this is an admission.  To me it's, you know,

10   someone asking about why they didn't allow someone to let their

11   car smell like trash, isn't something that somebody would

12   respond to --

13          THE COURT:  No.  The question was, "Why didn't you

14   tell me you took it to the dumpster, took the backpack to the

15   dumpster?"

16          MS. FERRONE:  And she says, "Yeah.  He was, like, 'Oh,

17   I'm sorry.'"  So, she's not even sure what he said.

18          THE COURT:  No.  He says he is sorry that he wasn't

19   more candid, or at least that is an argument that can be made.

20   That is a reading that can be made, I think, of his encounter

21   with Agent Walker.

22          So, I am going to permit that to come in, and,

23   similarly, Page 305.  There are two objections there.

24          When I get to 315, the jury is simply going to have to

25   thread its way through Ms. Kumiskali's form of speaking, but I

1    think I will exclude -- no, I am not going to exclude any of

2    this, because it ends up with him, that is, Ms. Kumiskali

3    affirming that Azamat did say something about the backpack in

4    the dumpster that day.

5              MS. FERRONE:  Your Honor, on Page 71, Page 305 Lines 7

6    to 10 or even later, I don't see how that is an admission or

7    adoptive admission.  Agent Walker is just asking why Azamat

8    didn't say that the dumpster had been emptied.

9              THE COURT:  This is providing context for this

10   encounter, which is somewhat oblique, as described, but once

11   you sort through it, it is Mr. Tazhayakov saying something

12   about the dumpster in response to Agent Walker's expression of

13   disappointment with his lack of candor earlier.  I agree that

14   it is not easily deconstructed as a literary piece, but the

15   thrust of it I think is there.

16             So, I am overruling those objections.

17             So, I think I have dealt with all the objections with

18   respect to Ms. Kumiskali's video.

19             MR. WOOLDRIDGE:  I would just say one thing, your

20   Honor.

21             THE COURT:  Sure.

22             MR. WOOLDRIDGE:  At least on Page 316, Line 8, and

23   this is kind of a similar issue we raised earlier about

24   Kumiskali answering, "I don't know," and that's essentially her

25   answer to the question posed on Line 8.

1          THE COURT:  No, it is not.  It is, "I think he did."

2     Someone was trying to put words in her mouth that Azamat never

3     said anything about the backpack in the dumpster that day,

4     question.  Answer, first part of it, first sentence: "I think

5     he did."

6          MR. WOOLDRIDGE:  But then it's, "I don't remember."

7          THE COURT:  "Like I just said it, like, no one asked

8     me.  I don't know even why I set it out, but, yes, that's when

9     I -- the first time I found out about the backpack was actually

10     in the garbage, because of the encounter between Agent Walker

11     and Mr. Tazhayakov at the couch."

12          So, it will present a challenge for those who are not

13     familiar with this way of answering questions, but I can see it

14     as sufficient to permit it to be presented to the jury.  You

15     will argue to the jury, or may argue to the jury, "Who knows

16     what she was saying and what she thought?"  But that is what

17     trials are about.

18          So, now, to the question of the questionnaires,

19     because I think you are going to be busy this evening, do you

20     want me to go down the list of -- you are going to have to take

21     it down here.

22          MR. CAPIN:  Yes, thank you.

23          THE COURT:  But I will go through the list of ones

24     that the Jury Clerks kind of looked at and said might be

25     problematic.  This is not a finding, it is nothing like that,

1    but it may cause you to look more carefully at these, at least

2    for purposes of evaluation and analysis.

3              Juror No. 2, Juror No. 3, Juror No. 5, Juror No. 6,

4    Juror No. 15, Juror No. 19, Juror No. 21, Juror No. 23,

5    Juror No. 26.

6              And I want to emphasize that the focus on these has

7    really been Questions 15 and 44 and 46, but there may be other

8    problems in there.  I found other problems when I was looking

9    through them very quickly.

10             I said No. 26.  The next one is 27, the next one is

11   30, the next one is 31.

12             And I will just say with respect to 31, the Jury

13   Clerks, without asking any question of this one, perceived a

14   language problem, because you will find, I think, on this one

15   that the juror simply answered her name and age and address and

16   answered no other questions and left the room with that, which

17   suggests to me that perhaps this is not someone you will want

18   to have on the jury.

19             No. 32, No. 36, No. 38, No. 41, No. 45, No. 52,

20   No. 55, No. 58, No. 62, No. 65, No. 67, No. 69, No. 70, No. 72,

21   No. 73, No. 75, No. 76, No. 78, No. 80, No. 83, No. 85, No. 86,

22   No. 89, No. 98, No. 99, No. 100, No. 102, No. 103, No. 104,

23   No. 109, No. 110, No. 111, No. 112, No. 114, No. 117, No. 118,

24   No. 119, No. 120, No. 121, No. 123, No. 125, No. 126, No. 127,

25   No. 133, No. 135, No. 139, No. 146, No. 147, No. 150, No. 151,

1    No. 153, No. 155, No. 156, No. 157, No. 158, No. 159, No. 160,

2    No. 164, No. 165, No. 166, No. 167, No. 168, No. 172, No. 173,

3    No. 175, No. 178, No. 179, No. 182, No. 183, No. 184, No. 186,

4    No. 188, No. 190, No. 191, No. 195, No. 198, No. 203, No. 205,

5    No. 209, No. 210 -- excuse me -- No. 211, No. 212.

6              MR. WOOLDRIDGE:  Excuse me, your Honor.  Real quick.

7    So, 210 is a number?  I wasn't sure when you said, "Excuse me."

8              THE COURT:  Yes, 210 is a number.

9              Then, the next one is 211, and the one before that

10   would have been 209.

11             MR. WOOLDRIDGE:  Okay.  Thank you, your Honor.

12             THE COURT:  Then we are at 213, 214, 221, 224, 225,

13   226, 227, 229, 230, 231, 233, 234, 235, 237, 240, 242, 243.

14             So, those are the ones that were kind of culled out.

15   You may find them to be problematic yourselves, you may not.

16   But my encouragement is to get down to a manageable number of

17   jurors that do not present, perhaps on their face, some

18   problems that would require overly extended voir dire to get to

19   the bottom of it, but, rather, people who are likely to be

20   potential jurors but we need to know a little bit more about.

21   So, I will look to you to do that.

22             Now, I would suggest we get together at 11:00 tomorrow

23   morning.  I would hope by that time that you have got a list of

24   your own that is shared then, and then if there are disputed

25   ones, one side says, "Gee, we would like to have this person

1    excused for cause," and the other side says, "No," then I will

2    look at them from that perspective on the face of these.

3          What will happen is, when we excuse them they will be

4    told not to report on Wednesday.  On Wednesday we are going to

5    be spending the day in some form of individual voir dire with

6    each of these people.  I will ask all of them at least one

7    question of some sort.  But you will get to see them in the

8    Court, you will get to examine their demeanor and that sort of

9    thing.  That is part of the process.  It may be relatively

10   quick for a number of them.

11         I have in mind Ms. Ferrone's concern about what did

12   they say see, what kind of publicity have they been exposed to,

13   and I will ask that question.  But they are here, having said

14   that whatever they saw they are able to put it behind them, but

15   this will be kind of a safety net, at least on that, for, "Are

16   you sure that you can put that beside you," depending on what

17   they say about how much.

18         I am told, I have not seen it yet, that at least one

19   juror said that as soon as she learned that -- or he; I am not

20   sure gender -- that they were a juror, they took it upon

21   themselves to spend an extended period of time on the Internet

22   to prepare themselves for their jury service.  I suspect that

23   that is not somebody that either one of you is going to want to

24   have on the jury.  I think it is admirable that someone wants

25   to do homework before the test, but it poses some problems.

1    So, you will see all of the usual stuff that you see

2    when people talk candidly here.  But I really want to get

3    this -- I told the Jury Clerks, "Give me a broad cross-section

4    on those questions," and they did.  I am certain that there are

5    other questions.  I did, having asked the question about the

6    inquiry about Muslim there were some responses to that that

7    suggests that people would have predispositions there.  So, you

8    will look at those as well.

9    So, be back here at 11:00.  I hope that you will have

10   a pretty good understanding of what you are going to do.

11       MS. SIEGMANN:  Are we coming back here at 8:30?

12       THE COURT:  We will be doing the same thing we did

13   downstairs today tomorrow at about 9:00.  I do not think there

14   is a reason to come up here.  The Marshals can take

15   Mr. Tazhayakov to that holding area down there, and then

16   counsel can show up there.  I think what I will do is, I will

17   just have Mr. McAlear call Mr. Lovett, he will call you, and

18   then you can get Mr. Tazhayakov to that location.

19       You can do it from the basement too, can't you?

20       THE MARSHAL:  Yes, your Honor, no issues.

21       THE COURT:  Okay.

22       MR. CAPIN:  So, straight to the second floor at 11:00

23   or here at 11:00?

24       THE COURT:  No, no.  At 9:00 on the second floor to

25   hear more or less the same thing I said today.

1       MR. CAPIN:  And at 11:00, your Honor, would you like

2   the parties to give you something in writing in the nature of a

3   joint -- a combined list of --

4       THE COURT:  I would hope that you would, yes.  I would

5   hope you would, and also identify the ones that you could not

6   be sure about, and then I will probably spend some time looking

7   at them shrunk down to say, "I am not going to bring these

8   people in or this person in," or at least I will tell you and

9   you can try to argue me out of it, so there may be an

10  additional wait.

11      MS. SIEGMANN:  If the parties were to meet after the

12  9:00, would it have to be in writing, or is it something orally

13  that we can --

14      THE COURT:  I would like it to be in writing, but I

15  can take even modern handwriting.

16      MS. SIEGMANN:  We can send an email.  Would that be

17  sufficient?

18      THE COURT:  Sure.  Just something I have got that you

19  both have shared with each other and agreed upon, so we can get

20  through at least some of them.  I think that it is unlikely

21  that I will second-guess the ones that you agree upon.  I will

22  inquire about the ones that you do not agree upon, if there are

23  ones that you do not agree upon, and I probably will take a

24  second look at the people that remain at the end, just to see

25  if I view them as problematic.

1    If I do view them as problematic, we will have a

2    discussion late in the day about that so you know what I am

3    thinking and you can argue me out of it, if you disagree there,

4    on reflection.

5         MR. CAPIN:  Thank you.

6         THE COURT:  But I am trying to think of in the past

7    the kind of number of people that I have been able to work my

8    way through in criminal cases in which I have done individual

9    voir dire in this fashion, and I think I have done 60 or 70 in

10   a day there, without stinting in any way on developing the

11   information.  It is, I recall, quite tiring for me, because I

12   am doing all the work, and, of course, I will ask you if there

13   are some questions that you want *me* to put to the jury with

14   each of the jurors.

15        MR. CAPIN:  Can you remind us -- I think you are

16   sitting six alternates; is that correct?

17        THE COURT:  I am going to try and do six alternates.

18   I have thought about this a bit and I will see what we end up

19   with.  In theory, if we get 40 jurors or potential jurors, that

20   is enough, because if you use all of your peremptories, both as

21   to the jury itself and to the alternates, then that is enough

22   to yield us 18.  It could yield us more, but it is enough to

23   give us 18, that is, if you cross or you decide that you do not

24   want to exercise your peremptories or something like that.

25        So, if I get a yield of 40 or something like that,

1    that survive cause charge or cause challenge, then I am ready

2    to go on peremptories, in theory.  I might want a few more.  I

3    have thought about that we are going to have the holiday

4    weekend in which people may reconsider what they said and want

5    to bring to our attention newly discovered insights about

6    themselves, so I might have a few more.

7         I do not generally tell people that they are the

8    alternates.  They may be able to figure it out, but I do not

9    tell them that they are the alternates, and they will not see

10   it, because I think the preemptory challenges will probably

11   take place out of their presence, that we will go through all

12   these people.  I want to spend the least amount of time with

13   them that I can and send them on their way.

14        You will have the list, here these people are.  Then

15   we will go through the preemptory challenge but without them

16   being present in the room.

17        MR. CAPIN:  And what does the number of alternates do

18   to the number of peremptories?

19        THE COURT:  With six it goes to three, three each.

20        MR. CAPIN:  Thank you.

21        THE COURT:  And that is what I am going to be shooting

22   for.  It is a three-week trial.  Sometimes jurors are bored by

23   trials.  This will not be a boring trial for the jurors, and so

24   I do not think when we get people we are going to be seeing

25   people ask to leave.  That is the principal concern about

1    alternates.  But I do not want to have a three-week trial or

2    two-week trial, which is what I think this is going to be, and

3    have at the end not enough jurors to decide the case.

4            Mr. Myers?

5            MR. MYERS:  Let's see.  I'm just kind of figuring out

6    the math here.

7            THE COURT:  10 for you on the main --

8            MR. MYERS:  And they get 6?

9            THE COURT:  And they get 6.

10           MR. MYERS:  And that's 16, and we get 3 each for the

11   alternates?

12           THE COURT:  Right.

13           MR. MYERS:  Adding that all up, 16, 19, that's 22.

14           THE COURT:  Yes.

15           MR. MYERS:  And we need 18 people.

16           THE COURT:  Yes.  Subtract that from 40, and you have

17   got 18.

18           MR. MYERS:  I'm just questioning the 40, as opposed

19   to, say, 50 or 60.

20           THE COURT:  40 is the minimum model to get 18, right?

21   22 --

22           MR. MYERS:  I get the numbers, but I'm just saying if

23   we have problems with just four jurors, by my calculation, just

24   through something that happens, then all of a sudden we have

25   got to pull in a whole new panel.

1          THE COURT:  No.  The way in which it would work is, if

2     we had 40 that make it through cause challenge, then if you use

3     your peremptories, all of your peremptories, we are going to

4     end up with 18 people who are the jurors:  12 regular jurors, 6

5     alternate jurors.

6          Lurking in the back of my mind is a concern that I

7     might have someone who over the weekend thinks about it and

8     decides that they now remember that they had a close friend who

9     was badly injured in the bombing or something.  Then, I would

10    have to knock them off.  But with 6 alternates, I do not see

11    that I have got that much of a problem with it.  But I will be

12    a little bit loose on that.  I will not go "Bingo" as soon as I

13    hit 40, I do not think.

14          I want to be sure that the perplexity has not spread.

15          MR. MYERS:  I understand one hundred percent.  I just

16    always have a perplexed look on my face.

17                    (Laughter)

18          THE COURT:  Then, that is how I will respond to the

19    look, which is, I will wait until you stand up and say, "No, we

20    cannot do that."  But I think it works here.

21          All right.  So, I will see you tomorrow morning when I

22    enter the Jury Room.  Then we will go through the same drill.

23          MR. CAPIN:  Thank you, your Honor.

24          MS. FERRONE:  Thank you, your Honor.

25          MR. MYERS:  Thank you, your Honor.

1            THE CLERK:  All rise.

2        (The Honorable Court exited the courtroom at 5:22 p.m.)

3         (WHEREUPON, the proceedings adjourned at 5:22 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          C E R T I F I C A T E

3

4

5            I, Brenda K. Hancock, RMR, CRR and Official Reporter

6    of the United States District Court, do hereby certify that the

7    foregoing transcript constitutes, to the best of my skill and

8    ability, a true and accurate transcription of my stenotype

9    notes taken in the matter of *United States v. Tazhayakov*,  No.

10   1:13-cr-10238-DPW-2.

11

12

13

14

15   Date:  August 25, 2014          s/ *Brenda K. Hancock*
                                     Brenda K. Hancock, RMR, CRR
16                                   Official Court Reporter

17

18

19

20

21

22

23

24

25